**UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WASHINGTON
AT SEATTLE**

World Association of Icehockey Players
Unions North America Division, et al.,

               Plaintiffs,

    v.

National Hockey League, et al.,

               Defendants.

**Case No. 2:24-CV-2135-TL**

**PLAINTIFFS' CONSOLIDATED
MEMORANDUM OF LAW IN
OPPOSITION TO CHL AND NHL
DEFENDANTS' MOTIONS TO DISMISS**

**TABLE OF CONTENTS**

INTRODUCTION ........................................................................................................1

I.   THE PARTIES.................................................................................................5

     A.    Plaintiffs ................................................................................................5

     **1.   WAIPU Plaintiffs .............................................................................5**

     **2.   Individual Plaintiffs.........................................................................6**

     B.    Defendants ............................................................................................8

     **1.   The Major Junior Defendants .........................................................8**

           i.    The CHL .......................................................................................8

           ii.   The Major Junior Leagues and their Clubs................................8

     **2.   The NHL.............................................................................................9**

II.  THE UNLAWFUL SCHEME ......................................................................10

COMMON CHL/NHL ARGUMENTS...................................................................15

III. THE COURT HAS JURISDICTION OVER ALL DEFENDANTS ..............15

     A.    The Court May Exercise Personal Jurisdiction Over the QMJHL Defendants .....17

     **1.   The QMJHL Clubs Purposefully Directed their Activities at the United States.17**

     **2.   The Claims Arises Out of or Relate to the QMJHL's Clubs' Forum-Related Activities....................................................................20**

     **3.   The Exercise of Jurisdiction is Reasonable .............................21**

     B.    The OHL Non-Corporate Defendants are Subject to Personal Jurisdiction ..........22

     **1.   Clayton Act Jurisdiction...............................................................23**

     **2.   Rule 4(k)(2) Jurisdiction...............................................................24**

     **3.   Erie and Saginaw have minimum contacts with Washington .............................24**

     C.    The NHL is subject to personal jurisdiction .........................................24

     **1.   Clayton Act Jurisdiction...............................................................24**

     **2.   Long-Arm Jurisdiction...................................................................25**

           i.    The NHL purposefully availed itself of the laws of, and directed its conduct at, Washington ...................................................................25

           ii.   The claims arise out of or relate to the NHL's contacts with Washington ...........26

           iii.  The NHL has failed to meet its burden of showing the exercise of personal jurisdiction would be unreasonable ...............................26

Pls.' Consol. Opp'n to Defs.' Mots. to Dismiss - i
Case No. 2:24-CV-2135-TL

ZELLE LLP
1774 Pennsylvania Avenue NW, Suite 375
Washington, DC 20006 Zelle Law

IV.     NEITHER THE FTAIA NOR PRINCIPLES OF COMITY BARS PLAINTIFFS'
CLAIMS .....................................................................................................................28

      A.       Legal Principles Applicable to Rule 12(b)(6) Motions..........................28

      B.       Defendants' Motion is Premature ........................................................28

      C.       The FTAIA Does Not Immunize Defendants.......................................30

      **1.     The FTAIA Does Not Apply to Claims Involving Markets that Include the
United States....................................................................................................30**

      **2.     Plaintiffs Meet the FTAIA's Domestic Effects Exception .......................34**

      D.       Comity Principles Provide No Basis for Dismissal ............................35

THE NHL'S STANDING AND LABOR EXEMPTION ARGUMENTS ..................................37

V.      PLAINTIFFS GOULD AND DILAURA HAVE STANDING .........................37

      A.       Gould and DiLaura Have Article III Standing.....................................37

      B.       Gould and DiLaura Have Antitrust Standing........................................39

VI.     THE NON-STATUTORY LABOR EXEMPTION DOES NOT PROTECT THE NHL .40

      A.       The NHL's collective bargaining agreement with the labor union representing its
players is not properly before this Court on the NHL's motion to dismiss. ..........41

      B.       Even if the NHL's collective bargaining agreement were properly considered on a
motion to dismiss, the labor exemption would not apply. .....................................44

      C.       The non-statutory labor exemption does not shield the return requirement for
Players signed but not retained by the NHL, nor any other provision of the NHL-
CHL Agreement....................................................................................................45

      **1.     Because the NHLPA does not represent Major Junior League Players, who are
not employed by the NHL, the restraints fail to meet the first and second *Mackey*
factors...............................................................................................................46**

      **2.     Defendants cannot establish that the challenged restraints resulted from bona
fide arm's-length bargaining, so the third *Mackey* factor also is not satisfied. .........49**

CONCLUSION.........................................................................................................52

**TABLE OF AUTHORITIES**

*Action Embroidery Corp. v. Atlantic Embroidery, Inc.,*
  368 F.3d 1174 (9th Cir. 2004) ........................................................................... 15, 16

*Adan v. Swedish Health Services,*
  No. 2:23-cv-01266-TL, 2024 WL 2398208 (W.D. Wash. May 23, 2024) ........................... 37

*Allen Bradley Co. v. Local Union No. 3, IBEW,*
  325 U.S. 797 (1945) .......................................................................................... 40, 45

*Am. Copper & Brass, Inc. v. Donald Boliden AB,*
  No. 04-CV-2771, 2006 WL 8434907 (W.D. Tenn. Mar. 27, 2006) .................................. 32

*In re Animation Workers Antitrust Litig.,*
  123 F. Supp. 3d 1175 (N.D. Cal. 2015) ...................................................................... 13

*Arkansas v. Syngenta Crop Protection AG,*
  No. 22-CV-1287, 2025 WL 551660 (E.D. Ark. Feb. 19, 2025) ..................................... 23

*Assoc. Gen. Contractors of Cal. v. Cal. State Council of Carpenters (AGC),*
  459 U.S. 519 (1983) ............................................................................................... 39

*Ayla, LLC v. Ayla Skin Party, Ltd.,*
  11 F.4th 972 (9th Cir. 2021) .................................................................................... 24

*Ballard v. National Football League Players Association,*
  123 F. Supp. 3d 1161 (E.D. Mo. 2015) ....................................................................... 43

*Barnum Timber Co. v. EPA,*
  633 F.3d 894 (9th Cir. 2011) ............................................................................... 38, 39

*Bedrosian v. Tenet Healthcare Corp.,*
  208 F.3d 220 (9th Cir. 2000) .................................................................................... 49

*Brown v. Pro Football, Inc.,*
  518 U.S. 231 (1996) .......................................................................................... 40, 46

*Calder v. Jones,*
  465 U.S. 783 (1984) ............................................................................................... 17

*California ex rel. Harris v. Safeway, Inc.,*
  651 F.3d 1118 (9th Cir. 2011) .................................................................................. 51

ZELLE LLP
1774 Pennsylvania Avenue NW, Suite 375
Washington, DC 20006Zelle Law

*In re Capacitors Antitrust Litig.,*
   No. 14-CV-3264, 2016 WL 5724960 (N.D. Cal. Sept. 30, 2016) ................................... *passim*

*Carrier Corp. v. Outokumpu Oyj,*
   673 F.3d 430 (6th Cir. 2012) ............................................................................... 21

*In re Cathode Ray Tube (CRT) Antitrust Litig.,*
   27 F. Supp. 3d 1002 (N.D. Cal. 2014) ............................................................. 20, 27

*CollegeSource, Inc. v. AcademyOne, Inc.,*
   653 F.3d 1066 (9th Cir. 2011) ........................................................................ 17, 21

*Columbare v. Sw. Airlines, Co.,*
   No. 3:21-CV-297-B-BK, 2023 WL 406439 (N.D. Tex. Jan. 10, 2023) ................................. 43

*Connell Constr. Co. v. Plumbers & Steamfitters Loc. Union No. 100,*
   421 U.S. 616 (1975) ...................................................................................... 45, 46

*CSR Ltd. v. Cigna Corp.,*
   405 F. Supp. 2d 526 (D.N.J. 2005) ...................................................................... 28

*D'Augusta v. Am. Petro. Inst.,*
   117 F.4th 1094 (9th Cir. 2024) ........................................................................ 15, 24

*Davis v. Cranfield Aerospace Sols., Ltd.,*
   71 F.4th 1154 (9th Cir. 2023) ............................................................................ 16

*Decker Coal Co. v. Commonwealth Edison Co.,*
   805 F.2d 834 (9th Cir. 1986) ............................................................................. 23

*Doe v. WebGroup Czech, A.S.,*
   93 F.4th 442 (9th Cir. 2024) ............................................................................. 17

*Duarte v. Quality Loan Serv. Corp.,*
   No. 17-CV-8014, 2018 WL 2121800 (C.D. Cal. May 8, 2018) ............................................. 31

*Duffy v. Yardi Systems, Inc.,*
   No. 23-CV-1391, 2024 WL 4980771 (W.D. Wash. Dec. 4, 2024) ....................................... 11

*In re Dynamic Random Access Memory (DRAM) Antitrust Litig.,*
   546 F.3d 981 (9th Cir. 2008) ...................................................................... 33, 34, 35

*Eller v. NFL Players Ass'n,*
   731 F.3d 752 (8th Cir. 2013) ............................................................................. 46

ZELLE LLP
1774 Pennsylvania Avenue NW, Suite 375
Washington, DC 20006Zelle Law

*F. Hoffmann-La Roche Ltd. v. Empagran S.A.*,
  542 U.S. 155 (2004) ................................................................................ *passim*

*Ford Motor Co. v. Montana Eighth Jud. Dist.*,
  592 U.S. 351 (2021) ................................................................................ 16, 22

*Freestream Aircraft (Berm.) Ltd. v. Aero Law Grp.*,
  905 F.3d 597 (9th Cir. 2018) ................................................................. 21

*Gilliam v. Speier*,
  318 B.R. 712 (9th Cir. BAP 2004) ......................................................... 23

*Glencore Grain Rotterdam B.V. v. Shivnath Rai Harnarain Co.*,
  284 F.3d 1114 (9th Cir. 2002) ............................................................... 27

*In re High-Tech Employee Antitrust Litig.*,
  856 F. Supp. 2d 1103 (N.D. Cal. 2012) ................................................. 13

*Home Box Off., Inc. v. Directors Guild of Am., Inc.*,
  531 F. Supp. 578 (S.D.N.Y. 1982) ........................................................ 51

*In re Intel Corp. Microprocessor Antitrust Litig.*,
  452 F. Supp. 2d 555 (D. Del. 2006) ...................................................... 33

*Int'l Longshore & Warehouse Union v. ICTSI Or., Inc.*,
  863 F.3d 1178 (9th Cir. 2017) ............................................................... 45

*Khoja v. Orexigen Therapeutics, Inc.*,
  899 F.3d 988 (9th Cir. 2018) ...................................................... 41, 42, 43

*Link v. Link*,
  2020 NSSC 293 (N.S. S.C.) .................................................................. 23

*Lujan v. Defenders of Wildlife*,
  504 U.S. 555 (1992) .......................................................................... 37, 38

*Ly Chhen v. Boeing Co.*,
  No. 18-CV-779, 2018 WL 4103665 (W.D. Wash. Aug. 29, 2018) ......... 43

*M & G Polymers USA, LLC v. Tackett*,
  574 U.S. 427 (2015) ............................................................................... 49

*MacCallum v. New York Yankees Partnership*,
  392 F. Supp. 2d 259 (D. Conn. 2005) ................................................... 23

ZELLE LLP
1774 Pennsylvania Avenue NW, Suite 375
Washington, DC 20006Zelle Law

*Mackey v. NFL,*
    543 F.2d 606 (8th Cir. 1976) ........................................................................ 46, 51

*Mansor v. U.S. Citizenship and Immigr. Servs.,*
    685 F. Supp. 3d 1000 (W.D. Wash. 2023) ........................................................ 37, 38

*Markson v. CRST Int'l, Inc.,*
    No. 17-CV-1261, 2022 WL 790960 (C.D. Cal. Feb. 24, 2022) ............................ 38

*McCourt v. California Sports, Inc.,*
    600 F.2d 1193 (6th Cir. 1979) ........................................................................ 48

*Mirlis v. Greer,*
    952 F.3d 51 (2d Cir. 2020) .............................................................................. 43

*Mohr v. NHL,*
    2021 FC 488 (Fed. Ct. Can. 2021) .................................................................. 36

*Motorola Mobility LLC v. AU Optronics Corp.,*
    775 F.3d 816 (7th Cir. 2015) .......................................................................... 33, 34

*Nat'l Basketball Ass'n v. Williams,*
    45 F.3d 684 (2d Cir. 1995) .............................................................................. 48

*Nat'l Hockey League Players Ass'n v. Plymouth Whalers Hockey Club,*
    419 F.3d 462 (6th Cir. 2005) .......................................................................... 50

*Northrim Bank v. Pearl Bay Seafoods, LLC,*
    717 F. Supp. 3d 1026 (W.D. Wash. 2024) ........................................................ 16

*In re Optical Disk Drive Antitrust Litigation,*
    No. 10-MD-2143, 2015 WL 1926635 (N.D. Cal. Apr. 28, 2015) ........................... 28

*In re Packaged Seafood Prods. Antitrust Litig.,*
    338 F. Supp. 3d 1079 (S.D. Cal. 2018) ............................................................ 19

*Pinkert v. Schwab Charitable Fund,*
    48 F.4th 1051 (9th Cir. 2022) ........................................................................ 38, 43

*Pinkerton v. United States,*
    328 U.S. 640 (1946) ...................................................................................... 38

*Precision Assocs. v. Panalpina World Transp.,*
    No. 08-CV-42, 2013 WL 6481195 (E.D.N.Y. Sept. 20, 2013) ............................. 30

ZELLE LLP
1774 Pennsylvania Avenue NW, Suite 375
Washington, DC 20006Zelle Law

*Reed v. Advocate Health Care,*
   No. 06 C 3337, 2007 WL 967932 (N.D. Ill. Mar. 28, 2007) ............................................ 51, 52

*Reina-Rodriguez v. U.S.,*
   655 F.3d 1182 (9th Cir. 2011) ................................................................................. 43

*Robertson v. Nat'l Basketball Ass'n,*
   389 F. Supp. 867 (S.D.N.Y. 1975) ............................................................................. 12

*In re Rubber Chems. Antitrust Litig.,*
   504 F. Supp. 2d 777 (N.D. Cal. 2007) .................................................................... 33, 35

*Sarei v. Rio Tinto, PLC,*
   487 F.3d 1193 (9th Cir. 2007) ................................................................................. 36

*Seattle Totems Hockey Club, Inc. v. NHL,*
   652 F.2d 852 (9th Cir. 1981) ................................................................................... 26

*Seattle Totems Hockey Club, Inc. v. NHL,*
   No. 75-CV-804, 1983 U.S. Dist. LEXIS 20342 (W.D. Wash. Aug. 22, 1983) ..................... 26

*Shields v. Fédération Internationale de Natation,*
   419 F. Supp. 3d 1188 (N.D. Cal. 2019) ................................................... 18, 20, 27, 35

*Silverman v. Major League Baseball Player Rels. Comm., Inc.,*
   67 F.3d 1054 (2d Cir. 1995) ................................................................................... 48

*Smack Apparel Co. v. Seattle Hockey Partners, LLC,*
   No. 22-CV-44, 2022 U.S. Dist. LEXIS 149326 (W.D. Wash. Aug. 19, 2022) ................. 10, 26

*Snyder & Assocs. Acquisitions LLC v. United States,*
   859 F.3d 1152 (9th Cir. 2017) ................................................................................. 28

*Soler v. Cty. of San Diego,*
   762 F. App'x 383 (9th Cir. 2019) ............................................................................. 17

*Subspace Omega LLC v. Amazon Web Servs.,*
   No. 23-CV-1772, 2024 WL 5202517 (W.D. Wash. Dec. 23, 2024) ......................... 29, 31, 35

*T-Mobile USA, Inc. v. Auto-Owners Ins. Co.,*
   No. 20-CV-567, 2020 WL 4788021 (W.D. Wash. Aug. 18, 2020) ....................................... 21

*In re TFT-LCD (Flat Panel) Antitrust Litig.,*
   No. 07-MD-1827, 2008 WL 2219837 (N.D. Cal. May 27, 2008) .......................................... 34

ZELLE LLP
1774 Pennsylvania Avenue NW, Suite 375
Washington, DC 20006Zelle Law

*Ulloa v. Securitas Security Services USA,*
  No. 23-CV-1752, 2023 WL 8720140 (N.D. Cal. Dec. 18, 2023)......................................42, 43

*United Mine Workers of Am. v. Pennington,*
  381 U.S. 657 (1965) .............................................................................................................. 45

*United States v. Hsiung,*
  778 F.3d 738 (9th Cir. 2015) ............................................................................................... 28

*United States v. Plummer,*
  941 F.2d 799 (9th Cir. 1991) ............................................................................................... 49

*United States v. Ritchie,*
  342 F.3d 903 (9th Cir. 2003) ............................................................................................... 42

*In re Vitamin C Antitrust Litig.,*
  8 F.4th 136 (2d Cir. 2021) ............................................................................................. 36, 37

*In re Western States Wholesale Natural Gas Antitrust Litig.,*
  715 F.3d 716 (9th Cir. 2013) ............................................................................................... 19

*Will Co. v. Ka Yeung Lee,*
  47 F.4th 917 (9th Cir. 2022) ............................................................................................... 19

*William Morris Endeavor Entertainment, LLC v. Writers Guild of America, West, Inc.,*
  432 F. Supp. 3d 1127 (C.D. Cal. 2020) .............................................................................. 46

*Williams v. Apple, Inc.,*
  449 F. Supp. 3d 892 (N.D. Cal. 2020) ................................................................................ 49

*Wilson v. PTT, LLC,*
  351 F. Supp. 3d 1325 (W.D. Wash. 2018)........................................................................... 15

*Wood v. Nat'l Basketball Ass'n,*
  809 F.2d 954 (2d Cir. 1987)................................................................................................. 48

*Wyndham Hotel Grp. Canada v. Ostrander,*
  No. 21-CV-16333, 2022 WL 16552817 (D.N.J. Oct. 31, 2022) .......................................... 23

*Yahoo! Inc. v. La Ligue Contre Le Racisme,*
  433 F.3d 1199 (9th Cir. 2006) ..................................................................................17, 18, 19

*Zero Cloud One Intelligent Tech. (Hangzhou) Co. v. Flying Heliball LLC,*
  No. 24-CV-1699, 2024 WL 4665594 (W.D. Wash. Nov. 4, 2024)......................................... 21

Pls.' Consol. Opp'n to Defs.' Mots. to Dismiss - viii
Case No. 2:24-CV-2135-TL

ZELLE LLP
1774 Pennsylvania Avenue NW, Suite 375
Washington, DC 20006Zelle Law

**Statutes and Rules**

Clayton Act, 15 U.S.C. § 22 ................................................................... *passim*

Federal Rule of Civil Procedure 4(k)(2) ................................................... 24

Federal Rule of Civil Procedure 8(a)(2) ................................................... 28

Federal Rule of Civil Procedure 12(b)(1) ............................................. 28, 36

Federal Rule of Civil Procedure 12(b)(2) ................................................. 15

Federal Rule of Civil Procedure 12(b)(6) ............................................. *passim*

Wash. Rev. Code § 4.28.185.................................................................. 16

**Other Authorities**

Alex Dourian, *Two Minutes for Unfair Restraint: How the NHL-CHL Player Transfer Agreement Serves as a Catalyst for Abuse of Dominance,* 10
Am. Univ. Bus. L. Rev. 329 (2021) ....................................................... 14

Restatement (3d) of the Foreign Relations Law of the U.S. § 403 cmt. e .................................. 36

THE DEVELOPING LABOR LAW: THE BOARD, THE COURTS, AND THE NATIONAL LABOR RELATIONS ACT, ch. 29 § 29.II.B (John E. Higgins, Jr., ed., 2023) ................................ 45

Pls.' Consol. Opp'n to Defs.' Mots. to Dismiss - ix
Case No. 2:24-CV-2135-TL

ZELLE LLP
1774 Pennsylvania Avenue NW, Suite 375
Washington, DC 20006Zelle Law

Plaintiffs World Association of Icehockey Players Unions North America Division and World Association of Icehockey Players Unions USA Corporation ("WAIPU Plaintiffs"), along with Tanner Gould and Isaiah DiLaura (collectively with the WAIPU Plaintiffs, "Plaintiffs"), respectfully submit this memorandum of law in opposition to Defendants' motions to dismiss. Dkt. No. 139 ("MJ Mem."); Dkt. No. 141 ("NHL Mem.").

## INTRODUCTION

Plaintiffs allege that the entire top tier of North American hockey conspired to restrain competition in the labor market for prospective and current major junior hockey players' ("Players") services. At the fulcrum of this conspiracy lies the NHL-CHL Agreement, which ties the National Hockey League ("NHL") and, through the NHL's control and dominion over their rosters, the American Hockey League ("AHL") and the East Coast Hockey League ("ECHL") to the Western Hockey League ("WHL"), Ontario Hockey League ("OHL") and the Quebec Maritimes Junior Hockey League ("QMJHL") (collectively with the OHL and WHL, the "Major Junior Leagues" or "Leagues").

Defendants' conspiracy eliminates Players' freedom to choose where they will provide their labor and imposes standardized, non-negotiable terms and conditions that govern Players' provision of their hockey services to the Major Junior Clubs ("Clubs"). Defendants accomplish their restraint of competition through a variety of *per se* illegal tactics, including by (i) allocating the North American market by granting an exclusive territory, each comprised of several U.S. states and Canadian provinces, to each Major Junior League, (ii) conducting involuntary drafts within these exclusive territories whereby a Players' major junior rights are exclusively allocated to his drafting Club, (iii) compelling Players to sign Standard Player Agreements ("SPAs") that contain non-negotiable provisions governing, for example, the durations of the contracts, the terms by which Players can terminate the contracts, and the compensation that Players will receive for

Pls.' Consol. Opp'n to Defs.' Mots. to Dismiss - 1
Case No. 2:24-CV-2135-TL

ZELLE LLP
1774 Pennsylvania Avenue NW, Suite 375
Washington, DC 20006

the provision of their hockey services, as well as exclusive licenses to Players' names, images and likenesses ("NIL"), and (iv) causing the AHL and ECHL to refrain from competing to sign Players.

Congress passed the antitrust laws to ensure that markets, including labor markets, remain open and competitive. Defendants' conspiracy is a textbook example of why Congress chose to act—to prevent the few from exploiting the economic rights of the many. Defendants' exploitative conduct has manifested itself in the horrific abuse of Players, destroying the lives of countless boys who want nothing more than to chase the dream of playing in the NHL. Plaintiffs do not seek recompense for those injuries here: Defendants will have to answer for them in another court on another day. But in this Court, Defendants should have to answer for their anticompetitive actions that made that abuse possible—their restraint of Players' freedom of movement, which compelled Players to make a choice that no child should have to make—between the exploitation of their labor and abandoning their dreams.

Defendants' motions do not address the substance of Plaintiffs' claims. Defendants only argue that the Court should decline to adjudicate these claims, which it could only do by ignoring the integrated transnational nature of Defendants' conspiracy and its domestic impact. The Court should reject these arguments for the following reasons:

*First*, this Court may assert personal jurisdiction over each Defendant because the well-pleaded allegations make out a *prima facie* case that the Major Junior Defendants have minimum contacts with the United States, which is the relevant forum for these antitrust claims. The Major Junior Defendants' unlawful market allocation scheme covers all fifty states for a simple reason: the United States is an important part of a unified North American labor market for Players' services from which Defendants source and retain Players pursuant to their unlawful market agreements. Every Club, including those in the QMJHL, scouts, recruits, and drafts Players in the

Pls.' Consol. Opp'n to Defs.' Mots. to Dismiss - 2
Case No. 2:24-CV-2135-TL

ZELLE LLP
1774 Pennsylvania Avenue NW, Suite 375
Washington, DC 20006

United States. Dkt. No. 1 ("Compl.") ¶¶ 8-9, 84-146, 174-176, 266, 280-281, 283. But for Defendants' conspiracy, Clubs operating on both sides of the 49th parallel would be competing for Players' services across all fifty states. The Complaint further details how the Leagues and their constituent Clubs also exploit Players' labor to earn significant revenues from American consumers. This Court may assert personal jurisdiction over the NHL because the NHL has substantial and jurisdictionally relevant contacts with this District (where the Seattle Kraken and several WHL Clubs operate). Plaintiffs' allegations show that the NHL—in part through the Kraken—has extensive contacts with the forum, including through its participation in the unlawful agreements that harmed Players in the United States and this District.

*Second*, the FTAIA does not immunize Defendants' anticompetitive conduct. That statute only exempts "wholly foreign" conduct and transactions from the Sherman Act; however, the relevant anticompetitive conduct and transactions pleaded here are directed at and performed across each of the Leagues' exclusive, transnational territories, and the effects of Defendants' anticompetitive conduct is felt here. Defendants' conspiracy includes U.S.-based entities that have agreed to refrain from competing for Players in Canada and the United States, and further restricts the ability of both American and Canadian Players to compete for employment in the United States. Moreover, both American and Canadian Players drafted by NHL clubs suffer additional antitrust injuries as a result of the NHL's (and its clubs') participation in the conspiracy, including when NHL clubs (including U.S.-based clubs) return those Players to their former Major Junior Clubs if they fail to make their NHL clubs' opening day rosters, or when the NHL's minor league affiliates in the AHL or ECHL (all of which are based in the United States) refuse to compete for their services.

Pls.' Consol. Opp'n to Defs.' Mots. to Dismiss - 3
Case No. 2:24-CV-2135-TL

ZELLE LLP
1774 Pennsylvania Avenue NW, Suite 375
Washington, DC 20006

Defendants seek to draw analogies to *F. Hoffmann-La Roche Ltd. v. Empagran S.A.*, 542 U.S. 155 (2004), but that case was decided on materially different facts. *Empagran* involved damage claims pursued by international victims of foreign price-fixing activity where the conduct giving rise to the plaintiffs' antitrust injuries took place abroad. *Id.* at 158. Here, by contrast, every Player suffered antitrust injury in the United States due to, among other things, the U.S.-based Clubs' agreement not to compete for (a) any Player who resided in a territory exclusively allocated to a different League, and (b) any Player on a different Club's protected list, as well as by the NHL's agreement that its AHL and ECHL affiliated clubs would not compete for Players. *Empagran* held only that the FTAIA bars damage claims where the plaintiff's claim rests solely on an "*independent* foreign effect giving rise to the claim." *Id.* at 159. But for Defendants' conspiracy, a competitive market would have existed in which *all* U.S.- *and* Canadian-based Clubs (including all AHL and ECHL clubs) would have competed for the services of *all* Players.

*Third*, the NHL-specific arguments also fail, as they rest on a patently false misreading of the Complaint—that the sole basis for Plaintiffs' claims against the NHL is a single provision in the NHL-CHL Agreement. In fact, Plaintiffs challenge *multiple* provisions of that Agreement and further allege that the NHL and its constituent clubs participate in the conspiracy through their efforts to prevent their AHL and ECHL affiliates from competing for Players' services. These restraints (which the NHL's motion ignores) also provide Plaintiffs Tanner Gould and Isaiah DiLaura Article III and antitrust standing against the NHL.

*Finally*, the non-statutory labor exemption does not protect any of the NHL's challenged conduct. The NHL's argument relies on documents outside the four corners of Plaintiffs' Complaint—in particular, the collective bargaining agreement ("CBA") between the NHL and the National Hockey League Players Association ("NHLPA"), the exclusive bargaining representative

Pls.' Consol. Opp'n to Defs.' Mots. to Dismiss - 4
Case No. 2:24-CV-2135-TL

ZELLE LLP
1774 Pennsylvania Avenue NW, Suite 375
Washington, DC 20006

of its players' union—a document that may not be considered under Rule 12(b)(6). For that procedural defect alone, the NHL's non-statutory exemption argument should be rejected.

Moreover, even if the Court *could* consider that CBA and other facts raised by Defendants that go beyond the pleadings under Rule 12(b)(6), the non-statutory exemption would still not provide a defense for the following reasons: (1) the NHL–NHLPA CBA could not shield from antitrust scrutiny the NHL's agreement to prohibit competition with the Major Junior Defendants by its minor league affiliates—an agreement the NHL does not contend has any basis in the CBA or the NHL-CHL Agreement; (2) the challenged restraints do not primarily affect the terms and conditions of employment of *NHL players*, the only hockey players whose union is party to the NHL-NHLPA CBA; and (3) the NHL cannot demonstrate as a matter of law that the challenged restraints are the product of bona fide, arms-length bargaining between the NHL and the NHLPA. To the contrary, those restraints are directed at *Major Junior Players*, who operate in an entirely separate labor market, who have either *never entered* or subsequently *departed from* the NHL, and whose interests are not represented in any collective bargaining between the NHL and the NHLPA. Consequently, any labor exemption flowing from the NHL-NHLPA CBA cannot possibly immunize these restraints.

The motions to dismiss should be denied.

## BACKGROUND

### I.   THE PARTIES

#### A.    Plaintiffs

##### 1.   WAIPU Plaintiffs

WAIPU Plaintiffs are membership organizations that represent the interests of current and prospective North American Major Junior Hockey Players. Compl. ¶¶ 57-70. During the relevant period, WAIPU Plaintiffs have had Players in all three Major Junior Leagues as members,

Pls.' Consol. Opp'n to Defs.' Mots. to Dismiss - 5
Case No. 2:24-CV-2135-TL

ZELLE LLP
1774 Pennsylvania Avenue NW, Suite 375
Washington, DC 20006

including American and non-American Players who play Major Junior hockey in the United States. *Id.* WAIPU Plaintiffs have never been certified as the bargaining representative of any of their members, or any other professional hockey players, and have never collectively bargained with any Defendant on any Player's behalf.

### 2. Individual Plaintiffs

Isaiah DiLaura is an American citizen who was born and raised in Lakeville, Minnesota. DiLaura was first recruited at age 13 by scouts for WHL Clubs, but none from the OHL or QMJHL. *Id.* ¶ 77. The Prince George Cougars drafted him at age 15. *Id.* After DiLaura declined to sign an SPA, the Cougars placed him on its protected list, which prevented him from shopping his services to other clubs. *Id.* ¶ 78. DiLaura did not want to play for Prince George, which is located in a remote area of British Columbia. *Id.* ¶ 77. Indeed, many OHL Clubs are located closer to DiLaura's hometown than the Prince George Club. DiLaura was ultimately persuaded to play for Prince George when he was promised the starting goalie position and to be treated as a professional athlete, with all the glitz and glamour of fans, and playing games in big arenas before large crowds. *Id.* ¶ 78. In light of these promises, DiLaura signed an SPA while attending a Prince George training camp at age 17 without his parents or other adult present to advise him. *Id.* Prince George promptly reneged on nearly all of these promises, save for one: he *was* treated as a professional by being benched for complaining about those broken promises and then traded, first from Prince George to the Portland (Oregon) Winterhawks and then to the Swift Current Broncos in Saskatchewan. *Id.* ¶ 79. DiLaura was not asked to consent to the trades and was given less than 24 hours' notice to join his new Club. *Id.*

Before being drafted, DiLaura was harmed by Defendants' conspiracy because his residence in WHL territory prevented Clubs outside the WHL from competing for his services. Thus, DiLaura could not have sold his services to any Club in the OHL, no matter how much any

ZELLE LLP
1774 Pennsylvania Avenue NW, Suite 375
Washington, DC 20006

Club in that League might have wanted to sign him. DiLaura was also harmed the moment he was subject to the WHL draft because the draft restrained competition among WHL Clubs for his services. For example, the Spokane Chiefs could not hire DiLaura. Finally, DiLaura was harmed when he signed a WHL SPA, which bound him to play exclusively for, and made him the property of, Prince George (and the Clubs to which he would subsequently be traded) for the entirety of his Major Junior career. DiLaura's harms are representative of the harms suffered by the class DiLaura seeks to represent.

Tanner Gould is a Canadian citizen who was born and raised in Calgary, Canada. *Id.* ¶ 71. By age 14, Gould had already been recruited by several clubs in the WHL, but none from the OHL or QMJHL. *Id.* The Tri-City Americans, located in Kennewick, Washington, drafted him at age 15. *Id.* Gould knew that because he was drafted by Tri-City, he could not negotiate with any other Major Junior Club. *Id.* ¶¶ 166, 188. Gould signed an SPA with Tri-City that contained the same non-negotiable terms as DiLaura, as well as a $500,000 development fee that would need to be paid if Gould ever sought to be released from his contract. *Id.* ¶¶ 72, 75. Gould suffered a back injury toward the end of his first season, which was not properly treated by the Tri-City medical staff. When Gould reported to Tri-City at the start of his second season that his back was still not fully recovered, Tri-City abandoned Gould, trading him to the Prince Albert Raiders where his career languished. *Id.* ¶¶ 74, 248-250. Although Gould's SPA provided that he could withhold his consent to be traded, Tri-City's management informed Gould that if he did so, Tri-City would ensure that he would never play organized hockey anywhere until he served out the remainder of his contract on Tri-City's inactive list. *Id.* ¶¶ 74, 250. Forced to choose between a trade he did not want and the end of his hockey career, Gould had no choice but to consent.

Pls.' Consol. Opp'n to Defs.' Mots. to Dismiss - 7
Case No. 2:24-CV-2135-TL

ZELLE LLP
1774 Pennsylvania Avenue NW, Suite 375
Washington, DC 20006

Before being drafted, Gould was harmed by Defendants' conspiracy because his residence in WHL territory prevented Clubs outside the WHL from competing for his services. Gould could not have sold his services to any U.S.-based Club in the OHL or QMJHL, no matter how much any Club in those Leagues might have wanted to sign him. Gould was also harmed the moment he was subject to the WHL draft because the draft restrained competition among WHL Clubs for Gould's services. Thus, the draft impaired his ability to sell his services in the U.S. labor market, including to any of the other U.S.-based Clubs in the WHL. Finally, Gould was harmed when he signed a WHL SPA, which bound him to play exclusively for, and made him the property of the Tri-City Americans (and the Clubs to which he would subsequently be traded) for the entirety of his Major Junior career. Gould's harms are representative of the harms suffered by the class of Players Gould seeks to represent. Gould's harms also demonstrate why Defendants' FTAIA arguments are inapplicable to Canadian Players who ultimately play for Canada-based Clubs.

**B.  Defendants**

      1.  <u>The Major Junior Defendants</u>

        *i.  The CHL*

The CHL is "not a sports league." *Id.* ¶¶ 2, 153. It has no teams or organized regular-season game schedules. *Id.* ¶¶ 4-5. No cooperation among the Leagues is necessary to offer major junior hockey to the public. *Id.* As the CHL President admitted under oath: "The CHL and the Leagues are separate entities. There is no parent-subsidiary relationship between them. The CHL has no role in hockey operations for the Leagues, nor has it ever had any material control over" the three independent Leagues. *Id.* ¶ 2.

        *ii.  The Major Junior Leagues and their Clubs*

The Major Junior Leagues are separate legal entities, with their respective teams operating "independently from one another." *Id.* ¶¶ 3, 85-146, 155-156. The Leagues include nine Clubs

ZELLE LLP
1774 Pennsylvania Avenue NW, Suite 375
Washington, DC 20006

that operate in the United States, of which six are in the WHL (and three operate in Washington), and three are in the OHL. Each league is "independently responsible" for "scheduling, organizing, and operating games," "establishing playing rules," "organizing player drafts for new players," and "providing direction regarding player agreements." *Id.* ¶ 3.

The Major Junior Defendants communicate and "collaborate" with each other through the CHL's executive council, which is comprised of the commissioners from each of the WHL, OHL, and QMJHL. *Id.* ¶ 157. This "collaboration" includes collusion on "player benefits" to provide "a consistent approach" for Players. *Id.* ¶ 158.

Clubs in each League have the exclusive right to scout, recruit, draft, and sign Players who reside in a U.S. state or Canadian province allocated to their respective League. *Id.* ¶¶ 8-9, 11, 22, 24, 53, 71, 77, 166, 168-170, 174-176, 180-183, 280-281. All Clubs, either directly or collectively through their Leagues, scout Players in their allocated U.S. states, conduct training camps in their allocated U.S. states, draft Players who reside in their allocated U.S. states, and sign such Players to SPAs. *Id.* ¶¶ 84-146, 174-176, 180-183, 280-281. Conversely, all Clubs refrain from scouting Players in U.S. states allocated to one of the other Leagues, and do not compete to sign Players who reside in those states. *Id.* ¶¶ 174-176, 180-183. All Players in the WHL and OHL play games against rivals in the United States, while Players in the QMJHL must be prepared to play in the United States when the Memorial Cup is played here. *See, e.g.*, *id.* ¶¶ 153, 280-281, 286; MJ Mem. 17 n.1.

2. The NHL

The NHL is an unincorporated joint venture association that operates in the United States and Canada through, and for, 32 member Clubs (the "NHL Clubs"), including the Kraken, that collectively have annual revenues of approximately $6 billion. *Id*. ¶ 82. The NHL Clubs each have minor-league affiliates in the AHL and ECHL. *Id.* ¶¶ 37-39, 268. Nearly all AHL and ECHL

ZELLE LLP
1774 Pennsylvania Avenue NW, Suite 375
Washington, DC 20006

clubs are owned by or affiliated with NHL Clubs, and all AHL and ECHL clubs operate in the United States. *Id.* The NHL "transacts business in the Western District of Washington by engaging in activities there relating to the business of professional ice hockey." Answer ¶ 4, *Smack Apparel Co. v. Seattle Hockey Partners, LLC*, No. 22-CV-44 (W.D. Wash. Mar. 31, 2022), Dkt. No. 16.

## II.    THE UNLAWFUL SCHEME

Plaintiffs have plausibly alleged that Defendants have engaged in a single conspiracy on both sides of the 49th parallel to restrain competition in the labor market for Player services. Compl. ¶¶ 1, 6, 17, 24, 36, 46, 63, 166-167, 198.

The Major Junior Defendants have allocated among themselves exclusive territories across North America from which they may recruit, source, and draft Players. *Id.* ¶¶ 8-9, 11, 22, 24, 53, 71, 77, 170-183. Pursuant to this agreement, Clubs have restricted their scouting, recruiting, and signing of Players who reside within their exclusive territory, and have refrained from doing so regarding Players who reside outside their allocated territory. *Id.* As described by one Canadian court, "Each of the CHL leagues has a strictly defined geographic territory over which *it owns* the rights of all junior-aged players, who range in age from 16 to 20." *Id.* ¶ 171 (emphasis added). For example, this unlawful agreement allocates all Players who reside in Washington State to the WHL. *Id.* ¶¶ 174, 177. The map below details Defendants' market allocation as alleged.

ZELLE LLP
1774 Pennsylvania Avenue NW, Suite 375
Washington, DC 20006



Thus, for example, Defendants have agreed that only the WHL can recruit, source and draft Players residing in Washington State and that the QMJHL and the OHL will not compete for the services of such Players. *Id.* ¶¶ 174-177. Every U.S. state is similarly allocated to one of the three Leagues. *Id.* ¶¶ 174-178. The Leagues include nine U.S.-based Clubs that have agreed not to compete for Players outside of their Leagues' "protected" territories. *Id.* ¶ 281. Defendants' North American-wide agreement not to compete is a *per se* illegal market allocation. *See, e.g.*, *Duffy v. Yardi Systems, Inc.*, No. 23-CV-1391, 2024 WL 4980771, at *7 (W.D. Wash. Dec. 4, 2024) ("Horizontal price fixing and market allocation are *per se* Section 1 violations." (quoting *Optronic Techs., Inc. v. Ningbo Sunny Elec. Co.,* 20 F.4th 466, 479 (9th Cir. 2021)). In the absence of this market allocation, Players would be able to negotiate with multiple Clubs across the three Leagues and Clubs would be forced to compete for Players' services by offering better terms and conditions.

Pls.' Consol. Opp'n to Defs.' Mots. to Dismiss - 11
Case No. 2:24-CV-2135-TL

ZELLE LLP
1774 Pennsylvania Avenue NW, Suite 375
Washington, DC 20006

Each year, the Leagues conduct player drafts as they agreed to do pursuant to the terms of the CHL Constitution. *Id.* ¶¶ 166, 187-199. Unlike other player drafts, these League drafts are "involuntary," *i.e.*, Players do not apply to participate in the draft. *Id.* Clubs simply draft Players who happen to reside in their League's protected territory when they age-qualify and then, pursuant to the unlawful scheme, own those Players' rights through age 20—even if the Player chooses not to sign an SPA. *Id.* These drafts also differ from other player drafts in that they are not the product of a CBA, ignoring an unbroken line of precedent regarding player rights dating back to the 1970s. *Id.* ¶ 192. Defendants' drafts are all about control of the market; for this reason, the Major Junior Defendants have agreed to draft far more Players than they need to fill their rosters. *Id.* ¶ 197. Indeed, once drafted, all Clubs other than the Player's drafting Club have agreed to refrain from competing for that Player's services. *Id.* ¶¶ 196, 210. Player drafts are another form of unlawful market allocation because they eliminate competition for players' services. *See, e.g.*, *Robertson v. Nat'l Basketball Ass'n*, 389 F. Supp. 867, 893 (S.D.N.Y. 1975) (finding that player drafts are "readily susceptible to condemnation," either as a group boycott or as "illegal horizontal territorial allocations and product market divisions"). In the absence of a draft, Players would be able to negotiate with multiple Clubs across all three Leagues, and Clubs would be forced to compete for Players' services by offering better terms and conditions.

Once drafted, the Major Junior Defendants have further agreed that they can place Players on "protected lists" that ensures that no other Club will compete for their services. *Id.* ¶¶ 196, 206-210, 220. Clubs use these protected lists to prevent unsigned Players from playing elsewhere, as well as to discipline uncooperative Players who, for example, decline to accede to trades or who otherwise protest the unlawful *status quo*. *Id.* ¶¶ 53, 77, 200-201, 206-210.

Pls.' Consol. Opp'n to Defs.' Mots. to Dismiss - 12
Case No. 2:24-CV-2135-TL

ZELLE LLP
1774 Pennsylvania Avenue NW, Suite 375
Washington, DC 20006

Having restrained competition for Player services through the conduct described above, the Major Junior Defendants exploit that restraint by presenting Players with agreed-upon, non-negotiable terms in "standard" SPAs that, among other things, fix Player compensation below competitive levels and which seize each Player's NIL rights. *Id.* ¶¶ 75, 201-204, 224-225, 227-229, 231. These price-fixed wages result in pay far below the levels of other developmental hockey leagues, such as the ECHL and AHL. *Id.* ¶ 229. For example, Players are paid a "stipend" of just $250 per month in the WHL, whereas players in the ECHL earn on average over $2,800 per month, and players in the AHL earn on average over $5,000 per month. *Id.* ¶¶ 228-229. Defendants have further agreed that the term of each Player's SPA shall cover his entire major junior career, and provide that while Clubs may trade Players or refuse to play them for any reason, Players may not terminate their SPAs to play organized hockey anywhere else in the world until they age out of major junior hockey or they (or their new Clubs) pay steep player development fees, which can be as much as $500,000. *Id.* ¶¶ 17, 221. These terms also preclude Players from playing in the NCAA until they age out of major junior hockey. *Id.* ¶ 219.

A drafted Player has no choice but to accept the SPA's terms because Defendants' agreements prevent any other Club from competing for that Player's services. *Id.* ¶¶ 196, 210. Thus, in addition to being the consequence of Defendants' agreement to eliminate competition for Player services through the market allocation scheme and player drafts discussed above, these provisions of the SPAs also constitute horizontal price-fixing. *See, e.g., In re High-Tech Employee Antitrust Litig.*, 856 F. Supp. 2d 1103, 1117 (N.D. Cal. 2012) (finding agreement among employers to suppress compensation and restrict employees' mobility stated per se claim*); In re Animation Workers Antitrust Litig.*, 123 F. Supp. 3d 1175, 1182 (N.D. Cal. 2015) (same).

Pls.' Consol. Opp'n to Defs.' Mots. to Dismiss - 13
Case No. 2:24-CV-2135-TL

ZELLE LLP
1774 Pennsylvania Avenue NW, Suite 375
Washington, DC 20006

The NHL is no mere bystander here: the NHL-CHL Agreement enshrines the NHL's central role in the conspiracy in at least two important ways. *First*, it sets forth the rules governing the transfer or assignment of Players who are drafted by NHL clubs but do not make the NHL club's opening day roster. *Id.* ¶¶ 270-271, 275, 287. Under those rules, any Player who is drafted by an NHL club—but does not make its opening day roster—must be returned to his former Major Junior Club. *Id.* ¶¶ 270-271, 287. Most 18-year-old NHL draftees do not make the opening day roster. As a result, the NHL-CHL Agreement ensures that the conspiracy that binds the Player to his drafting Major Junior Club endures, even after the Player has been drafted by an NHL club. Thus, pursuant to this agreement, the Seattle Kraken are obligated to return Players it drafts that don't make its roster to those Players' former Clubs.[1] Through these actions, the NHL not only prevented these Players from earning substantially more money by competing in the AHL or ECHL, but also subjected these Players to the various anticompetitive agreements discussed above, including the price-fixing provisions of Players' prior SPAs. The NHL's role in this conspiracy is thus memorialized in the NHL-CHL Agreement, which provides the NHL with an inexpensive pool of talent and a cheap place to "park" Players once drafted into the NHL. *See, e.g.,* Alex Dourian, *Two Minutes for Unfair Restraint: How the NHL-CHL Player Transfer Agreement Serves as a Catalyst for Abuse of Dominance*, 10 Am. Univ. Bus. L. Rev. 329 (2021).

*Second*, pursuant to Defendants' unlawful agreement, the NHL and its constituent clubs have compelled their AHL and ECHL affiliates not to compete for Players "owned" by Major Junior Clubs. *Id.* ¶¶ 272-273. While European hockey players under 20, for example, are eligible

---

[1] For example, the Kraken recently assigned their top draft pick in the 2024 NHL draft (and 8th overall pick) to his former WHL Club, the Spokane Chiefs. *See* "Seattle Kraken Reassign Berkly Catton to Spokane," CHL (Sept. 25, 2024), https://chl.ca/whl-chiefs/article/seattle-kraken-reassign-berkly-catton-to-spokane/.

ZELLE LLP
1774 Pennsylvania Avenue NW, Suite 375
Washington, DC 20006

to (and frequently do) play in the AHL and ECHL, drafted Players subject to the anticompetitive scheme are barred by Defendants' conspiracy from playing in those leagues *even though* many drafted Players are demonstrably capable of playing in the AHL and ECHL and enriching the quality of play in those leagues. *Id.* ¶¶ 272-274, 278. This was apparent during the pandemic, when Major Junior Hockey was shuttered and Major Junior Players were temporarily given permission to play in the AHL and ECHL, where they thrived. *Id.* ¶ 273. That permission was withdrawn when Major Junior Hockey reopened at the conclusion of the pandemic, reinstating the longstanding agreement of the AHL and ECHL not to compete for Major Junior Players at the behest of the NHL.[2] *Id.* ¶ 274.

## COMMON CHL/NHL ARGUMENTS

## III. THE COURT HAS JURISDICTION OVER ALL DEFENDANTS

Under Rule 12(b)(2), Plaintiffs need only make "a *prima facie* showing of jurisdictional facts" and all disputed facts are to be resolved in Plaintiffs' favor. *Wilson v. PTT, LLC*, 351 F. Supp. 3d 1325, 1331 (W.D. Wash. 2018) (citations omitted). A court may assert personal jurisdiction over a defendant if (1) a statute confers jurisdiction, and (2) the exercise of jurisdiction comports with constitutional due process. *Action Embroidery Corp. v. Atlantic Embroidery, Inc.*, 368 F.3d 1174, 1177 (9th Cir. 2004). Because Plaintiffs assert federal antitrust claims, Section 12 of the Clayton Act, 15 U.S.C. § 22, provides a statutory basis for jurisdiction. *D'Augusta v. Am. Petro. Inst.*, 117 F.4th 1094, 1100 n.1 (9th Cir. 2024) ("We have interpreted Section 12 of the

---

[2] Consider for example, the situation of a Major Junior Player and a European player, both drafted and signed by an NHL club, but who fail to make the roster. The Major Junior Player must be reassigned to his former Club—a world of bus rides and monthly stipends of a few hundred dollars playing against younger and less experienced competition—whereas the European player can join the NHL club's affiliate AHL or ECHL team with better pay, better competition, and better treatment. The only difference between the two is the existence of the unlawful restraints. *See, e.g.*, Compl. ¶ 279.

Pls.' Consol. Opp'n to Defs.' Mots. to Dismiss - 15
Case No. 2:24-CV-2135-TL

ZELLE LLP
1774 Pennsylvania Avenue NW, Suite 375
Washington, DC 20006

Clayton Act (15 U.S.C. § 22) to grant personal jurisdiction over any corporate antitrust defendant with minimum contacts with the nation." (citing *Action Embroidery*, 386 F.3d at 1180)). In the alternative, to the extent this Court concludes that a defendant is not subject to the Clayton Act, Washington's long-arm statute, Rev. Code § 4.28.185, provides the statutory basis. Both statutes extend to the limits of constitutional due process. *See Action Embroidery*, 386 F.3d at 1180; *Northrim Bank v. Pearl Bay Seafoods, LLC*, 717 F. Supp. 3d 1026, 1032 (W.D. Wash. 2024).

Whether the forum is the United States under the Clayton Act or Washington under the Washington long-arm statute, courts in the Ninth Circuit apply a three-part test to determine whether minimum contacts exist: (1) the defendant must "purposefully direct" its activities to the forum or "purposefully avail" itself of the benefits afforded by the forum's laws; (2) the claim must "arise out of or relate to the defendant's forum-related activities"; and (3) the exercise of jurisdiction must comport with fair play and substantial justice, *i.e.*, it must be reasonable. *Davis v. Cranfield Aerospace Sols., Ltd.*, 71 F.4th 1154, 1161-62 (9th Cir. 2023).

Purposeful availment and purposeful direction are distinct concepts. *Davis*, 71 F.4th at 1162. Both "ask whether defendants have voluntarily derived some benefit from their interstate activities such that it will not be haled into a jurisdiction solely as a result of random, fortuitous, or attenuated contacts." *Id.* (citing *Glob. Commodities Trading Grp., Inc. v. Beneficio de Arroz Choloma, S.A.*, 972 F.3d 1101, 1106 (9th Cir. 2020)). While purposeful availment is "typically" used in contract cases and purposeful direction in tort, the Ninth Circuit recently clarified that the law does not "impose a rigid dividing line between these two types of claims." *Id.* Instead, courts should "comprehensively evaluate the extent of the defendant's contacts with the forum state," "which may mean looking at both purposeful availment and purposeful direction." *Id.* "Arise out of" and "relates to" are also distinct concepts. *Ford Motor Co. v. Montana Eighth Jud. Dist.*, 592

Pls.' Consol. Opp'n to Defs.' Mots. to Dismiss - 16
Case No. 2:24-CV-2135-TL

ZELLE LLP
1774 Pennsylvania Avenue NW, Suite 375
Washington, DC 20006

U.S. 351, 362 (2021) (holding that the "first half of that standard asks about causation; but the back half, after the 'or,' contemplates that some relationships will support jurisdiction without a causal showing"). When considering these first two prongs, "a strong showing on one axis will permit a lesser showing on the other." *Yahoo! Inc. v. La Ligue Contre Le Racisme*, 433 F.3d 1199, 1210 (9th Cir. 2006) (*en banc*). If Plaintiffs meet their burden under the first two elements, Defendants bear the burden to disprove the third. *CollegeSource, Inc. v. AcademyOne, Inc.*, 653 F.3d 1066, 1076 (9th Cir. 2011).

The WHL and all but four OHL clubs (discussed below) correctly concede that they are subject to the Court's jurisdiction.

### A. The Court May Exercise Personal Jurisdiction Over the QMJHL Defendants

The QMJHL is subject to the Court's jurisdiction because Plaintiffs have made a *prima facie* case that the QMJHL and its Clubs purposefully directed their conduct at the United States, rendering the exercise of personal jurisdiction over them reasonable.

### 1. The QMJHL Clubs Purposefully Directed their Activities at the United States

In analyzing purposeful direction, the Ninth Circuit applies the effects test derived from *Calder v. Jones*, 465 U.S. 783 (1984). *Doe v. WebGroup Czech, A.S.*, 93 F.4th 442, 452 (9th Cir. 2024) (citing *Axiom Foods, Inc. v. Acerchem Int'l, Inc.*, 874 F.3d 1064, 1069 (9th Cir. 2017)). To satisfy that test, the defendant must have (1) committed an intentional act, (2) expressly aimed at the United States, (3) causing harm that the defendant knows is likely to be suffered in the United States. *Id.* Under the effects test, personal jurisdiction can be asserted over an out-of-state defendant if the effect of the conduct is felt in the forum (here, the United States)—even if the defendant did not establish physical contact with the forum. *Soler v. Cty. of San Diego*, 762 F. App'x 383, 385 (9th Cir. 2019) ("Jurisdiction . . . may not be avoided merely because the defendant

ZELLE LLP
1774 Pennsylvania Avenue NW, Suite 375
Washington, DC 20006

did not *physically* enter the forum State." (quoting *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 476 (1985))).  Further, the conduct need not be aimed solely at the United States, so long as the United States was within the targeted region.  *Yahoo!*, 433 F.3d at 1207 ("[T]he 'brunt' of the harm need not be suffered in the forum state.").  In *Shields v. Fédération Internationale de Natation*, for example, the district court found jurisdiction over the Fédération Internationale de Natation ("FINA") for claims arising out of FINA's control over international swimming competitions.  419 F. Supp. 3d 1188, 1209 (N.D. Cal. 2019).  The court rejected FINA's argument that the plaintiff could not show that the alleged conduct was expressly aimed at the United States because the restraint at issue was a global restriction rather than one that specifically targeted swimming events in the United States.  *Id.*

All three elements are present here.  First, the QMJHL Clubs engaged in intentional acts directed at the United States when they entered into and implemented the challenged agreements. *Schwarzenegger*, 374 F.3d at 806.  The Complaint details how the QMJHL Clubs scout and recruit players—including by conducting player development camps—in the United States, while limiting their recruitment, drafting, and signing of Players to the protected territory (New England, in the United States) allocated to them.  Compl. ¶¶ 8, 128-146, 280, 175-177, 179, 180, 183, 186, 189, 280-281.  Like the other Defendants, the QMJHL Clubs also marketed themselves in the United States by entering into licensing agreements with American companies, selling television and streaming rights to United States residents, and selling merchandise and tickets to United States residents.  *Id.* ¶¶ 42, 83, 128-146, 266, 283.

Finally, the harmful effects of the QMJHL's conduct and the conduct of its co-conspirators were felt in the United States and in this District.  *Id.* ¶ 178, 280-283, 301-302.  Per Defendants' agreement, QMJHL Clubs scouted and drafted Players only from its allocated territory, thus

Pls.' Consol. Opp'n to Defs.' Mots. to Dismiss - 18
Case No. 2:24-CV-2135-TL

ZELLE LLP
1774 Pennsylvania Avenue NW, Suite 375
Washington, DC 20006

refusing to compete for the services of Players residing outside of New England, including those Players who reside in Washington.  *Id.* ¶¶ 9, 175-177, 179, 180, 183, 186, 189, 199, 280-281.  For example, no QMJHL Club scouted or otherwise competed to sign either Gould or DiLaura.  *Id.* ¶¶ 71, 77, 175, 177.  Conversely, competition for the services of Players who reside in New England was similarly restrained, as no U.S.-based Club, nor any other OHL or WHL Club, would or will compete for their services.  *Id.* ¶¶ 9, 174-175, 180-182.  Territorial allocations aside, the QMJHL further harmed U.S. Players by subjecting them to involuntary drafts that restrained competition for their services.[3]  *Id.* ¶¶ 26, 196-200, 209.  These allegations demonstrate foreseeable harm in the United States.  *In re Western States Wholesale Natural Gas Antitrust Litig.*, 715 F.3d 716, 744 (9th Cir. 2013) (plaintiffs alleged actions outside the forum that caused harm inside the forum).

Plaintiffs need not show that the "'brunt' of the harm" caused by their restraints of trade were suffered in the United States.  *Yahoo!*, 433 F.3d at 1207.  It is enough that a "jurisdictionally sufficient amount of harm" is suffered in the forum, even if "more harm might have been suffered in another [forum]."  *Id.*; *see also Will Co. v. Ka Yeung Lee*, 47 F.4th 917, 926 (9th Cir. 2022) (asserting jurisdiction over foreign defendants who "appealed to and profited from a United States audience, and thus expressly aimed the [product] at the United States").  Courts regularly find personal jurisdiction where foreign defendants participate in agreements that inflate the prices paid by United States residents.  *See, e.g.*, *In re Packaged Seafood*, 338 F. Supp. 3d at 1156 (asserting jurisdiction over a United Kingdom limited liability partnership that had an equitable interest in a

---

[3] Consider, for example, a star bantam Player who resides in Boston or Lewiston: any Club in the QMJHL would be willing to pay competitive wages to recruit this Player (but for the collusive agreements).  However, because of Defendants' agreements, no QMJHL Club *actually* competes for his services, and this star Player instead has no choice but to accept the imposition of an SPA that shackles his freedom of movement and which pays him a mere pittance for his hockey services.

ZELLE LLP
1774 Pennsylvania Avenue NW, Suite 375
Washington, DC 20006

United States packaged seafood producer, reasoning that the partnership had committed intentional acts that could support a finding of purposeful direction toward the forum with respect to an alleged price-fixing conspiracy); *In re Cathode Ray Tube (CRT) Antitrust Litig.,* 27 F. Supp. 3d 1002, 1012 (N.D. Cal. 2014) (asserting jurisdiction over foreign entity based on evidence that manufacturer participated in agreement to fix CRT prices abroad and in the United States).

The QMJHL's assertion that Plaintiffs failed to allege "purposeful direction" because any harm a player in the QMJHL would suffer would be felt solely in Canada is meritless. As discussed above, the QMJHL, its Clubs, and its co-conspirators all directed their conduct at the United States and caused antitrust injury in the United States.

The QMJHL Clubs also purposefully availed themselves of the United States by, *inter alia*, selling broadcasting rights and merchandise into the United States, systematically scouting and recruiting players, agreeing with their U.S.-based counterparts not to encroach on their unlawfully allocated territories, negotiating payments from the NHL to "develop" Players, and agreeing with the NHL teams to be the sole employer for NHL-drafted Players who do not make an NHL club roster. Defendants' cases (two of which are unpublished appellate rulings) are off-point and certainly cannot be read to stand for some bright-line rule that foreign employers may systematically recruit talent in the forum without purposefully availing themselves of U.S. law. Here, there is that plus much more that show the QMJHL's contacts were far from random, fortuitous, or attenuated.

### 2. The Claims Arises Out of or Relate to the QMJHL's Clubs' Forum-Related Activities

Plaintiffs' claims *arise out of* and *relate to* Defendants' transnational agreement to restrain competition for Player services by allocating markets and conducting player drafts. *See Shields*, 419 F. Supp. 3d at 1209 (finding plaintiffs' allegations met the "arise out of" requirement by

Pls.' Consol. Opp'n to Defs.' Mots. to Dismiss - 20
Case No. 2:24-CV-2135-TL

ZELLE LLP
1774 Pennsylvania Avenue NW, Suite 375
Washington, DC 20006

alleging a "global antitrust conspiracy that include[d] anticompetitive conduct aimed at preventing [plaintiffs] from holding swimming competitions in the United States" even if some of the activity also took place outside the United States); *Carrier Corp. v. Outokumpu Oyj*, 673 F.3d 430, 451 (6th Cir. 2012) (finding cause of action "arises from" United States contacts where defendants' conspiracy had an "explicit geographical focus," including allocation of domestic business to certain defendants).

### 3. The Exercise of Jurisdiction is Reasonable

To defeat personal jurisdiction, the QMJHL Defendants must present a "compelling case" that "would render jurisdiction … unreasonable." *Freestream Aircraft (Berm.) Ltd. v. Aero Law Grp.*, 905 F.3d 597, 607 (9th Cir. 2018) (citation omitted); *Zero Cloud One Intelligent Tech. (Hangzhou) Co. v. Flying Heliball LLC*, No. 24-CV-1699, 2024 WL 4665594, at *4 (W.D. Wash. Nov. 4, 2024) ("[T]he burden then shifts to the defendant to show jurisdiction is unreasonable under the third prong." (citing *Picot v. Weston*, 780 F.3d 1206, 1211–1212 (9th Cir. 2015))). They have not met that burden.

In assessing reasonableness, courts look to a number of factors, including: (1) the extent of the defendant's purposeful injection into the forum's affairs; (2) the burden on the defendant of defending in the forum; (3) the extent of conflict with the sovereignty of the defendant's state; (4) the forum's interest in adjudicating the dispute; (5) the most efficient judicial resolution of the controversy; (6) the importance of the forum to the plaintiff's interest in convenient and effective relief; and (7) the existence of an alternative forum. *Freestream*, 905 F.3d at 607. A court must balance all of these factors; none is dispositive. *T-Mobile USA, Inc. v. Auto-Owners Ins. Co.,* No. 20-CV-567, 2020 WL 4788021, at *5 (W.D. Wash. Aug. 18, 2020) (citing *CollegeSource*, 653 F.3d at 1079).

Pls.' Consol. Opp'n to Defs.' Mots. to Dismiss - 21
Case No. 2:24-CV-2135-TL

ZELLE LLP
1774 Pennsylvania Avenue NW, Suite 375
Washington, DC 20006

The QMJHL Defendants argue that asserting jurisdiction over them would be unreasonable because the "key events" alleged in the Complaint occurred in Canada, the "more efficient" forum is Canada, and the QMJHL should not be made to answer for its antitrust violations in the United States. None of these arguments are persuasive. Rather, the exercise of jurisdiction is reasonable, based on the allegations in the Complaint, because, *inter alia*, (1) the QMJHL bargained for and its Clubs regularly exercise their exclusive right to recruit Players from a substantial portion of the United States, while refraining from competing for Players' services outside New England and thereby affecting Players in all 50 states, including Washington; (2) the defense of this action imposes no extra burden on the QMJHL because the QMJHL is represented by the same counsel as the WHL and OHL, neither of which contests the exercise of jurisdiction over them as burdensome; (3) there is no conflict with Canada's sovereignty for the reasons explained in Plaintiffs' opposition to Defendants' comity arguments, *infra* at 35–37; and, (4) the United States has a substantial interest in the vigorous enforcement of its antitrust laws in service of protecting American teenagers harmed by the QMJHL's conduct. In short, a defendant who benefits from shopping for Players' services in the United States cannot credibly claim that it would be unreasonable to litigate here when its method for "shopping" for players is anticompetitive and Plaintiffs' claims arise out of such conduct. *See Ford Motor Co.*, 592 U.S. at 360 ("When … a company 'exercises the privilege of conducting activities within a [forum]—thus 'enjoy[ing] the benefits and protection of [its] laws'—the [forum] may hold the company to account for related misconduct." (citation omitted)).

### B. The OHL Non-Corporate Defendants are Subject to Personal Jurisdiction

Two U.S.- and two Ontario-based clubs contend they are not subject to Clayton Act jurisdiction because they are not corporations and otherwise lack sufficient contacts with Washington to be subject to jurisdiction here. CHL Mem. 15.

ZELLE LLP
1774 Pennsylvania Avenue NW, Suite 375
Washington, DC 20006

1. <u>Clayton Act Jurisdiction</u>

The Sarnia Sting is operated by an unlimited liability corporation ("ULC"), which is a taxable corporation under Canadian Law, Compl. ¶ 124, and thus subject to Section 12 of the Clayton Act. *See Wyndham Hotel Grp. Canada v. Ostrander*, No. 21-CV-16333, 2022 WL 16552817, at *2 (D.N.J. Oct. 31, 2022) ("A ULC is an entity incorporated in the usual manner, possessing the formal characteristics of an ordinary corporation."); *Link v. Link*, 2020 NSSC 293 (N.S. S.C.) ¶ 37 ("Generally, for the purposes of Canadian tax law, an NS CA company, whether liability is limited or unlimited, is recognized as a corporation.").

The Erie Otters and Ottawa 67's are operated by limited partnerships and the Saginaw Spirit is operated by a limited liability company. Compl. ¶¶ 112, 119, 123. Courts have applied Section 12 to limited partnerships, limited liability companies, and other "corporate-like entities." *See, e.g. Arkansas v. Syngenta Crop Protection AG*, No. 22-CV-1287, 2025 WL 551660, at *6 (E.D. Ark. Feb. 19, 2025) (finding that courts have applied Section 12 to "corporate-like entities"); *Gilliam v. Speier*, 318 B.R. 712, 717 (9th Cir. BAP 2004) (finding that an LLC "fits comfortably within the Bankruptcy Code's definition of 'corporation'"); *MacCallum v. New York Yankees Partnership*, 392 F. Supp. 2d 259, 263 (D. Conn. 2005) ("[U]nincorporated business entities such as partnerships should be treated like corporations when applying section 1391(c)"); *Decker Coal Co. v. Commonwealth Edison Co.*, 805 F.2d 834, 841-42 (9th Cir. 1986) ("[C]ourts have analogized partnerships and associations to corporations in making venue determinations."). In fact, the Department of Justice recently invoked Section 12 to assert personal jurisdiction over Google LLC. Am. Compl. ¶ 307, *United States v. Google LLC*, No. 23-CV-108 (E.D. Va. Apr. 17, 2023), Dkt. No. 120.

Pls.' Consol. Opp'n to Defs.' Mots. to Dismiss - 23
Case No. 2:24-CV-2135-TL

ZELLE LLP
1774 Pennsylvania Avenue NW, Suite 375
Washington, DC 20006

### 2. Rule 4(k)(2) Jurisdiction

Even if the two Ottawa-based Clubs are not subject to Clayton Act Section 12 jurisdiction, they are nevertheless subject to this Court's jurisdiction pursuant to Rule 4(k)(2) of the Federal Rules of Civil Procedure.

Personal jurisdiction over a defendant is "proper under Rule 4(k)(2) when (1) the action arises under federal law, (2) 'the defendant is not subject to jurisdiction in any state's courts of general jurisdiction' [as the Canadian OHL Non-Corporate Defendants contend], and (3) the court's exercise of jurisdiction comports with due process." *Ayla, LLC v. Ayla Skin Party, Ltd.*, 11 F.4th 972, 978 (9th Cir. 2021).

The Ottawa-based clubs do not deny having minimum contacts with the United States, nor do any of the other OHL Clubs. Accordingly, the Court may assert personal jurisdiction over them under this Rule.

### 3. Erie and Saginaw have minimum contacts with Washington

Even if measured by contacts with Washington, the Erie Otters and Saginaw Spirit have purposefully directed their conduct toward Washington by agreeing not to source players from that state and the claims arise out of that agreement.

## C. The NHL is subject to personal jurisdiction

### 1. Clayton Act Jurisdiction

The Clayton Act also confers jurisdiction over the NHL. Although Defendants cite non-binding cases in support of their argument that the Clayton Act applies only to incorporated entities, the Ninth Circuit has not decided whether an unincorporated business entity, as distinguished from an individual, is a "corporation" for purposes of Clayton Act jurisdiction. Analogous cases suggest that it would. *See, e.g.*, *D'Augusta*, 117 F.4th at 1100 n.1 (finding district court erred in concluding that Section 12 did not reach limited partnership defendant).

Pls.' Consol. Opp'n to Defs.' Mots. to Dismiss - 24
Case No. 2:24-CV-2135-TL

ZELLE LLP
1774 Pennsylvania Avenue NW, Suite 375
Washington, DC 20006

### 2. Long-Arm Jurisdiction

Even if the forum is limited to Washington, Plaintiffs have made a *prima facie* showing on the first two elements and the NHL has failed to meet its burden to show the exercise of jurisdiction over it would be unreasonable.

> #### i. The NHL purposefully availed itself of the laws of, and directed its conduct at, Washington

The NHL argues that it did not "expressly aim" any conduct at Washington and, if it did, it could not have known that the conduct would cause harm in that forum.[4] Plaintiffs' Complaint amply demonstrates the opposite. Plaintiffs have alleged in detail the NHL's involvement in a transnational conspiracy that includes several Clubs, and an NHL club, that are located in Washington. Compl. ¶¶ 32-40, 82, 268-279, 281, 291, 293, 319-21. Gould played for a WHL Club in Washington and suffered injuries here. *Id.* ¶¶ 72-74. Moreover, the NHL–CHL Agreement requires, for example, that a Player drafted into the NHL from Kennewick's Tri-City Americans must be returned to Washington (*i.e.*, Tri-City) if he does not make the NHL club's roster. *Id.* ¶¶ 270-71, 287. In this respect, the NHL actively participates in the conspiracy by requiring that NHL clubs return Players who do not make their rosters to their former Clubs, ensuring that these Players will again be subject to the same anticompetitive restraints. Similarly, the NHL-CHL Agreement requires that the *Seattle Kraken* return to any Major Junior Defendant, including any QMJHL Club, any NHL draftee who does not make the Kraken's opening day roster. Indeed, the Kraken did so just a few months ago when they assigned their top draft pick in the

---

[4]   In a footnote, the NHL argues that the Complaint's allegations failed to show purposeful availment. NHL Mem. 8 n.10. As shown above, however, the Court may take judicial notice of the NHL's 2022 admission in this District that it transacts business here.

ZELLE LLP
1774 Pennsylvania Avenue NW, Suite 375
Washington, DC 20006

2024 NHL draft, Berkly Catton, to the WHL's Spokane Chiefs.[5]   This conduct is "expressly aimed" at Washington and profits the Kraken and the NHL at Players' expense.  In addition, the NHL further expressly aims its conduct at Washington because it compels its constituent clubs to cause their minor league affiliates in the AHL and the ECHL to refuse to compete for the services of Players in Washington under the age of 20.

> ### ii.     The claims arise out of or relate to the NHL's contacts with Washington

For the reasons discussed above, many of Plaintiffs' claims arise out of or relate to the NHL's contacts with Washington.  For example, Plaintiffs challenge the part of the NHL–CHL Agreement that requires NHL clubs, including the Kraken, to return draftees that do not make their rosters to the Major Junior Clubs that owned their rights, thereby perpetuating the scheme with respect to those Players.  Similarly, Plaintiffs challenge the NHL's payments that reinforce, for example, the Tri-City Americans' agreements with other WHL Clubs not to compete for Players outside of their allocated territory in the western part of North America.

> ### iii.    The NHL has failed to meet its burden of showing the exercise of personal jurisdiction would be unreasonable

The NHL argues that conferring jurisdiction over it would be unreasonable because it has "limited contacts" with Washington, and it would be inefficient to litigate in this District because the witnesses and evidence against the NHL are elsewhere.  NHL Mem. 15.  The NHL neglects to mention that it has previously been subject to suit in this district.  *See Smack Apparel Co. v. Seattle Hockey Partners, LLC*, No. 22-CV-44, 2022 U.S. Dist. LEXIS 149326 (W.D. Wash. Aug. 19, 2022) (NHL named as defendant); *Seattle Totems Hockey Club, Inc. v. NHL*, 652 F.2d 852 (9th Cir. 1981) (on appeal from the Western District of Washington); *Seattle Totems Hockey Club, Inc.*

---

[5]  *See supra* n.1.

ZELLE LLP
1774 Pennsylvania Avenue NW, Suite 375
Washington, DC 20006

*v. NHL*, No. 75-CV-804, 1983 U.S. Dist. LEXIS 20342 (W.D. Wash. Aug. 22, 1983) (denying NHL's motion for summary judgment). In none of these cases did a court dismiss the NHL for want of personal jurisdiction.

The NHL also fails to address the factors this Court considers for reasonableness, and the arguments it does assert are unpersuasive. The NHL mostly focuses on asserted burden and efficiency, citing a pre-*Daimler* non-antitrust case against a foreign individual with few ties to the chosen forum to argue that the NHL has not "purposefully injected" itself into this District. *Glencore Grain Rotterdam B.V. v. Shivnath Rai Harnarain Co.*, 284 F.3d 1114, 1125 (9th Cir. 2002). Unlike the defendant in *Glencore*, the NHL has many ties to Washington, including a professional hockey team, merchandising and television revenues, and its participation in a transnational conspiracy that inflicts antitrust injury on teenage hockey players from Washington. Indeed, just a year ago the NHL staged its marquee event, the Winter Classic, in this forum.[6]

The NHL must meet a high hurdle with respect to its efficiency argument because the "inconvenience for [the defendant] must be so great as to constitute a deprivation of due process." *In re CRT Antitrust Litig.*, 27 F. Supp. 3d at 1013 ("[C]ostliness and evidentiary complexity are simply parts of modern, multinational litigation, especially when the claims at issue concern an international price-fixing conspiracy"); *see also Shields*, 419 F. Supp. 3d at 1210 (location of evidence and witnesses no longer weighed heavily given the "modern advances in communication and transportation"). The NHL has failed to demonstrate the exercise of jurisdiction over it would deprive it of due process.

---

[6] *See* Geoff Baker, *NHL's outdoor tradition continues in Seattle with Winter Classic*, Seattle Times (Dec. 30, 2023), https://www.seattletimes.com/sports/kraken/nhls-outdoor-tradition-continues-in-seattle-with-winter-classic/.

Pls.' Consol. Opp'n to Defs.' Mots. to Dismiss - 27
Case No. 2:24-CV-2135-TL

ZELLE LLP
1774 Pennsylvania Avenue NW, Suite 375
Washington, DC 20006

## IV. NEITHER THE FTAIA NOR PRINCIPLES OF COMITY BARS PLAINTIFFS' CLAIMS

### A. Legal Principles Applicable to Rule 12(b)(6) Motions

A complaint need only include "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). In deciding a Rule 12(b)(6) motion, courts "accept as true all facts alleged in the complaint and construe them in the light most favorable to plaintiffs, the non-moving party." *Snyder & Assocs. Acquisitions LLC v. United States*, 859 F.3d 1152, 1157 (9th Cir. 2017).

### B. Defendants' Motion is Premature

Following the Ninth Circuit's decision in *Hsiung*, a defendant may no longer move for dismissal on FTAIA grounds pursuant to Rule 12(b)(1), as the FTAIA is no longer deemed a jurisdictional limitation on a court's power to hear the dispute. *See, e.g.*, *In re Capacitors Antitrust Litig.*, No. 14-CV-3264, 2016 WL 5724960, at *3 (N.D. Cal. Sept. 30, 2016) (citing *United States v. Hsiung*, 778 F.3d 738, 751 (9th Cir. 2015)). Accordingly, Defendants moved pursuant to Rule 12(b)(6). This distinction is significant because, unless a defect in pleading is plainly apparent on the face of the Complaint, questions about the applicable scope of the Sherman Act (including whether the FTAIA creates a carve-out on the facts of this case) are merits issues that cannot be resolved under Rule 12(b)(6). *See In re Optical Disk Drive Antitrust Litigation*, No. 10-md-02143-RS, 2015 WL 1926635, at *3 (N.D. Cal. Apr. 28, 2015) (denying motion to dismiss on FTAIA grounds because motion "implicates issues that ultimately may be appropriate for consideration on summary judgment, but which do not warrant dismissal at the pleading stage"); *see also CSR Ltd. v. Cigna Corp.*, 405 F. Supp. 2d 526, 533 (D.N.J. 2005) ("[I]f the FTAIA merely created additional substantive elements, then arguments to dismiss antitrust claims under the FTAIA would be properly analyzed under summary judgment standards pursuant to [Rule 56].").

Pls.' Consol. Opp'n to Defs.' Mots. to Dismiss - 28
Case No. 2:24-CV-2135-TL

ZELLE LLP
1774 Pennsylvania Avenue NW, Suite 375
Washington, DC 20006

Plaintiffs allege that Defendants engaged in anticompetitive conduct in the United States by agreeing to allocate an exclusive territory to each League and that each U.S. state was specifically allocated to one of the three exclusive territories. Compl. ¶¶ 84-146, 128, 168-171, 174-179. Plaintiffs further allege that Defendants, either directly or through their Leagues, scout Players in the United States and that Players who reside outside of a League's exclusive territory are not scouted by that League or by any of its Clubs. *Id*. ¶¶ 177, 179, 280. Plaintiffs also allege each League holds a player draft each year and Clubs may only draft Players who reside in the exclusive territory allocated to the Clubs' League. *Id*. ¶¶ 179-83, 281. Accordingly, a Player who resides in a U.S. state may only be drafted by a Club from a League that has been allocated exclusive rights to Players in that state. And once drafted, that Player may only sign with his drafting Club. The market for that Player's labor is restrained because no other Club (including U.S.-based Clubs) will compete for his services, either due to the market allocation agreement or as a consequence of the draft. The market for a Player who resides in Canada is similarly restrained: Once drafted, the market for his services is restrained because no Club (including U.S.-based Clubs) other than his drafting Club will compete for his services. Accordingly, Defendants have restrained competition in the North American labor market for Players' services, which includes the United States. *See Subspace Omega LLC v. Amazon Web Servs.*, No. 23-CV-1772, 2024 WL 5202517 (W.D. Wash. Dec. 23, 2024) (denying motion to dismiss on FTAIA grounds because plaintiff alleged that it was excluded as a competitor in a global market that included the United States).

Plaintiffs further allege Defendants' naked restraint on competition ensures the effectiveness of Defendants' other restraints—including their agreements to require Players to sign SPAs that, among other things, (a) have a multiyear term covering the entirety of a Players' major

Pls.' Consol. Opp'n to Defs.' Mots. to Dismiss - 29
Case No. 2:24-CV-2135-TL

ZELLE LLP
1774 Pennsylvania Avenue NW, Suite 375
Washington, DC 20006

junior career, (b) set prohibitive development or transfer fees that must be paid before a Player may be released from his SPA, (c) allow Clubs to retain Players on Protected Lists even if they are inactive, and (d) provide for non-competitive compensation for Players' services, which are provided in Canada and the United States. Compl. ¶¶ 201-223. Defendants' agreements also precluded age-appropriate Players from playing on teams in the AHL and ECHL and limited their ability to play in the NHL (by creating incentives for NHL clubs to return NHL players to their former Major Junior Clubs). *Id.* ¶¶ 220, 271-272, 277.

As explained below, these allegations are more than sufficient to show that Plaintiffs have pleaded a viable Sherman Act claim and that factual disputes regarding the application of the FTAIA, if any, are appropriately addressed at summary judgment.

## C. The FTAIA Does Not Immunize Defendants

1. <u>The FTAIA Does Not Apply to Claims Involving Markets that Include the United States</u>

As courts in the Ninth Circuit have recognized, Congress intended the FTAIA to "assure American companies that they would not be liable under the Sherman Act for conduct that typically would be considered anticompetitive, *so long as that conduct adversely affected foreign markets only*." *Capacitors*, 2016 WL 5724960, at *1 (citing *Empagran*, 542 U.S. at 161) (emphasis added). The FTAIA does so "by setting forth a general rule stating that the Sherman Act 'shall not apply to conduct involving trade or commerce …. with foreign nations.'" *Precision Assocs. v. Panalpina World Transp.*, No. 08-CV-42, 2013 WL 6481195, at *23 (E.D.N.Y. Sept. 20, 2013). In *Empagran*, the Supreme Court interpreted this phrase to mean "'commerce that did not involve American exports, but which was *wholly foreign*.'" *Empagran*, 542 U.S. at 163 (emphasis added). The Supreme Court supported this interpretation with the House Report on the FTAIA, in which Congress wrote: "It is thus clear that *wholly foreign transactions* as well as export

ZELLE LLP
1774 Pennsylvania Avenue NW, Suite 375
Washington, DC 20006

transactions are covered by the [FTAIA] . . ." *Empagran*, 542 U.S. at 163 (quoting H.R. Rep. No. 97-686 (1982)) (emphasis added).

In *Subspace Omega*, this Court denied an FTAIA challenge in a monopolization case because the "relevant market" included, but was not limited to, the United States. 2024 WL 5202517, at *12. This Court found that the effect of the defendant's anticompetitive conduct was to eliminate the plaintiff as a competitor, which resulted in a decrease in quality across the relevant *global* market. *Id.* The same analysis applies here. Defendants' anticompetitive conduct restrains competition for Player services across North America. Thus, Players who reside in Maine and Quebec suffer the same antitrust injury, in part, due to Defendants' conduct in Michigan, Pennsylvania, and Washington, while Players who reside in Washington suffer antitrust injury, in part, due to Defendants' conduct in Ontario and Quebec.

Moreover, Defendants' contention that 85% of the relevant transactions between Players and Clubs occurred outside of the United States is mistaken. MJ Mem. 7. Courts recognize that a "transaction" encompasses *all conduct performed under a contract*, from execution until "all the legal rights and obligations under the contract have been extinguished." *Duarte v. Quality Loan Serv. Corp.*, No. 17-CV-8014, 2018 WL 2121800, at *7 (C.D. Cal. May 8, 2018) (citing Black's Law Dictionary (10th ed. 2014)). The SPAs here are multiyear contracts that cover the entirety of Players' major junior careers. Compl. ¶ 24, 76, 166, 196, 204, 211. Accordingly, all work performed by Players and Defendants under those SPAs is therefore part of the relevant "transaction."

Defendants' myopic focus on the geographic location of the execution of the SPAs and the residence of Major Junior Clubs mirrors arguments made by defendants in *Capacitors*, where the district court chastised the defendants for focusing exclusively on where the plaintiffs chose to

Pls.' Consol. Opp'n to Defs.' Mots. to Dismiss - 31
Case No. 2:24-CV-2135-TL

ZELLE LLP
1774 Pennsylvania Avenue NW, Suite 375
Washington, DC 20006

purchase the price-fixed product, writing: "Defendants go too far. The locus of a transaction is not dispositive under the FTAIA." *Capacitors*, 2016 WL 5724960, at *5. The district court then considered the entirety of the transaction—who sold the product, where it was sold, who paid for it, where it was shipped, who took delivery, and where title transferred, among other factors. *Id.*; *see also Am. Copper & Brass, Inc. v. Donald Boliden AB*, No. 04-CV-2771, 2006 WL 8434907, at *3 (W.D. Tenn. Mar. 27, 2006) ("Notwithstanding Defendants' claim that its extraterritorial conduct had a *de minimis* effect on this country, *once a defendant executes performance under a price fixing agreement in the United States*, the agreement and the act are sufficient to establish a claim under the Sherman Act.") (emphasis added).

The same broad view of an individual transaction is even more appropriate here, because the location of Players' performance of their SPAs is a function of Defendants' illegal agreement. While the relevant transaction between a Player and the Club that drafted (or traded for) him includes the (forced) signing of an SPA, it also includes the market allocation agreement itself, as well as practices, travel, and games played under that SPA, Defendants' payment of monies to the Player, the Player's participation in Defendants' marketing activities, and Defendants' broadcast of that Player's games. Most of these factors apply to all Players, and some portion of them apply to all of them. At this stage, the allegations are sufficient to show that the "transactions" included the United States, were thus not "wholly foreign," and accordingly fall outside the scope of the FTAIA. Defendants' contrary arguments rest on, at best, disputed inferences that cannot be drawn in their favor.

Defendants rely exclusively on cases where the relevant transactions were clearly "wholly foreign." *See*, *e.g.*, *Empagran*, 542 U.S. at 159 (relevant transaction was wholly foreign because foreign plaintiff purchased price-fixed product outside of the United States); *In re Dynamic*

ZELLE LLP
1774 Pennsylvania Avenue NW, Suite 375
Washington, DC 20006

*Random Access Memory (DRAM) Antitrust Litig.*, 546 F.3d 981, 984 (9th Cir. 2008) (same); *see also Motorola Mobility v. AU Optronics Corp.*, 775 F.3d 816 (7th Cir. 2015) (relevant transaction was wholly foreign because Motorola decided to have its foreign subsidiary purchase LCD panels from foreign defendants); *In re Rubber Chems. Antitrust Litig.*, 504 F. Supp. 2d 777 (N.D. Cal. 2007) (same); *In re Intel Corp. Microprocessor Antitrust Litig.*, 452 F. Supp. 2d 555 (D. Del. 2006) (relevant transaction was wholly foreign because plaintiff's monopolization claims were based on lost sales of foreign products to foreign customers).

Those cases are easily distinguished from Plaintiffs' claims here. First, those cases concerned millions of individual transactions which began with a purchase order and ended with the payment of funds and the delivery of the ordered goods outside of the United States. Where those individual transactions were "wholly foreign"—*i.e.,* the price-fixed goods were bought by, paid for, and delivered to foreign entities—they were excluded by operation of the FTAIA. *Rubber Chems.*, 504 F. Supp. 2d at 784; *Empagran,* 542 U.S. at 159; *In re DRAM Antitrust Litig.*, 546 F.3d at 984. Here, by comparison, Plaintiffs allege that in performance of their contractual obligations to their Clubs, they travel within or to the United States, practice in the United States, and play hockey games in the United States. Compl. ¶¶ 152, 280-282. In cases where transactions that were performed in part in the United States, the transactions were held *not* to be barred by the FTAIA. *See Capacitors*, 2016 WL 5724960, at *3 ("[T]he parties agree that [foreign] capacitor sales billed to entities in the United States are not excluded by the FTAIA *regardless of where the products were ultimately delivered.*") (emphasis added).

Defendants claim *Motorola Mobility LLC v. AU Optronics Corp.*, 775 F.3d 816 (7th Cir. 2015), is instructive. MJ Mem. 10. It is, but not in a way that helps them. In that case, Motorola purchased priced-fixed products from foreign defendants in (1) the United States and, (2) outside

ZELLE LLP
1774 Pennsylvania Avenue NW, Suite 375
Washington, DC 20006

the United States through foreign subsidiaries. *Motorola*, 775 F.3d at 817. The Seventh Circuit held that Motorola could not seek damages for the purchases it made through those subsidiaries *because Motorola made a conscious decision to operate through those foreign entities* which, for example, provided the Motorola with tax benefits overseas. *Id*. at 820-21. The opposite is true here: Players did not *choose* to sign with Canadian clubs any more than they chose to agree to the terms of the SPAs that they had to sign as a result of the anticompetitive scheme. Through involuntary drafts, geographic market allocations, and unwanted trades, *Defendants* decided where Plaintiffs could play. Consider, for example, the experience of Gould, who was drafted by Tri-City and then traded against his wishes to Prince George. Or DiLaura, a Minnesota resident who was drafted by Prince George. Defendants would allow Gould to seek damages only for the period of time he was allocated by Defendants' conspiracy to Tri-City and would deny damages to Isaiah altogether. MJ Mem. 11. It is an illogical argument that cannot be squared with the text of the FTAIA, *Empagran*, or *Motorola*.[7]

## 2. Plaintiffs Meet the FTAIA's Domestic Effects Exception

Defendants' FTAIA arguments fall at the very first hurdle because their conduct and the relevant transactions are not "wholly foreign," precluding application of the FTAIA. For the same

---

[7] *Motorola* confirmed that even if 99% of a plaintiff's damage claims should be dismissed pursuant to the FTAIA, injunctive relief could still be granted. *Motorola*, 775 F.3d at 825-26 (noting difference between private damage claims and criminal injunctive relief). The FTAIA is no more a hurdle here than if Department of Justice had sought the relief itself. Defendants assert that two district courts have declined to issue injunctions against "foreign conduct giving rise to foreign effects," CHL Mem. 10., but neither case remotely resembles this one. The first, *DRAM*, presents an unremarkable application of the FTAIA to damage claims brought by a foreign purchaser arising from purely foreign conduct in which the district court did not independently analyze the request for injunctive relief. The second, *In re TFT-LCD (Flat Panel) Antitrust Litig.*, No. M 07-1827 SI, 2008 WL 2219837 (N.D. Cal May 27, 2008), involved a request to enjoin a proposed joint venture in Japan between foreign corporations where the plaintiffs failed to show any potential harm to competition.

Pls.' Consol. Opp'n to Defs.' Mots. to Dismiss - 34
Case No. 2:24-CV-2135-TL

ZELLE LLP
1774 Pennsylvania Avenue NW, Suite 375
Washington, DC 20006

reasons, Defendants' conspiracy has a direct, substantial, and reasonably foreseeable effect on U.S. commerce and that effect gives rise to Plaintiffs' claims. *See Empagran*, 542 U.S. at 162. As shown, the territorial allocations and restrictions on player movement directly caused a restriction in competition among U.S.-based clubs for the Players' labor and Plaintiffs' claims all arise from, among other things, that restriction. *See Shields*, 419 F. Supp. 3d at 1219 (quoting *In re DRAM Antitrust Litig.*, 546 F.3d at 988). Absent any effect on domestic commerce, Players (including Canadian Players forced to sign SPAs with Canadian Clubs) could have marketed themselves to U.S.-based Clubs and negotiated better contract terms.

In short, the "FTAIA does not state or support a *per se* rule excluding foreign purchasers just because they did their buying abroad." *Capacitors*, 2016 WL 5724960, at *5. To prevail on their motion, Defendants would have to be able to establish that, as a matter of law, the pleadings disclose *only* "foreign injury *independent of* domestic effects." MJ Mem. 13 (quoting *Rubber Chems.*, 504 F. Supp. 2d at 784). They cannot, as that would require the Court to draw inferences from the pleadings in Defendants' favor. Indeed, a straight line can be drawn between the restriction of competition among buyers across North America and Plaintiffs' injuries. That line exists regardless of whether Defendants allocated a Player to a Canadian- or U.S.-based Club. As was the case for the plaintiff in *Subspace*, Plaintiffs' allegations are "not reliant on the kind of intervening developments that render its alleged [domestic] effects speculative." 2024 WL 5202517, at *12.

### D. Comity Principles Provide No Basis for Dismissal

Once the Court determines that the FTAIA does not require dismissal of any claims, it can summarily reject Defendants' unsupported and sparse comity argument. Defendants cite no case in which a district court dismissed on comity grounds alone, and the law does not support their arguments. *See, e.g., Empagran*, 542 U.S. at 164 ("[O]ur courts have long held that application of

Pls.' Consol. Opp'n to Defs.' Mots. to Dismiss - 35
Case No. 2:24-CV-2135-TL

ZELLE LLP
1774 Pennsylvania Avenue NW, Suite 375
Washington, DC 20006

our antitrust laws to foreign anticompetitive conduct is nonetheless reasonable, and hence consistent with principles of prescriptive comity, insofar as they reflect a legislative effort to redress domestic antitrust injury that foreign anticompetitive conduct has caused."). Comity should not bar Plaintiffs' claims for the following reasons:

*First,* comity counsels courts to abstain from asserting *subject matter jurisdiction* that was otherwise properly asserted, only where doing so would conflict with or interfere with another nation's laws. *Sarei v. Rio Tinto, PLC*, 487 F.3d 1193, 1211 (9th Cir. 2007); *see also* Restatement (3d) of the Foreign Relations Law of the U.S. § 403 cmt. e (noting that conflicts exist "only when one state requires what another prohibits, or where compliance with the regulations of two states exercising jurisdiction consistently with this section is otherwise impossible"). But Defendants' motion is brought pursuant to Rule 12(b)(6), not Rule 12(b)(1). To the extent comity is relevant to Defendants' motion, it is solely as a principle that informed the statutory language of the FTAIA.

*Second*, Plaintiffs' claims do not raise any comity concerns. Comity concerns only exist where there is a "true conflict of law" because the two countries' legal demands are "irreconcilable." *In re Vitamin C Antitrust Litig.*, 8 F.4th 136, 145 (2d Cir. 2021) (*citing Hartford Fire Ins. Co. v. California*, 509 U.S. 764, 799 (1993)); *see also* Restatement (3d)*, supra* (same). Defendants make no such showing here. As Defendants note, their anticompetitive conduct has been challenged under Canadian law.[8] Defendants mischaracterize the holding of *Mohr*: the court did not dismiss the case on the merits or because the conduct alleged by Mohr was legal in Canada. *Mohr v. NHL*, [2021] FC 488 (Can.). Rather, the Mohr court found that Mohr's claims could only

---

[8] Contrary to Defendants' baseless assertions, Plaintiffs do not seek to recover damages here that are duplicative of the damages sought by plaintiffs in *Carcillo* or *Latulippe*. Plaintiffs cite those cases in support of their motion for a preliminary injunction, Dkt. No. 41, as evidence of the irreparable harms that Players face should the requested injunction not issue. Plaintiffs do not seek to recover damages for personal injury in this case.

Pls.' Consol. Opp'n to Defs.' Mots. to Dismiss - 36
Case No. 2:24-CV-2135-TL

ZELLE LLP
1774 Pennsylvania Avenue NW, Suite 375
Washington, DC 20006

be brought by the Canadian Competition Bureau under Section 90.1 of the Canadian Competition Act. *Id.* ¶¶ 57-60.

Accordingly, because Defendants' conduct may be challenged as civil violations under both the Sherman Act and the Canadian Competition Act, the conflict of law necessary for this Court to abstain from exercising its jurisdiction on comity grounds is lacking. The availability of disparate enforcement mechanisms does not change the fact that Defendants can comply with both U.S. and Canadian law. *See Vitamin C*, 8 F.4th 162-63 (dismissing claims because of the existence of a true conflict between Chinese and U.S. antitrust law).

## THE NHL'S STANDING AND LABOR EXEMPTION ARGUMENTS

## V.  PLAINTIFFS GOULD AND DILAURA HAVE STANDING

Gould and DiLaura have Article III and antitrust standing to pursue their claims against the NHL because they were among the direct and targeted victims of Defendants' anticompetitive agreements, *see, e.g.*, Compl. ¶¶ 32-45; 71-75; 77-80; 147-149; 165; 213-216, 222, 248-50; 217-18, 248-249; 220; 261; 269-271; 268, 272-274; 275-279; 281; 298-305, and a favorable decision in this litigation will redress that harm, *id.* ¶¶ 52-56; 334-336.

### A.  Gould and DiLaura Have Article III Standing

"To establish Article III standing, 'a plaintiff must show that (1) he …. has suffered an actual …. injury in fact, which is concrete and particularized; (2) there is a causal connection between the injury and conduct complained of; and (3) it is likely that a favorable decision in the case will redress the injury." *Adan v. Swedish Health Services*, No. 2:23-cv-01266-TL, 2024 WL 2398208 at *3 (W.D. Wash. May 23, 2024) (Lin, J.) (quoting *Mansor v. U.S. Citizenship and Immigr. Servs.*, 685 F. Supp. 3d 1000, 1008 (W.D. Wash. 2023)). At the motion to dismiss stage, this is a relatively low burden. *Lujan v. Defenders of Wildlife*, 504 U.S. at 561 (1992) (each element of standing must be supported "with the manner and degree of evidence required at the

Pls.' Consol. Opp'n to Defs.' Mots. to Dismiss - 37
Case No. 2:24-CV-2135-TL

ZELLE LLP
1774 Pennsylvania Avenue NW, Suite 375
Washington, DC 20006

successive stages of the litigation"); *Mansor*, 685 F. Supp. 3d 1000, 1008 (W.D. Wash. 2023) (noting lower burden at pleading stage under *Lujan*) (citing *Barnum Timber Co. v. EPA*, 633 F.3d 894, 899 (9th Cir. 2011)). Gould and DiLaura easily meet this standard. Each was drafted pursuant to Defendants' unlawful market allocation and drafts, which, combined with the restrictive provisions of the SPAs, restrained competition for their services. The harms they suffered are concrete, identifiable, and remediable.

The NHL claims that the harms Gould and DiLaura suffered were *only* caused by the Major Junior Clubs' conduct. NHL Mem. 16-17. The NHL, however, relies again on a crimped reading of the Complaint, ignoring allegations that render it an active participant in the conspiracy. Compl. ¶¶ 268-279 (describing NHL's role in the conspiracy). It disregards, for example, the millions of dollars in funding payments it makes to the Major Junior Clubs. Compl. ¶ 266(j). Gould and DiLaura need not prove that they would have made it to the NHL. They need only plausibly allege (and they have) that the NHL participated in a conspiracy that caused them some harm.[9] *See, e.g., Markson v. CRST Int'l, Inc.*, No. 17-CV-1261, 2022 WL 790960, at *11 (C.D. Cal. Feb. 24, 2022) ("Because antitrust liability is joint and several, a Plaintiff injured by one Defendant as a result of the conspiracy has standing to represent a class of individuals injured by any of the Defendant's co-conspirators." (quoting *In re NASDAQ Mkt.-Makers Antitrust Litig.*, 169 F.R.D. 493, 508 (S.D.N.Y. 1996))).

The cases on which the NHL relies are inapposite. They address standing in non-conspiracy cases whereas, here, the NHL is jointly and severally liable for the injuries suffered by Gould and DiLaura. *Pinkerton v. United States*, 328 U.S. 640, 647 (1946) ("[T]he overt act of one

---

[9] The NHL argues in a footnote that allegations that the NHL clubs control their AHL and ECHL affiliates are conclusory, NHL Mem. 17 n.12, but the Complaint alleges facts demonstrating that NHL clubs control—at a minimum—their affiliates' rosters. *See* Compl. ¶¶ 220, 268, 273 279.

Pls.' Consol. Opp'n to Defs.' Mots. to Dismiss - 38
Case No. 2:24-CV-2135-TL

ZELLE LLP
1774 Pennsylvania Avenue NW, Suite 375
Washington, DC 20006

partner in crime is attributable to all."); *see also Barnum Timber*, 633 F.3d at 901-02 (finding plaintiff had standing and noting plaintiff "need not eliminate any other contributing causes [of the harm suffered] to establish its standing").

### B. Gould and DiLaura Have Antitrust Standing

As a general principle, the direct victims of antitrust violations have antitrust standing. *Assoc. Gen. Contractors of Cal. v. Cal. State Council of Carpenters (AGC)*, 459 U.S. 519, 541 (1983). The Supreme Court has identified several factors that courts should consider in assessing the availability of relief for an antitrust violation: "a causal connection between an antitrust violation and harm to the [plaintiffs]"; "improper motive"; whether the Sherman Act was enacted to prevent the type of injury at issue; "the directness or indirectness of the asserted injury"; the speculative nature of the damages; and "the potential for duplicative recovery or complex apportionment of damages." *AGC*, 459 U.S. at 537-46.

The NHL's antitrust standing argument boils down to proposition that because Gould and DiLaura were not drafted by the NHL, they could not have been harmed by the NHL. NHL Mem. 18 ("Individual Plaintiffs were never even drafted into the NHL, which means [the non-rostered player-return] provision never applied to them, let alone caused them antitrust injury."). As discussed above, the Complaint alleges that NHL is indispensable to the perpetuation of Defendants' scheme.

In addition, Gould's and DiLaura's antitrust injuries are traceable to the conspiracy. No court has parsed antitrust standing co-conspirator by co-conspirator, weeding out those co-conspirators whose role in the conspiracy had less direct impact on a particular plaintiff's injuries. Such a practice would essentially eliminate joint-and-several liability for antitrust conspirators. Tellingly, none of the CHL clubs challenge Gould or DiLaura's antitrust standing. Gould and DiLaura had no contact with the QMJHL, for instance. If Gould and DiLaura have antitrust

ZELLE LLP
1774 Pennsylvania Avenue NW, Suite 375
Washington, DC 20006

standing against the QMJHL due to its participation in the conspiracy, it stands to reason that Gould and DiLaura have antitrust standing against the NHL for its participation in the conspiracy.

Again, the Complaint does not solely allege that the NHL participates in the conspiracy through its agreement in the NHL-CHL Agreement. Rather, the NHL encourages and facilitates the conspiracy through *multiple* provisions of that anticompetitive Agreement, including provisions committing the NHL to provide the Major Junior Defendants significant funding in support of their anticompetitive system. Compl. ¶ 266(j). The Complaint also alleges that the NHL directly encourages the Major Junior Defendants' anticompetitive system, which continues to confer enormous financial benefits on the NHL, by prohibiting its minor league affiliates from competing with the Major Junior Defendants for under-20 North American hockey talent.

## VI. THE NON-STATUTORY LABOR EXEMPTION DOES NOT PROTECT THE NHL

The NHL's contention that the non-statutory labor exemption immunizes it from liability for the anticompetitive conduct alleged in the Complaint should also be rejected.

The non-statutory labor exemption shields from federal antitrust liability certain restraints on competition imposed through the collective bargaining process. *Brown v. Pro Football, Inc.*, 518 U.S. 231, 236-37 (1996). The doctrine seeks to reconcile potential conflicts between federal labor and antitrust law by allowing unions and employers to negotiate CBAs and other contracts that address mandatory terms and conditions of employment in the bargaining unit represented by the union, despite the potential anticompetitive effects of those agreements. *Id.* at 237; *Allen Bradley Co. v. Local Union No. 3, IBEW*, 325 U.S. 797, 806 (1945). The doctrine cannot immunize the NHL from liability for the anticompetitive conduct alleged here, though, for multiple reasons.

First, the NHL relies on documents and evidence outside the scope of the Complaint that may not be considered under Rule 12(b)(6). Second, even if those documents could be considered,

Pls.' Consol. Opp'n to Defs.' Mots. to Dismiss - 40
Case No. 2:24-CV-2135-TL

ZELLE LLP
1774 Pennsylvania Avenue NW, Suite 375
Washington, DC 20006

and even if they were construed as NHL now urges, they would not provide blanket immunity to the NHL because (1) the challenged restrains do not govern entry into the NHL and primarily affect Major Junior Players who either never entered the NHL or who already left it, and (2) Plaintiffs also challenge a restraint that the NHL recognizes is entirely outside the scope of those documents, the NHL's agreement to prohibit its minor league affiliates from competing with the Major Junior Defendants for under-20 hockey talent. Restraints that principally, if not solely, affect non-parties to the NHL's bargaining relationship with the NHLPA cannot be protected by any labor immunity flowing from the NHL-NHLPA CBA, nor can any restraints having no possible connection to that CBA.

### A. The NHL's collective bargaining agreement with the labor union representing its players is not properly before this Court on the NHL's motion to dismiss.

The NHL's non-statutory exemption argument should not even be considered at this stage, because it relies upon evidence not properly before the Court: (1) its CBA with the labor union that represents its players, the National Hockey League Players Association ("NHLPA"), *see* NHL Mem. 21 (citing Ex. 4); and (2) factual representations made by NHL Deputy Commissioner William L. Daly regarding the NHLPA's negotiations with the NHL and an e-mail exchange attached to his declaration containing inadmissible hearsay. NHL Mem. 4-5, 22 (citing Dkt. No. 142 ("Daly Decl.") ¶¶ 13-16 & Ex. 5).)

Courts adjudicating Rule 12(b)(6) motions may only consider documents attached or incorporated by reference into the complaint through "extensive" reference therein or because plaintiff's claims necessarily rely upon them, and certain public records to the extent they contain judicially noticeable facts. *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 998-99, 1002-03 (9th Cir. 2018). The NHL-NHLPA CBA and the Daly declaration fall into neither category. In fact, the NHL does not even attempt to argue that the Daly declaration is admissible.

Pls.' Consol. Opp'n to Defs.' Mots. to Dismiss - 41
Case No. 2:24-CV-2135-TL

ZELLE LLP
1774 Pennsylvania Avenue NW, Suite 375
Washington, DC 20006

The NHL's only textual basis for arguing that the Complaint incorporates the NHL-NHLPA CBA by reference is a statement in a single paragraph in Plaintiffs' 353-paragraph Complaint that "[p]layer drafts are … used in several other professional sports leagues" and "have been the subject of collective bargaining with duly certified player associations." NHL Mem. 4; *see* Compl. ¶ 192. That statement does not directly reference or quote *any* CBA, let alone the NHL-NHLPA CBA, and is not close to the "extensive" reference required to incorporate a document by reference. *United States v. Ritchie*, 342 F.3d 903, 908-09 (9th Cir. 2003) (mere mention of document's existence insufficient to incorporate contents); *see also Khoja*, 899 F.3d at 1007 (documents unnamed in complaint not incorporated by reference).[10]

Nor do Plaintiffs' claims for relief rely (much less "necessarily" rely) upon the NHL-NHLPA CBA. *See Khoja*, 899 F.3d at 1002. The NHL does not argue otherwise, nor could it, as the Complaint's allegations are not based in any way on the NHL-NHLPA CBA, and the terms of that CBA are therefore not necessary to the Complaint. *See, e.g.*, *id.* at 1004 (blog post cited once and providing factual background not incorporated into complaint because contents were not necessary to establish any element of claims). That Defendants seek to rely on the NHL-NHLPA CBA as the foundation for their non-statutory labor exemption *defense* does not change that result. As the Ninth Circuit has held, if a document "merely creates a defense to the well-pled allegations in the complaint, then that document did not necessarily form the basis of the complaint." *Id.* at 1002. Applying this precedent, the court in *Ulloa v. Securitas Security Services USA* refused to consider an unpled CBA and related witness declarations submitted by the defendant on a Rule

---

[10] The NHL's assertion that Plaintiffs' failure to include in their Complaint a passing reference to the NHL that appeared in Plaintiffs' previous SDNY complaint constitutes a "judicial admission" is unsupported by any on-point authority. *See* NHL Mem. 30 n.13. Even if the Court were to deem it proper to consider Plaintiffs' SDNY complaint, that brief prior reference was insufficient to incorporate the NHL-NHLPA CBA into that complaint either.

ZELLE LLP
1774 Pennsylvania Avenue NW, Suite 375
Washington, DC 20006

12(b)(6) motion where the plaintiff's state labor code claims did not rely upon the unpled CBA. No. 23-CV-1752, 2023 WL 8720140, at *2 nn.1-2 (N.D. Cal. Dec. 18, 2023) (citing *Lee v. City of Los Angeles*, 250 F.3d 668, 688 (9th Cir. 2001) & *Khoja*, 899 F.3d at 1002). This Court should likewise refuse to consider the NHL-NHLPA CBA or the Daly declaration.

The NHL suggests that the Court may nonetheless consider the NHL-NHLPA CBA because that document is available on the NHL's website. NHL Mem. 4 n.4. But the relevant question raised by Defendants' 12(b)(6) motion is not whether the NHL-NHLPA CBA exists, online or otherwise, but how that CBA should be construed and how it might apply in the specific context of the non-statutory exemption—matters that may not be judicially noticed because they are disputed. *See Khoja*, 899 F.3d at 999-1001 (reversing judicial notice of public records' contents whose meaning was subject to reasonable dispute); *Reina-Rodriguez v. U.S.*, 655 F.3d 1182, 1193 (9th Cir. 2011) (no judicial notice where document "is subject to varying interpretations, and there is a reasonable dispute as to what [it] establishes"); *Ulloa*, 2023 WL 8720140, at *2 (in response to arguments indistinguishable from Defendant's, refusing to take judicial notice of CBA available online in absence of on-point authority supporting movant's request). [11]

---

[11]  The NHL's handful of citations are not to the contrary. NHL Mem. 4 n.4. In *Ly Chhen v. Boeing Co.*, No. 18-CV-779, 2018 WL 4103665, at *1 (W.D. Wash. Aug. 29, 2018), and *Pinkert v. Schwab Charitable Fund*, 48 F.4th 1051, 1055 n.2 (9th Cir. 2022), the noticed documents were referenced extensively in plaintiffs' complaints. *Ballard v. National Football League Players Association*, 123 F. Supp. 3d 1161 (E.D. Mo. 2015), is directly contrary to Ninth Circuit precedent prohibiting consideration at the Rule 12(b)(6) stage of documents relevant only to a defense. *See supra* at 41. *Columbare v. Sw. Airlines, Co.*, No. 3:21-CV-297-B-BK, 2023 WL 406439, at *4 (N.D. Tex. Jan. 10, 2023), took judicial notice of an online contract to resolve a choice-of-law dispute, not to adjudicate the merits of a defense. And *Mirlis v. Greer*, 952 F.3d 51, 63 n.11 (2d Cir. 2020), permitted judicial notice of blog posts to evaluate the propriety of publicly releasing a videorecorded deposition, entirely outside the Rule 12(b)(6) context.

Pls.' Consol. Opp'n to Defs.' Mots. to Dismiss - 43
Case No. 2:24-CV-2135-TL

ZELLE LLP
1774 Pennsylvania Avenue NW, Suite 375
Washington, DC 20006

For this fundamental procedural infirmity alone, the Court should reject the NHL's non-statutory exemption defense.

**B. Even if the NHL's collective bargaining agreement were properly considered on a motion to dismiss, the labor exemption would not apply.**

The NHL contends that Plaintiffs' claim against it is based solely on a provision of the NHL-CHL Agreement that requires Players drafted and signed by NHL teams, but not retained on an NHL roster, to be returned to the Major Junior Clubs from which they were drafted, and that this provision, along with all others contained in the NHL-CHL Agreement, has been incorporated into the NHL-NHLPA CBA so as to be immunized from antitrust liability. *See* NHL Mem. 1-2, 12-13, 20, 27-33.

As an initial matter, the NHL's mischaracterization of the Complaint dooms its argument. Plaintiffs challenge far more than the single provision of the NHL-CHL Agreement upon which the NHL focuses, including provisions of the NHL-CHL Agreement whereby the NHL agrees (1) to return drafted and *un*signed Players exclusively to the Major Junior Clubs from which they were drafted (Compl. ¶¶ 270-71; Ex. 1 at 8-9) and (2) to provide funding to the Major Junior Defendants in support of their anticompetitive system, which benefits the NHL by providing it a ready source of top talent at reduced cost. Compl. ¶¶ 266j, 269, 275-79; *e.g.*, Ex. 1 at 4-5 (NHL pays consideration to Major Junior Clubs in return for their consent to NHL's retention of their Players). The NHL's failure to argue that these other challenged restraints are immunized by the non-statutory exemption waives such arguments and requires rejection of the NHL's defense.

Plaintiffs also challenge a restraint that does not appear anywhere in the NHL-CHL Agreement; the NHL's agreement to restrict its minor league affiliates from competing with the Major Junior Defendants for North American hockey Players under the age of 20. Compl. ¶¶ 272-73. The NHL makes no argument that the non-statutory exemption shields this challenged

restraint. Therefore, even if the NHL-NHLPA CBA *did* incorporate the NHL-CHL Agreement and even if that Agreement's provisions *were* subject to the non-statutory exemption (it does not, and they are not, *see infra*), the exemption would not cloak the NHL in blanket immunity. The Court need go no further and may reject the NHL's non-statutory exemption defense on this basis.

### C. The non-statutory labor exemption does not shield the return requirement for Players signed but not retained by the NHL, nor any other provision of the NHL-CHL Agreement.

Finally, the non-statutory exemption does not shield the single NHL-CHL Agreement provision on which the NHL focuses: the requirement that Players drafted and signed to an NHL contract but *not retained by the NHL* must be returned to the Major Junior Club from which they were drafted. That restraint has no application to players employed in the NHL and it does not restrict entry into the NHL. Rather, like every other provision in the NHL-CHL Agreement challenged as an unlawful restraint of trade, it only applies to Players who have *left* the NHL or who *never entered* it.

Application of the non-statutory exemption requires a fact-specific balancing inquiry that weighs the anticompetitive impacts of restraints imposed through collective bargaining against the strength of the union's core bargaining objectives on behalf of the workers it represents. *See, e.g., Connell Constr. Co. v. Plumbers & Steamfitters Loc. Union No. 100*, 421 U.S. 616, 621-26 (1975); *United Mine Workers of Am. v. Pennington*, 381 U.S. 657, 661-669 (1965); *Allen Bradley*, 325 U.S. at 800-11; THE DEVELOPING LABOR LAW: THE BOARD, THE COURTS, AND THE NATIONAL LABOR RELATIONS ACT, ch. 29 § 29.II.B (John E. Higgins, Jr., ed., 2023). That inquiry has been distilled into three core requirements, adopted by the Ninth Circuit as the "*Mackey* test": a restraint must "(1) … primarily affect the parties to the agreement and no one else, (2) … concern[] wages, hours, or conditions of employment that are mandatory subjects of collective bargaining, and (3) … [result] from bona fide, arm's-length collective bargaining." *Int'l Longshore & Warehouse*

Pls.' Consol. Opp'n to Defs.' Mots. to Dismiss - 45
Case No. 2:24-CV-2135-TL

ZELLE LLP
1774 Pennsylvania Avenue NW, Suite 375
Washington, DC 20006

*Union v. ICTSI Or., Inc.*, 863 F.3d 1178, 1190 (9th Cir. 2017) ("*ILWU*"); *see Mackey v. NFL*, 543 F.2d 606, 614 (8th Cir. 1976).[12]   The restraints challenged in this lawsuit satisfy none of these requirements.

> 1. <u>Because the NHLPA does not represent Major Junior League Players, who are not employed by the NHL, the restraints fail to meet the first and second *Mackey* factors.</u>

First, the restraints at issue do not primarily affect the NHL and the professional NHL hockey players represented by the NHLPA, and do not concern the terms and conditions of employment of any NHLPA-represented professional NHL players.  Rather, they principally affect Major Junior Players who are rostered and employed *by Major Junior Clubs*, not NHL teams. Because "the policy of the antitrust laws is clearly set against employer-union agreements seeking to prescribe labor standards outside the bargaining unit," *Pennington*, 381 U.S. at 659, courts uniformly refuse to apply the non-statutory exemption to agreements between a labor organization and an employer or other party with such disproportionate non-party effects. *See, e.g.*, *id.*; *Connell*, 421 U.S. at 619; *William Morris Endeavor Entertainment, LLC v. Writers Guild of America, West, Inc.*, 432 F. Supp. 3d 1127, 1137 (C.D. Cal. 2020) (non-statutory exemption inapplicable where challenged agreement "prohibit[ed] actors and directors" who were not bargaining unit members from engaging in certain conduct).

To be covered by the non-statutory exemption, the NHL would need to establish as a factual matter either that Major Junior Players are within the bargaining unit represented by the NHLPA or that the restraints Defendants impose upon the labor market for developmental league youth hockey Players primarily affect the NHL hockey players represented by the NHLPA.  Aside from

---

[12]   Although the Eighth Circuit has held that the Supreme Court's decision in *Brown v. Pro Football* overruled *Mackey*, *see Eller v. NFL Players Ass'n*, 731 F.3d 752, 754-55 (8th Cir. 2013), the Ninth Circuit has rejected that reading of *Brown*. *See ILWU*, 863 F.3d at 1194.

Pls.' Consol. Opp'n to Defs.' Mots. to Dismiss - 46
Case No. 2:24-CV-2135-TL

ZELLE LLP
1774 Pennsylvania Avenue NW, Suite 375
Washington, DC 20006

being wholly inappropriate at this pleadings stage, those showings would be factually impossible to make.

Citing the NHL-NHLPA CBA's recognition clause, the NHL erroneously contends that the NHLPA is the exclusive representative entitled to negotiate mandatory terms and conditions of employment not only for current NHL players, but also for Major Junior Players who, despite having signed an NHL contract, were sent back to the Major Junior Leagues pursuant to the NHL-CHL Agreement's mandatory return provision who do *not* play in the NHL as a result. NHL Mem. 28. However, the CBA's recognition clause language designating the NHLPA as "the exclusive bargaining representative of all present and future Players *employed as such in the League by the Clubs*," Ex. 4 at 10 (emphasis added), makes clear that the NHLPA is only authorized to represent professional hockey players *currently* employed by the NHL—not, as here, players who were never employed by the NHL, or were initially drafted and signed but then returned to the Major Junior Leagues. Indeed, the NHLPA's Constitution defines its membership as "[a]ll players who are on an NHL club roster," which does *not* include Players who are initially drafted and signed by the NHL but then returned to their Major Junior League employer. [13]

To argue that the non-statutory exemption can apply to restraints primarily affecting Players outside the bargaining unit, the NHL relies on cases involving collectively bargained restrictions on professional sports draft eligibility (e.g., who may be drafted and which teams they may play for). *See* NHL Mem. 20-21. But those cases merely illustrate the longstanding, noncontroversial labor law principle that the terms and conditions for *entering* a bargaining unit

---

[13] Although the NHLPA Constitution is not before the Court on Defendants' Rule 12(b)(6) motion, *see supra* at 41, if the Court disagrees and takes judicial notice of the NHL-NHLPA CBA, Plaintiffs request that it also take judicial notice of the NHLPA Constitution, which appears at https://ipmall.law.unh.edu/sites/default/files/hosted_resources/SportsEntLaw_Institute/League%20Constitutions%20&%20Bylaws/nhlpa_constitution.pdf.

Pls.' Consol. Opp'n to Defs.' Mots. to Dismiss - 47
Case No. 2:24-CV-2135-TL

ZELLE LLP
1774 Pennsylvania Avenue NW, Suite 375
Washington, DC 20006

(i.e., becoming employed within the unit) are within the mandatory subjects a union is authorized to negotiate on behalf of its membership, even if the resulting provisions also affect some individuals outside the bargaining unit. *See, e.g.*, *Clarett*, 369 F.3d at 139 (likening NFL eligibility rules to "circumstances under which an employer may … refuse to hire an employee," a traditional "mandatory bargaining subject" (alteration in original)); *Nat'l Basketball Ass'n v. Williams*, 45 F.3d 684, 685-86 (2d Cir. 1995) (describing NBA basketball teams as comprising a multi-employer bargaining unit for which player draft sets terms of entry); *Wood v. Nat'l Basketball Ass'n*, 809 F.2d 954, 960 (2d Cir. 1987) (comparing NBA draft to "exclusive referral of workers by a hiring hall"). Provisions that restrict or define the conditions of *entry* into a bargaining unit are a far cry from provisions that primarily affect the terms and conditions of non-party, unrepresented workers who are employed entirely *outside* the bargaining unit, like those at issue here.[14]

Because the anticompetitive restraints that Plaintiffs challenge primarily affect the Major Junior Leagues and the Players they employ, not the terms and conditions of employment of the parties to the NHL-NHLPA CBA (the NHL and the NHLPA's NHL hockey player members), the non-statutory exemption does not apply.

---

[14] Similarly, the reserve system and transfer payment cases the NHL cites address rules governing *intra-league* transfers between employers within a multi-employer professional sports league bargaining unit, not *inter-league* transfers between unionized (NHL teams) and non-unionized employers (Major Junior Clubs). *See Silverman v. Major League Baseball Player Rels. Comm., Inc.*, 67 F.3d 1054, 1061 (2d Cir. 1995) (addressing free agency and reserve system provisions governing hiring of Major League Baseball players); *McCourt v. California Sports, Inc.*, 600 F.2d 1193 (6th Cir. 1979) (addressing reserve system requirements applying to NHL players). They, too, are inapposite.

Pls.' Consol. Opp'n to Defs.' Mots. to Dismiss - 48
Case No. 2:24-CV-2135-TL

ZELLE LLP
1774 Pennsylvania Avenue NW, Suite 375
Washington, DC 20006

2. <u>Defendants cannot establish that the challenged restraints resulted from bona fide arm's-length bargaining, so the third *Mackey* factor also is not satisfied.</u>

Initially, the NHL cannot establish as a matter of law that the challenged restraints were agreed to by the NHLPA, let alone that they resulted from "bona fide, arms-length collective bargaining." *ILWU*, 863 F.3d at 1190. Setting aside that this question of fact is wholly inappropriate on this motion to dismiss, the NHL's assertion that the NHL-CHL Agreement was incorporated in its entirety into the NHL-NHLPA CBA and ratified by the NHLPA is highly implausible.[15] The 2005 letter that purportedly effects such incorporation, *see* NHL Mem. 5 (citing Ex. 6), merely provides: (1) *if* the NHL considers modifying any of the NHL-CHL Agreement provisions *specifically cited* in the NHL-NHLPA CBA, and (2) *if* the NHL's proposed modification of those cited provisions would affect the terms and conditions of employment of the NHLPA's bargaining unit members (i.e., professional NHL hockey players), then (3) the NHL would be required to bargain and reach agreement with the NHLPA before implementing any of the proposed modifications. Ex. 6. That language does not come close to incorporating the entire NHL-CHL Agreement into the CBA. *See M & G Polymers USA, LLC v. Tackett*, 574 U.S. 427, 435 (2015) (CBAs are interpreted according to ordinary principles of contract law).

The NHL also erroneously argues that Articles 8.7 and 9.1(d)(iv) of the CBA set forth the Major Junior return requirement for Players signed but not retained on an NHL roster. But Article

---

[15] "[W]hat the parties intended by an ambiguous contract is a factual determination," *United States v. Plummer*, 941 F.2d 799, 803 (9th Cir. 1991), and thus "where the language 'leaves doubt as to the parties' intent,' [any] motion to dismiss must be denied." *Williams v. Apple, Inc.*, 449 F. Supp. 3d 892, 908 (N.D. Cal. 2020) (quoting *Monaco v. Bear Stearns Residential Mortg. Corp.*, 554 F. Supp. 2d 1034, 1040 (C.D. Cal. 2008) (quoting *Consul Ltd. v. Solide Enteres., Inc.*, 802 F.2d 1143, 1149 (9th Cir. 1986))); *cf. Bedrosian v. Tenet Healthcare Corp.*, 208 F.3d 220 (9th Cir. 2000) ("Resolution of contractual claims on a motion to dismiss is proper if the terms of the contract are unambiguous.").

Pls.' Consol. Opp'n to Defs.' Mots. to Dismiss - 49
Case No. 2:24-CV-2135-TL

ZELLE LLP
1774 Pennsylvania Avenue NW, Suite 375
Washington, DC 20006

8.7 (which applies to *all* 18- and 19-year-old draftees, including those drafted from European

leagues and other *non*-Major Junior League Clubs) applies only if an NHL club wishes to transfer

("Loan") a drafted and signed player to a non-NHL club; it does not *require* reassignment of any

such player to the Club from which he was drafted. *See* Ex. 4 at 21. Plaintiffs' Complaint, by

contrast, challenges the far more pernicious provision in the NHL-CHL Agreement through which

Defendants agreed that any 18-19 year old Player drafted from a Major Junior Club but not retained

by the drafting NHL team for more than 10 regular-season games *must be returned* to the Player's

former Major Junior Club—a restriction that applies *only* to draftees from Major Junior Hockey

and not to any draftees from any other leagues. *See* Compl. ¶¶ 271-72, 78-79; Ex. 1 at 5-6.[16] The

NHL also ignores that the NHL-CHL Agreement's restrictive reassignment provisions apply to

*unsigned* as well as signed Major Junior draftees. *See* Ex. 1 at 5-6 (return requirement for signed

Players), 8 (same for unsigned Players). So, even if Article 8.7 *did* actually set forth the challenged

restrictive return requirement for signed but non-retained draftees, it could not immunize from

antitrust scrutiny the return requirement for *unsigned* Major Junior draftees.

Article 9.1(d)(iv) does not set forth the mandatory return provision Plaintiffs challenge

either. Contrary to the NHL's selective quotation, Article 9.1(d)(iv) merely "confirm[s] and

affirm[s]" so-called "return dates" to the Major Juniors and the minor leagues. *See* Ex. 4 at 24.

Plaintiffs do not challenge "return dates" (whatever those may be), and the NHL-CHL

---

[16] Even if Article 8.7 were coterminous with the NHL-CHL Agreement's return provision, that provision would not be the actual cause of the anticompetitive effects at issue here. *Cf. Nat'l Hockey League Players Ass'n v. Plymouth Whalers Hockey Club*, 419 F.3d 462, 474 (6th Cir. 2005) (non-statutory labor exemption applies only where "injury complained of [was] actually" caused by CBA). The "actual cause" would include the other restraints challenged in this lawsuit, without which a Player offered back to his Major Junior Club by the NHL could, like players drafted from European hockey leagues, seek to break his contract with that Major Junior Club and sign with a team in a competing developmental league, such as the AHL or ECHL. *See* Compl. ¶¶ 278-79.

Pls.' Consol. Opp'n to Defs.' Mots. to Dismiss - 50
Case No. 2:24-CV-2135-TL

ZELLE LLP
1774 Pennsylvania Avenue NW, Suite 375
Washington, DC 20006

Agreement's mandatory return provision that Plaintiffs *do* challenge contains nothing resembling them. *See* Ex. 1 at 5-6. The NHL's implausible construction of this ambiguous language cannot be credited on its motion to dismiss. *See Williams*, 449 F. Supp. 3d at 908.

Finally, even if the NHL-CHL Agreement's restraints were somehow ratified by the NHL-NHLPA CBA, Defendants cannot establish as a matter of law that they resulted from "bona fide, arms-length bargaining." *ILWU*, 863 F.3d at 1190. Under Ninth Circuit precedent, inclusion of a non-bargaining employer (here, the Major Junior Defendants) in a challenged agreement signals "that the conduct is not anchored in the collective-bargaining process and should instead be subject to scrutiny by antitrust laws designed to prevent unreasonable restraints." *California ex rel. Harris v. Safeway, Inc.*, 651 F.3d 1118, 1131 (9th Cir. 2011); *see also Reed v. Advocate Health Care*, No. 06 C 3337, 2007 WL 967932, at *3-5 (N.D. Ill. Mar. 28, 2007) (non-statutory exemption did not shield employer from antitrust liability for wage-fixing conspiracy with competitors that occurred outside of collective bargaining relationship with union); *Home Box Off., Inc. v. Directors Guild of Am., Inc.*, 531 F. Supp. 578, 590 (S.D.N.Y. 1982) ("crucial determinant" for non-statutory exemption is agreement's "relative impact on the product market and the interests of union members"), *aff'd,* 708 F.2d 95 (2d Cir. 1983) (quoting *Jewel Tea*, 381 U.S. at 690 n.5).

Rather than serving a legitimate interest of the NHL player bargaining unit or facilitating collective bargaining between the NHL and NHLPA, the NHL-CHL Agreement's challenged restraints principally serve the interests of the NHL and the non-party Major Junior Defendants by artificially depressing compensation in the separate labor market for competitive youth hockey. As in *Mackey*, the NHL cannot demonstrate any benefit inuring to the NHLPA or its members from the NHL-CHL Agreement's terms, nor that any term of that Agreement has ever been modified because of bargaining with the NHLPA. *See* 543 F.2d at 616. Absent such a showing,

Pls.' Consol. Opp'n to Defs.' Mots. to Dismiss - 51
Case No. 2:24-CV-2135-TL

ZELLE LLP
1774 Pennsylvania Avenue NW, Suite 375
Washington, DC 20006

Defendants' anticompetitive restraints are nothing more than an agreement between two groups of employers that, even if they had been later accepted by the NHLPA, could not be considered the product of bona fide, arms-length bargaining with that union. *See id.* (union acceptance of status quo Rozelle Rule in CBA not result of bona fide, arms-length bargaining where Rule did not benefit union and was promulgated independently by NFL employer group); *cf. Reed*, 2007 WL at *4-5 (non-statutory exemption inapplicable to employers' wage-fixing agreement absent certified multi-employer bargaining unit or other evidence of quid-pro-quo bargaining over agreement with labor representative of single unionized employer). [17]

## CONCLUSION

For the reasons set forth above, Defendants' motions should be denied.

Dated: March 6, 2025

/s/ *Michael C. Subit*

Michael C. Subit (WSBA # 29189)
FRANK FREED SUBIT &
THOMAS LLP
705 2nd Ave. Ste. 1200
Seattle, WA 98104
p: (206) 682-6711
msubit@frankfreed.com

I certify that this memorandum contains 16,797 words, in compliance with the Court's Order of February 28, 2025, and the Local Civil Rules.

Jeffrey I. Shinder (*pro hac vice*)
Ethan E. Litwin (*pro hac vice*)
David Scupp (*pro hac vice*)
Tyler S. Ross (*pro hac vice*)
SHINDER CANTOR LERNER LLP

---

[17] Even if the hearsay email exchange between Daly and the NHLPA's general counsel were properly considered at this pleadings stage, the NHLPA GC's email providing "no objection to the finalization and execution of the CHL Agreement" would hardly provide evidence of bona-fide, arm's length dealing regarding any term of the NHL-CHL Agreement. As explained above, the NHLPA's non-objection could signify, at most, the absence of any changes to that Agreement that affected the terms and conditions of NHL players' employment and/or over which the union demanded bargaining. *See* Ex. 6.

Pls.' Consol. Opp'n to Defs.' Mots. to Dismiss - 52
Case No. 2:24-CV-2135-TL

ZELLE LLP
1774 Pennsylvania Avenue NW, Suite 375
Washington, DC 20006

14 Penn Plaza, 19th Floor
New York, NY 10122
Tel: (646)960-8601
jeffrey@scl-llp.com
ethan@scl-llp.com
david@scl-llp.com
tross@scl-llp.com

J. Wyatt Fore (*pro hac vice*)
SHINDER CANTOR LERNER LLP
600 14th St. NW, 5th Floor
Washington, DC 20005
Tel: (646) 960-8612
wyatt@scl-llp.com

Judith A. Zahid (*pro hac vice*)
Sarah Van Culin (*pro hac vice*)
ZELLE LLP
555 12th Street, Suite 1230
Oakland, CA 94607
Tel: (415) 693-0700
jzahid@zellelaw.com
svanculin@zellelaw.com

James R. Martin (*pro hac vice*)
ZELLE LLP
1774 Pennsylvania Avenue, NW,
Suite 375
Washington, DC 20006
Tel: (202) 899-4101
jmartin@zellelaw.com

Michael Rubin (*pro hac vice*)
Stacey Leyton
Bronwen O'Herin (*pro hac vice*)
ALTSHULER BERZON LLP
177 Post Street, Suite 300
San Francisco, CA 94108
Tel: (415) 421-7151
mrubin@altber.com
sleyton@altber.com
boherin@altber.com

Gregory S. Asciolla (*pro hac vice*)
Alexander E. Barnett (*pro hac vice*)
Geralyn J. Trujillo (*pro hac vice*)

ZELLE LLP
1774 Pennsylvania Avenue NW, Suite 375
Washington, DC 20006

Noah L. Cozad (*pro hac vice*)
DICELLO LEVITT LLP
485 Lexington Avenue, Suite 1001
New York, NY 10017
Tel: (646) 933-1000
gasciolla@dicellolevitt.com
abarnett@dicellolevitt.com
gtrujillo@dicellolevitt.com
ncozad@dicellolevitt.com

Steve D. Shadowen (*pro hac vice*)
Richard Brunell (*pro hac vice*)
Tina Miranda (*pro hac vice*)
HILLIARD SHADOWEN LLP
1135 6th Street, Suite 125
Austin, TX 78703
Tel: (717) 903-1177
steve@hilliardshadowenlaw.com
rbrunell@hilliardshadowenlaw.com
tmiranda@hilliardshadowenlaw.com

Paul E. Slater (*pro hac vice*)
Joseph M. Vanek (*pro hac vice*)
Matthew H. Rice
Matthew T. Slater (*pro hac vice*)
Trevor K. Scheetz (*pro hac vice*)
SPERLING KENNY
NACHWALTER, LLC
321 North Clark Street, 25th Floor
Chicago, Illinois 60654
p: (312) 641-3200
pes@sperlingkenny.com
jvanek@sperlingkenny.com
mslater@sperlingkenny.com
mrice@sperlingkenny.com
tscheetz@sperlingkenny.com

James Almon (*pro hac vice*)
SPERLING KENNY
NACHWALTER, LLC
2707 Killarney Way, Suite 202
Tallahassee, Florida 32309
p: (850) 354-5300
jalmon@sperlingkenny.com

Pls.' Consol. Opp'n to Defs.' Mots. to Dismiss - 54
Case No. 2:24-CV-2135-TL

ZELLE LLP
1774 Pennsylvania Avenue NW, Suite 375
Washington, DC 20006

*Attorneys for Plaintiffs and Proposed
Classes*

ZELLE LLP
1774 Pennsylvania Avenue NW, Suite 375
Washington, DC 20006