UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

WORLD ASSOCIATION OF
ICEHOCKEY PLAYERS UNIONS
NORTH AMERICA DIVISION et al.,

               Plaintiffs,

    v.

NATIONAL HOCKEY LEAGUE et al.,

               Defendants.

CASE NO. 2:24-cv-02135-TL

ORDER ON MOTIONS TO DISMISS

This case arises out of Defendants' alleged conspiracy to restrain competition for the provision of ice hockey services in North America by players aged 16–20. This matter is before the Court on the Canadian Hockey League Defendants' Motion to Dismiss (Dkt. No. 139) and Defendant National Hockey League's Motion to Dismiss (Dkt. No. 141). Having considered Plaintiffs' consolidated response (Dkt. No. 151), Defendants' replies (Dkt. Nos. 152, 153), the Parties' supplemental briefing on international comity (Dkt. Nos. 164, 165, 166, 167, 168), and

1    the relevant record, and having held oral argument (*see* Dkt. Nos. 158, 159), the Court GRANTS

2    Defendants' motions.

### I.    BACKGROUND

#### A.    Major Junior Hockey

Canadian men's[1] junior hockey is "amateur [ice] hockey played by athletes under twenty years of age." Dkt. No. 42-2 (Affidavit of Dan MacKenzie filed in *McEwan v. Canadian Hockey League, et al.*[2]) at 645 (*Carcillo v. Canadian Hockey League*, 2023 ONSC 886). "Major Junior hockey players . . . compete at the highest level of junior hockey." *Id.* The three Major Junior Leagues, *see infra* Section I.B.2.b., are "the world's most competitive development leagues for [ice hockey] players between the ages of 16–20." Dkt. No. 1 ¶ 290.

Each of the three Major Junior Leagues is composed of numerous franchises (called "clubs"), each of which operates an ice hockey team. *See infra* Section I.B.2.b. Each league operates a separate exhibition, a regular season (consisting of approximately 70 games), and a playoff schedule by which the clubs within the league compete to determine the league champions. Dkt. No. 42-2 at 645. "The league champions compete for the Memorial Cup, a round-robin tournament to determine the national Major Junior Champion." *Id.* (cleaned up).

To obtain players, each Major Junior League conducts an entry draft where North American hockey players are selected. Dkt. No. 1 ¶ 287. The leagues separately conduct a draft for international players. Dkt. No. 42-2 at 646. In the North American drafts, clubs within each league are assigned the exclusive right to negotiate with players for a contract to play Major

---

[1] *See* Dkt. No. 1-1 at 4 (noting that the CHL is a competitive male junior hockey league); Dkt. No. 1 ¶ 171 (noting that the CHL functions as a development league for the NHL, which is the "premier professional men's hockey league in North America").

[2] Plaintiffs filed the declarations contained in Docket Number 42 in support of their Motion for Preliminary Injunction (Dkt. No. 41).

Junior hockey. Dkt. No. 42-7 (Expert Report of Professor Stephen F. Ross) at 3. The contracts offered by clubs to the drafted players are standardized. Dkt. No. 1 ¶¶ 13–14. Even if a drafted player chooses not to sign with its assigned club, the club retains the exclusive right to the player and will place the player on what is known as a "protected list." Dkt. No. 42-7 at 3.

All 18- and 19-year-old players in the Major Junior Leagues are eligible for the annual NHL player draft. Dkt. No. 1 ¶ 270. When a Major Junior player is drafted to an NHL club, but does not make that club's roster, they are assigned back or returned to their prior Major Junior club. *Id.* Playing in the Major Junior Leagues is the clearest path for players to reach the NHL. Dkt. No. 42-2 at 26.

**B.    The Parties**

**1.    Plaintiffs**

**a.    *The World Association of Icehockey Players Unions***

**Plaintiff World Association of Icehockey Players Unions North America Division ("WAIPU North America")** is a labor organization that represents the interests of current and prospective North American Major Junior hockey players. Dkt. No. 1 (Complaint) ¶ 57. Its principal place of business is located in Montréal, Canada. *Id.* ¶ 58.

**Plaintiff World Association of Icehockey Players Unions USA Corporation ("WAIPU USA") (together with WAIPU North America, "WAIPU Plaintiffs")** is also a labor organization that represents the interests of current and prospective North American Major Junior hockey players. Dkt. No. 1 ¶ 57. It is a Delaware corporation with its principal place of business in Newark, Delaware. *Id.* ¶ 59.

WAIPU Plaintiffs' membership includes players from both the United States and Canada in all three Major Junior Leagues. *Id.* ¶¶ 61–62. Members of WAIPU North America are also members of WAIPU USA, and vice versa. *Id.* ¶ 59.

1    WAIPU Plaintiffs are not a certified labor union and do not engage in collective

2    bargaining with any club or league. *Id.* ¶ 60. They "assist current and prospective [ice hockey

3    p]layers with advocacy and education, and work with them to help them understand how [M]ajor

4    [J]unior hockey and its rules and regulations operate." *Id.* ¶¶ 64, 70. As part of that assistance,

5    WAIPU Plaintiffs "provide a comprehensive range of services for their members," including

6    academic guidance, counseling services, access to free legal counsel, and support for players'

7    families. *Id.* ¶ 67. WAIPU Plaintiffs also advocate for players by, among other things,

8    participating in discussions with the Major Junior Leagues, communicating with Canadian and

9    United States government officials, testifying in public hearings in Canada and the United States,

10   and corresponding with federal and provincial sports ministers in Canada. *Id.* ¶ 66; *see also id.*

11   ¶ 68.

12              **b.    *Individual Plaintiffs***

13        **Plaintiff Tanner Gould** is a Canadian citizen and ice hockey player who was recruited to

14   the Western Hockey League ("WHL") in 2020. Dkt. No. 1 ¶ 71. Gould was originally drafted by

15   the Tri-City Americans, a WHL Club located in Kennewick, Washington, for which he played in

16   2021 and 2022. *Id.* ¶¶ 71, 73–74. Gould was subsequently traded from the Tri-City Americans to

17   the Prince Albert Raiders, a WHL Club located in Prince Albert, Saskatchewan. *Id.* ¶ 74.

18        **Plaintiff Isaiah DiLaura (together with Plaintiff Gould, the "Individual Plaintiffs")**

19   is a United States citizen and ice hockey player who was recruited to the WHL in 2015. *Id.* ¶ 77.

20   DiLaura was originally drafted to the Prince George Cougars, a WHL Club located in Prince

21   George, British Columbia. *Id.* When he opted not to sign with the Prince George Cougars

22   following the draft, DiLaura was placed on the Club's "protected list," preventing him from

23   playing for any other Major Junior Club. *Id.* DiLaura was "ultimately persuaded to play" for the

24   Prince George Cougars for two seasons, after which he was traded to the Portland Winterhawks,

a WHL Club located in Portland, Oregon, and then the Swift Current Broncos, a WHL Club located in Swift Current, Saskatchewan. *Id.* ¶¶ 78–79.

### 2. Defendants

#### a. *National Hockey League*

**Defendant National Hockey League ("NHL")** is an unincorporated joint venture association with its principal place of business in New York, New York. Dkt. No. 1 ¶ 82. The NHL operates a professional ice hockey league consisting of thirty-two member clubs, a majority of which are located in the United States, including one club located in Washington. *Id.*

#### b. *Canadian Hockey League*

**Defendant Canadian Hockey League ("CHL")** is an unincorporated not-for-profit organization that is organized under the laws of Canada, with its principal place of business in Etobicoke, Ontario. *Id.* ¶ 83. The CHL "oversees and issues rules pertaining to the operations of the three Major Junior Leagues." *Id.*

The three Major Junior Leagues (which are also referred to as the "CHL Member Leagues")—the Western Hockey League, the Ontario Major Junior Hockey League, and the Québec Maritimes Junior Hockey League—"constitute the largest developmental leagues for hockey players aged 16–20 who aspire to play in the NHL." *Id.* "Sixty (60) Major Junior Clubs operate in these three Leagues across North America, in both the United States and Canada." *Id.* There are approximately 1,500 players across the CHL Member Leagues. *Id.* ¶ 153.

**Defendant Western Hockey League ("WHL")** is a corporation incorporated under the laws of Canada, with its principal place of business in Calgary, Alberta. *Id.* ¶ 84. The WHL operates 22 franchises ("Clubs") located throughout the western United States and western Canada. *Id.* Each WHL Club owns a team that plays in the WHL. *Id.* Clubs in the WHL only recruit and draft players in Alaska, Arizona, California, Colorado, Hawaii, Idaho, Kansas,

Minnesota, Montana, Nebraska, Nevada, New Mexico, North Dakota, Oklahoma, Oregon, South Dakota, Texas, Utah, Washington, and Wyoming ("WHL Exclusive States"), as well as from the Canadian provinces of British Columbia, Manitoba, Saskatchewan, and Alberta, and the Northwest, Yukon, and Nunavut territories. *Id.*; *id.* at ¶ 174.

Each of the 22 WHL Clubs is also a named Defendant in this action. *Id.* ¶¶ 85–106. The WHL and WHL Clubs are collectively referred to as the "WHL Defendants."

**Defendant Ontario Major Junior Hockey League ("OHL")** is a corporation incorporated under the laws of Canada, with its principal place of business in Scarborough, Ontario. *Id.* ¶ 107. The OHL operates 20 Clubs located in the United States and Canada. *Id.* Each OHL Club owns a team that plays in the OHL. *Id.* Clubs in the OHL only recruit and draft players in Alabama, Arkansas, Delaware, Florida, Georgia, Illinois, Indiana, Iowa, Kentucky, Louisiana, Maryland, Michigan, Mississippi, Missouri, New Jersey, New York, North Carolina, Ohio, Pennsylvania, South Carolina, Tennessee, Virginia, West Virginia, and Wisconsin ("OHL Exclusive States"), as well as from the Canadian province of Ontario. *Id.*; *id.* ¶ 175.

Each of the 20 OHL Clubs is also a named Defendant in this action. *Id.* ¶¶ 108–27. The OHL and OHL Clubs are collectively referred to as the "OHL Defendants."

**Defendant Québec Maritimes Junior Hockey League ("QMJHL") (together with the WHL and OHL, the "CHL Member Leagues")** is a corporation incorporated under the laws of Canada, with its principal place of business in Boucherville, Québec. *Id.* ¶ 128. The QMJHL operates 18 Clubs located in Canada. *Id.* Each QMJHL Club owns a team that plays in the QMJHL. *Id.* Clubs in the QMJHL only recruit and draft players in Maine, Massachusetts, Vermont, Rhode Island, New Hampshire, and Connecticut ("QMJHL Exclusive States"), as well as from the Canadian provinces of Quebec, Nova Scotia, New Brunswick, Prince Edward Island, and Newfoundland and Labrador. *Id.*; *id.* ¶ 176.

1    Each of the 18 QMJHL Clubs is also a named Defendant in this action. *Id.* ¶¶ 129–46.

2    The QMJHL and QMJHL Clubs are collectively referred to as the "QMJHL Defendants."

3    Together, Defendant CHL and the WHL Defendants, OHL Defendants, and QMJHL

4    Defendants are the "CHL Defendants."[3]

5    **C.    The Alleged Conspiracy**

6    The facts alleged in Plaintiffs' Class Action Complaint ("Complaint"), which the Court

7    takes as true for the purposes of this Order, are as follows:

8    Plaintiffs allege that Defendants have engaged in a conspiracy to restrain competition in

9    the labor market for Major Junior ice hockey player services. Dkt. No. 1 ¶ 1. As alleged, this

10   conspiracy operates by allocating to each of the CHL Member Leagues—i.e., the WHL, OHL,

11   and QMJHL—exclusive territories across North America from which they may recruit, draft, and

12   sign players; outside of each league's allocated territory, the leagues have agreed not to compete

13   for the services of potential Major Junior hockey players. *Id.* ¶¶ 8–9. Each of these territories

14   includes a combination of U.S. states and Canadian provinces. *Id.* ¶ 8.

15   The CHL Member Leagues conduct annual player drafts pursuant to the terms of the

16   CHL Constitution. *Id.* ¶¶ 166, 187–99. These drafts are involuntary, meaning that players do not

17   apply to participate in the draft. *Id.* In the draft, each of the CHL Member League Clubs has an

18   opportunity to select players who reside in their league's exclusive territory. *Id.* Players then

19   have the opportunity to sign a Standard Player Agreement ("SPA") with the club that selects

20   them. *Id.* These standardized agreements are non-negotiable and, Plaintiffs allege, fix players'

21   compensation below competitive levels and require them to surrender their name, image, and

22   likeness ("NIL") rights to the clubs. *Id.* If a player chooses not to sign an SPA, he is unable to be

23

24   ---
[3] Plaintiffs also refer to these defendants as the "Major Junior Defendants." *See* Dkt. No. 151 at 18–19.

drafted by any other club in the CHL and is therefore unable to play Major Junior hockey. *Id.* Once a club has drafted a player, other clubs will not compete for that player's services. *Id.* CHL Member League Clubs generally draft more players than they need to fill their rosters. *Id.* ¶ 197. Players not placed on a club's roster—whether because the club has drafted more players than needed to fill their roster or because the player has chosen not to sign with the club—are placed on "protected lists," ensuring that no other club will compete for their services. *Id.* ¶¶ 196, 206–10.

Plaintiffs allege that Defendants exploit the restraints placed on players by paying them wages far below the levels of other developmental hockey leagues. Players are paid a stipend of $250 per month; by comparison, players in the East Coast Hockey League ("ECHL") earn an average of over $2,800 per month, and players in the American Hockey League ("AHL") earn an average of over $5,000 per month. *Id.* ¶¶ 228–29. Additionally, players are precluded from terminating their SPAs to play organized hockey before aging out of Major Junior hockey without paying prohibitive "development fees," which can be as much as $500,000. *Id.* ¶¶ 17, 219, 221.

Defendant NHL and Defendant CHL have an agreement that sets forth the rules governing the transfer or assignment of players who are drafted by an NHL Club but who do not make that club's roster (the "NHL-CHL Agreement"). *Id.* ¶¶ 270–71. Under the NHL-CHL Agreement, these players are returned to their former CHL Member League Club. *Id.* Additionally, the NHL-CHL Agreement restricts the NHL's constituent minor leagues—the AHL and ECHL—from competing for players already drafted to a CHL Member League Club. *Id.* ¶¶ 272–73.

1    **D.    Procedural History**

2        This action was preceded by related litigation in Canada regarding the underlying alleged

3    conspiracy; some of this litigation remains pending. Two pending cases concern personal injury,

4    and one pending case concerns violations of Canada's wage-and-hour laws. *See Carcillo v. CHL*,

5    No. 20-CV-642705 (Super. Ct. Ont.) (concerning physical and sexual abuse); *McEwan v. CHL*,

6    S190264, (Sup. Ct. B.C.) (concerning concussions); *Berg v. CHL*, CV-14-514423CP (Super. Ct.

7    Ont.) (concerning wage-and-hour law violations). The Canadian litigation most similar to the

8    instant case, which challenged restraints on competition to recruit and sign players, was

9    previously dismissed without leave to amend. *See Mohr v. NHL*, [2021] FC 488 (Fed. Ct. Can.).

10       This action was originally filed in the United States District Court for the Southern

11   District of New York, where it was dismissed for lack of personal jurisdiction. *World Ass'n of

12   Icehockey Players Unions North Am. Div. v. National Hockey League*, No. C24-1066, 2024 WL

13   4893266 (S.D.N.Y. Nov. 26, 2024) ("New York Case"). The instant action was filed in the

14   Western District of Washington in December 2024, and shortly thereafter Plaintiffs filed a

15   motion for preliminary injunction, which remains pending. *See* Dkt. Nos. 1, 41 (motion for

16   preliminary injunction).

17       In early February 2025, CHL Defendants and Defendant NHL filed the instant motions to

18   dismiss. Dkt. Nos. 139, 141.

19                              **II.    LEGAL STANDARD**

20   **A.    Rule 12(b)(2): Personal Jurisdiction**

21       QMJHL Defendants, certain OHL Defendants, and Defendant NHL move to dismiss for

22   lack of personal jurisdiction. "When a defendant moves to dismiss for lack of personal

23   jurisdiction, the plaintiff bears the burden of demonstrating that the court has jurisdiction over

24   the defendant." *Leopona, Inc. v. UK Cycling Events, Ltd.*, No. C17-1765, 2018 WL 2716807,

at *2 (W.D. Wash. June 6, 2018) (citing *Pebble Beach Co. v. Caddy*, 453 F.3d 1151, 1154 (9th Cir. 2006)). This burden requires that a plaintiff "make only a prima facie showing of jurisdictional facts to withstand the motion to dismiss." *Pebble Beach*, 453 F.3d at 1154 (quoting *Doe v. Unocal*, 248 F.3d 915, 922 (9th Cir. 2001), *abrogated on other grounds by Williams v. Yamaha Motor Co.*, 851 F.3d 1015 (9th Cir. 2017)).

"The general rule is that personal jurisdiction over a defendant is proper if it is permitted by a long-arm statute and if the exercise of that jurisdiction does not violate due process." *Id.* (citing *Fireman's Fund Ins. Co. v. Nat'l Bank of Coops.*, 103 F.3d 888, 893 (9th Cir. 1996)). However, "[t]here is no general federal long-arm statute, so a federal district court applies either the law of the state in which it sits or looks to specific federal statutes to supply the requisite service of process." *In re Packaged Seafood Prods. Antitrust Litig.*, 338 F. Supp. 3d 1118, 1135 (S.D. Cal. 2018) (cleaned up).

### 1.    Long-Arm Statute

Here, Plaintiffs allege three bases for personal jurisdiction: the Clayton Act, Federal Rule of Civil Procedure 4(k)(2),[4] and Washington's long-arm statute. *See* Dkt. No. 151 at 25–26, 34.

#### a.    *The Clayton Act*

"In an antitrust action, section 12 of the Clayton Act is the requisite federal long-arm statute and provides:

> Any suit, action, or proceeding under the antitrust laws against a corporation may be brought not only in the judicial district whereof it is an inhabitant, but also in any district wherein it may be found or transacts business; and all process in such cases may be served in the district of which it is an inhabitant, or wherever it may be found."

---

[4] Plaintiffs do not assert Rule 4(k)(2) as a basis of personal jurisdiction against Defendant NHL or the QMJHL Defendants. *See* Dkt. No. 151 at 27, 34.

*In re Packaged Seafood Prods.*, 338 F. Supp. 3d at 1135 (quoting 15 U.S.C. § 22). Accordingly, the Clayton Act provides for nationwide personal jurisdiction over corporate defendants. *See id.* at 1136; *see also KM Enters., Inc. v. Global Traffic Techs., Inc.*, 725 F.3d 718, 724 (7th Cir. 2013). Due process therefore "demands a showing of minimum contacts with the United States with respect to foreign defendants" in order for personal jurisdiction pursuant to the Clayton Act to attach, meaning that the defendant must "have acted within any district of the United States or sufficiently caused foreseeable consequences in this country." *In re Packaged Seafood Prods.*, 338 F. Supp. 3d at 1136 (cleaned up) (quoting *Action Embroidery Corp. v. Atl. Embroidery, Inc.*, 368 F.3d 1174, 1180 (9th Cir. 2004)).

### b.    *Rule 4(k)(2)*

Personal jurisdiction is proper under Federal Rule of Civil Procedure 4(k)(2) where "(1) the action arises under federal law; (2) "the defendant is not subject to jurisdiction in any state's courts of general jurisdiction"; and (3) the court's exercise of jurisdiction comports with due process." *Ayla, LLC v. Alya Skin Pty. Ltd.*, 11 F.4th 972, 978 (9th Cir. 2021). Like an analysis of personal jurisdiction pursuant to the Clayton Act, "[u]nder Rule 4(k)(2), the due process analysis . . . 'consider[s] contacts with the nation as a whole.'" *Id.* (quoting *Holland Am. Line Inc. v. Wärtsilä N. Am., Inc.*, 485 F.3d 450, 462 (9th Cir. 2007)).

### c.    *Washington Long-Arm Statute*

If personal jurisdiction pursuant to a federal statute such as the Clayton Act does not apply, it is well established that "under the [Washington] long-arm statute, RCW 4.28.185, our courts may assert jurisdiction over nonresident individuals and foreign corporations to the extent permitted by the due process clause of the United States Constitution, except as limited by the terms of the statute." *Shute v. Carnival Cruise Lines*, 113 Wn.2d 763, 766–67, 783 P.2d 78, 79 (1989) (citation omitted); *see also Easter v. Am. W. Fin.*, 381 F.3d 948, 960 (9th Cir. 2004);

1   *Chan v. Soc'y Expeditions, Inc.*, 39 F.3d 1398, 1405 (9th Cir. 1994). Therefore, a court may

2   exercise jurisdiction over a nonresident defendant so long as the exercise jurisdiction does not

3   "offend traditional notions of fair play and substantial justice." *Chan*, 39 F.3d at 1405 (citing

4   *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945)).

5           **2.      Due Process**

6           Under any of the three bases asserted by Plaintiff for personal jurisdiction, a showing of

7   minimum contacts must be made to comport with due process. "Due process requires that to

8   exercise jurisdiction over a non-resident defendant, the defendant 'have certain minimum

9   contacts with the forum such that the maintenance of the suit does not offend traditional notions

10  of fair play and substantial justice.'" *Wash. Shoe Co. v. A-Z Sporting Goods Inc.*, 704 F.3d 668,

11  672 (9th Cir. 2012) (cleaned up) (quoting *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316

12  (1945)), *abrogated on other grounds by Axiom Foods, Inc. v. Acerchem Int'l, Inc.*, 874 F.3d

13  1064 (9th Cir. 2017); *see also Seabourn Cruise Line Ltd. v. Goldring*, No. C22-999, 2022 WL

14  16579558, at *4 (W.D. Wash. Oct. 11, 2022) (same standard when applying Washington long-

15  arm statute). "Under the due process analysis, a defendant may be subject to either general or

16  specific personal jurisdiction." *Easter*, 381 F.3d at 960 (citing *Helicopteros Nacionales de

17  Colombia, S.A. v. Hall*, 466 U.S. 408, 414 & n.9 (1984)). Plaintiffs do not argue that any of the

18  at-issue Defendants are subject to general jurisdiction; thus, the question is whether Defendants

19  are subject to an assertion of specific jurisdiction.

20          In the Ninth Circuit, courts rely on a three-prong test for analyzing whether minimum

21  contacts exist to support an assertion of specific personal jurisdiction: (1) the defendant must

22  "purposefully direct" its activities to the forum or "purposefully avail" itself of the benefits

23  afforded by the forum's laws; (2) the claim must "arise out of or relate to the defendant's forum-

24  related activities"; and (3) the exercise of jurisdiction must comport with fair play and substantial

justice, i.e., it must be reasonable. *Davis v. Cranfield Aerospace Sols., Ltd.*, 71 F.4th 1154, 1161–62 (9th Cir. 2023). "The plaintiff bears the burden of satisfying the first two prongs of the test," after which the burden shifts to the defendant to "'present a compelling case' that the exercise of jurisdiction would not be reasonable." *Schwarzenegger v. Fred Martin Motor Co.*, 374 F.3d 797, 802 (9th Cir. 2004). Further, when considering these first two prongs, "a strong showing on one axis will permit a lesser showing on the other." *Yahoo! Inc. v. La Ligue Contre Le Racisme*, 433 F.3d 1199, 1210 (9th Cir. 2006) (en banc). However, if a plaintiff fails to establish any one of the requirements, then a court cannot exercise personal jurisdiction over a nonresident defendant without violating due process of law. *Pebble Beach*, 453 F.3d at 1155 ("If any of the three requirements is not satisfied, jurisdiction in the forum would deprive the defendant of due process of law." (quoting *Omeluk v. Langsten Slip & Batbyggeri A/S*, 52 F.3d 267, 270 (9th Cir. 1995))).

### a.   *Purposeful Direction and Purposeful Availment*

The term "purposeful availment," "in shorthand fashion, [is often used] to include both purposeful availment and purposeful direction," but these are two distinct concepts. *Schwarzenegger*, 374 F.3d at 802. The purposeful direction analysis is most often used in tort cases, while the purposeful availment analysis is most often used in contract cases. *Id.*

A showing of purposeful direction consists of evidence of a defendant's actions outside the forum state that are directed *at* the forum. *Id.* at 803. Purposeful direction is analyzed under the "effects test" announced in the Supreme Court's decision in *Calder v. Jones*, 465 U.S. 783 (1984). The purposeful direction "effects test" is satisfied where the defendant has "(1) committed an intentional act, (2) expressly aimed at the forum state, (3) causing harm that the defendant knows is likely to be suffered in the forum state." *Marvix Photo, Inc. v. Brand Techs., Inc.*, 647 F.3d 1218, 1228 (9th Cir. 2011) (citing *Calder*, 465 U.S. at 789–90). "The first

prong of the *Calder* effects test, the intentional act requirement, simply attempts to differentiate between an actual, physical act and an intent to accomplish a result or consequence of an act." *In re Packaged Seafood*, 338 F. Supp. 3d at 1156 (citing *Picot v. Weston*, 780 F.3d 1206, 1214 (9th Cir. 2015)). The second prong, the requirement that the intentional act be expressly aimed at the forum, is satisfied when an antitrust defendant's "allegedly anticompetitive behavior is targeted at a resident of the forum, or at the forum itself." *In re Cathode Ray Tube (CRT) Antitrust Litig.*, 27 F. Supp. 3d 1002, 1011 (N.D. Cal. 2014) (citing *In re W. States Wholesale Nat. Gas Antitrust Litig.*, 715 F.3d 716, 743 (9th Cir. 2013)). The final prong requires that the intentional acts cause harm that "the defendant knows is likely to be suffered in the forum." *In re W. States*, 715 F.3d at 744. The injury must "be 'tethered' to the forum state in a 'meaningful way' in order to create a jurisdictionally relevant contact." *In re Packaged Seafood*, 338 F. Supp. 3d at 1161 (quoting *Walden v. Fiore*, 571 U.S. 277, 290 (2014)).

A showing of purposeful availment consists of evidence of the defendant's actions *in* the forum, such as executing or performing a contract there. *Schwarzenegger*, 374 F.3d at 802. "By taking such actions, a defendant "'purposefully avails itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws.'" *Id.* (quoting *Hanson v. Denckla*, 357 U.S. 235, 253 (1958)). In return, a defendant "must—as a quid pro quo—'submit to the burdens of litigation in that forum.'" *Id.* (quoting *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 476 (1985)).

### b.    *Arising Out of Forum-Related Activities*

"A court determines whether a claim arises out of defendant's forum-related activities in terms of 'but for' causation." *In re Packaged Seafood*, 338 F. Supp. 3d at 1161 (citing *Unocal*, 248 F.3d at 924, *abrogated on other grounds by Williams*, 851 F.3d at 1024. The "but for" test requires "some nexus between the cause of action and the defendant's activities in the forum."

1  *Id.* (quoting *Schute v. Carnival Cruise Lines*, 897 F.2d 377, 387 (9th Cir. 1988), *rev'd on other*

2  *grounds*, 499 U.S. 585 (1991)).

3             **c.**   ***Reasonableness***

4        "For a court to exercise personal jurisdiction . . . over a defendant, such assertion of

5  jurisdiction must be 'reasonable.'" *In re Packaged Seafood*, 338 F. Supp. 3d at 1162 (quoting

6  *Amoco Egypt Oil Co. v. Leonis Navigation Co.*, 1 F.3d 848, 851 (9th Cir. 1993)). If the plaintiff

7  establishes that their claim arises out of defendant's purposefully directed forum-related

8  activities, the burden shifts to the defendant to make a "'compelling case' that the exercise of

9  jurisdiction is not reasonable." *Id.* (quoting *Martensen v. Koch*, 942 F. Supp. 2d 983, 993 (N.D.

10  Cal. 2013)). The court weighs seven factors when assessing reasonableness:

11          (1) the extent of the defendant's purposeful interjection in the
12          forum; (2) the burden on the defendant; (3) the extent of any
           conflict with the sovereignty of the defendant's domicile; (4) the
13          forum state's interest in adjudicating the dispute; (5) the efficient
           resolution of the dispute; (6) the convenience and effectiveness of
14          the plaintiff's relief; and (7) the existence of an alternative forum.

15  *Id.* (citing *Sinatra v. Nat'l Enquirer, Inc.*, 854 F.2d 1191, 1198–99 (9th Cir. 1988)).

16  **B.**   **Rule 12(b)(6): Failure to State a Claim**

17        A defendant may seek dismissal when a plaintiff fails to state a claim upon which relief

18  can be granted. Fed. R. Civ. P. 12(b)(6). In reviewing a Rule 12(b)(6) motion to dismiss, the

19  Court takes all well-pleaded factual allegations as true and considers whether the complaint

20  "state[s] a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678

21  (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). While "[t]hreadbare

22  recitals of the elements of a cause of action, supported by mere conclusory statements," are

23  insufficient, a claim has "facial plausibility" when the party seeking relief "pleads factual content

24  that allows the court to draw the reasonable inference that the defendant is liable for the

1    misconduct alleged." *Id.* at 672. When reviewing a dismissal pursuant to Rule 12(b)(6), "we

2    accept as true all facts alleged in the complaint and construe them in the light most favorable to

3    plaintiff[], the non-moving party." *DaVinci Aircraft, Inc. v. United States*, 926 F.3d 1117, 1122

4    (9th Cir. 2019) (alteration in original) (quoting *Snyder & Assocs. Acquisitions LLC v. United*

5    *States*, 859 F.3d 1152, 1156–57 (9th Cir. 2017)).

6          CHL Defendants argue that, on the face of the Plaintiffs' Complaint, Plaintiffs fail to

7    plausibly allege foreign injury claims for the majority of Major Junior hockey players that either

8    fall outside or meet an exception to the Foreign Trade Antitrust Improvements Act ("FTAIA"),

9    15 U.S.C. § 6a, and that the doctrine of international comity counsels the Court to dismiss the

10   few claims that are not barred by the FTAIA.[5] Dkt. No. 139 at 11.

11       **1.**       **Foreign Trade Antitrust Improvements Act ("FTAIA")**

12         The FTAIA "excludes from the Sherman Act's reach much anticompetitive conduct that

13   causes only foreign injury." *F. Hoffmann-La Roche Ltd. v. Empagran S.A.* (*Empagran I*), 542

14   U.S. 155, 158 (2004). "It does so by setting forth a general rule stating that the Sherman Act

15   'shall not apply to conduct involving trade or commerce . . . with foreign nations.'" *Id.* (omission

16   in original) (quoting 15 U.S.C. § 6a). The FTAIA "is not a subject-matter jurisdiction limitation

17   on the power of the federal courts but a component of the merits of a Sherman Act claim

18   involving nonimport trade or commerce with foreign nations." *United States v. Hui Hsiung*, 778

19   F.3d 738, 751 (9th Cir. 2015).

20         The FTAIA provides:

21                Sections 1 to 7 of this title [[(the Sherman Act)]] shall not apply to

22                conduct involving trade or commerce (other than import trade or import commerce) with foreign nations unless—

23

24   [5] The Court will refer to these arguments as CHL Defendants' as they briefed these issues; however, Defendant NHL joined in CHL Defendants' motion on these two grounds. Dkt. No. 141 at 30.

(1) such conduct has a direct, substantial, and reasonably foreseeable effect—

    (A) on trade or commerce which is not trade or commerce with foreign nations, or on import trade or import commerce with foreign nations; or

    (B) on export trade or export commerce with foreign nations, of a person engaged in such trade or commerce in the United States; and

(2) such effect gives rise to a claim under the provisions of sections 1 to 7 of this title, other than this section.

If sections 1 to 7 of this title apply to such conduct only because of the operation of paragraph (1)(B), then sections 1 to 7 of this title shall apply to such conduct only for injury to export business in the United States.

15 U.S.C. § 6a. "This technical language initially lays down a general rule placing *all* (nonimport) activity involving foreign commerce outside the Sherman Act's reach." *Empagran I*, 542 U.S. at 162 (emphasis in original). But,

It then brings such conduct back within the Sherman Act's reach *provided that* the conduct *both* (1) sufficiently affects American commerce, *i.e.*, it has a "direct, substantial, and reasonably foreseeable effect" on American domestic, import, or (certain) export commerce, *and* (2) has an effect of a kind that antitrust law considers harmful, *i.e.*, the "effect' must "giv[e] rise to a [Sherman Act] claim."

*Id.* (emphasis in original) (quoting 15 U.S.C. § 6a(1), (2)).

## 2. International Comity

"International comity is the recognition which one nation allows within its territory to the legislative, executive or judicial acts or another nation, having due regard both to international duty and convenience, and to the rights of its own citizens or of other persons who are under the protection of its laws." *Cooper v. Tokyo Elec. Power Co. Holdings, Inc.*, 960 F.3d 549, 565–66 (9th Cir. 2020) (cleaned up). "It is 'a doctrine of prudential abstention, one that counsels voluntary forbearance when a sovereign which has a legitimate claim to jurisdiction concludes that a second sovereign also has a legitimate claim to jurisdiction under principles of

international law.'" *Id.* at 566 (quoting *Mujica v. AirScan Inc.*, 771 F.3d 580, 598 (9th Cir. 2014)). This doctrine "embodies the policy of 'good neighborliness, common courtesy and mutual respect between those who labour in adjoining judicial vineyards.'" *Id.* (quoting *Mujica*, 771 F.3d at 598).

International comity comprises two distinct concepts: prescriptive comity (addressing "the extraterritorial reach of federal statutes") and adjudicative comity (a "discretionary act of deference by a national court to decline to exercise jurisdiction in a case properly adjudicated in a foreign state")." *Id.* (quoting *Mujica*, 771 F.3d at 598–99). This case presents a question of adjudicatory comity. "In deciding whether to apply the doctrine of adjudicative comity, . . . courts weigh 'several factors, including [1] the strength of the United States' interest in using a foreign forum, [2] the strength of the foreign governments' interests, and [3] the adequacy of the alternative forum.'" *Id.* (quoting *Mujica*, 771 F.3d at 603). When assessing the United States' and the foreign government's interests in relying on a foreign forum, courts consider a nonexclusive list of factors: "(1) the location of the conduct in question, (2) the nationality of the parties, (3) the character of the conduct in question, (4) the foreign policy interests of the [countries], and (5) any public policy interests." *Mujica*, 771 F.3d at 604.

### III.    DISCUSSION

### A.    Whether Plaintiffs Have Asserted Personal Jurisdiction Over Defendants

Certain Defendants argue that they should be dismissed for lack of personal jurisdiction. *See* Dkt. No. 139 at 20 (QMJHL and Non-Corporation OHL Defendants); Dkt. No. 141 at 16 (Defendant NHL).

#### 1.    QMJHL Defendants

Plaintiffs argue that the assertion of personal jurisdiction over QMJHL Defendants pursuant to the Clayton Act is appropriate. Dkt. No. 151 at 25. QMJHL Defendants are alien

corporations (*see* Dkt. No. 1 ¶¶ 128–46), and they do not dispute this fact,[6] making jurisdiction pursuant to the Clayton Act proper.

### a.      *Scope of Jurisdiction under the Clayton Act*

Plaintiffs assert that QJMHL Defendants are subject to the Court's jurisdiction under the Clayton Act based on their contacts with the United States. Dkt. No. 151 at 27. However, CHL Defendants dispute the Ninth Circuit's interpretation regarding the scope of the minimum contacts required under the act. Dkt. No. 139 at 21. The Ninth Circuit has "interpreted Section 12 of the Clayton Act (15 U.S.C. § 22) to grant personal jurisdiction over any corporate antitrust defendant with minimum contacts with the nation" sufficient to satisfy due process. *D'Augusta v. Am. Petroleum Inst.*, 117 F.4th 1094, 1100 n.1 (9th Cir. 2024) (citing *Action Embroidery Corp.*, 368 F.3d at 1180). CHL Defendants assert that Ninth Circuit precedent conflicts with the view of the majority of circuit courts and the plain text of the statute. Dkt. No. 139 at 21 (citing *KM Enters., Inc. v. Glob. Traffic Techs., Inc.*, 725 F.3d 718, 728 (7th Cir. 2013) (collecting precedent)). Regardless, and as CHL Defendants correctly note, this Court is bound by the precedent set in *D'Augusta*. Thus, the United States is the relevant forum for purposes of the minimum contacts analysis.

---

[6] While the majority of the QMJHL Defendants appear to be Canadian corporations, four of the QMJHL Defendants appear to be foreign limited partnerships or another type of foreign corporate entity: Defendant Cape Breton Major Junior Hockey Club Limited (Dkt. No. 1 ¶ 132), Defendant Moncton Wildcats Hockey Club Limited (*id.* ¶ 137), Defendant Saint John Major Junior Hockey Club Limited (*id.* ¶ 142), and Defendant Les Saguenéens Junior Majeur de Chicoutimi (*id.* ¶ 145). Not all foreign corporate entities are treated as corporations for purposes of a jurisdictional analysis. *see 3|5|2 Capital GP LLC v. Wear*, No. C24-1172, 2024 WL 4434382, at *4 (W.D. Wash. Oct. 7, 2024) (outlining citizenship analysis for foreign corporate entities, including limited partnerships); *see also infra* Section III.A.2.a. However, because neither party addresses the issue here, the Court will treat all QMJHL Defendants as foreign corporations. To the extent they are not corporations, see the discussion in Section III.A.2.

b.    *Sufficiency of Minimum Contacts*

Courts in the Ninth Circuit apply the purposeful direction test to antitrust cases. *In re Packaged Seafood*, 338 F. Supp. 3d at 1149 (citing *In re Capacitors Antitrust Litig.*, No. C14-3264, 2015 WL 3638551, at *2 (N.D. Cal. June 11, 2015)); *see also In re W. States*, 715 F.3d at 743. However, CHL Defendants make arguments under both purposeful direction and purposeful availment (presumably to the extent Plaintiffs rely on the contracts between the players and the Clubs as part of the conspiracy). Dkt. No. 139 at 22–24. In response, Plaintiffs rely on the same facts for both arguments. *See* Dkt. No. 151 at 28, 30. Under either purposeful direction or purposeful availment, "'[t]he first step of the specific jurisdiction analysis involves a qualitative evaluation of the defendant's contact with the forum state,' . . . in order to determine whether the 'defendant's conduct and connection with the forum State are such that he should reasonably anticipate being haled into court there.'" *Core-Vent Corp. v. Nobel Indus. AB*, 11 F.3d 1482, 1485 (9th Cir. 1993) (first quoting *Lake v. Lake*, 817 F.2d 1416, 1421 (9th Cir. 1987), then quoting *Worldwide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297 (1980)), *holding modified by Yahoo! Inc.*, 433 F.3d 1199.

(1)    **Purposeful Direction**

Plaintiffs contend that QMJHL Defendants purposefully directed activity toward the United States by (1) entering into and implementing the challenged agreements; (2) scouting and recruiting players from the United States and conducting player development camps in the United States; and (3) "market[ing] themselves in the United States by entering into licensing agreements with American companies, selling television and streaming rights to United States residents, and selling merchandise and tickets to United States residents." Dkt. No. 151 at 28.

(a)    <u>Whether QMJHL Defendants Committed an Intentional Act</u>

Plaintiffs contend that QMJHL Defendants have "engaged in intentional acts directed at the United States" by entering into and implementing the challenged agreements—including by scouting and recruiting players from the United States and conducting player development camps in the United States. Dkt. No. 151 at 28; *see also* Dkt. No. 1 ¶¶ 8, 128–46, 175–77, 180, 183, 186, 189, 280–81. CHL Defendants do not address, and therefore concede, the first element of the purposeful direction test regarding whether QMJHL Defendants committed an intentional act. Therefore, the Court will focus on the second and third elements in its analysis of purposeful direction.

(b)    <u>Whether QMJHL Defendants' Actions were Expressly Aimed at the United States</u>

The Court will discuss in turn each of the reasons asserted by Plaintiffs that QMJHL Defendants have expressly aimed their actions at the United States.

i)    The Challenged Agreements

While the alleged conspiracy is sufficient to establish the first element of the purposeful direction analysis (which is likely why Defendants did not make any argument with respect to this element),[7] standing alone, it cannot establish an express aim at the United States (versus an aim at perhaps Canada or at the two countries jointly). To allow so would be to automatically provide personal jurisdiction over any and all defendants in an antitrust lawsuit that alleged some

---

[7] Defendants argue that the only act connecting QMJHL Defendants to the conspiracy is that "*other* defendants contracted with CHL players in the United States," and "[t]he Ninth Circuit has rejected this 'conspiracy' theory of jurisdiction." Dkt. No. 152 at 15 (emphasis in original) (citing *Aldini AG v. Silvaco, Inc.*, 2023 WL 3749792, at *6 (N.D. Cal. Mar. 27, 2023), *aff'd,* No. 23-15630, 2024 WL 5165600 (9th Cir. Dec. 19, 2024)). However, Plaintiffs allege that seven of the 18 QMJHL Clubs signed at least one American player since 2020. Dkt. No. 1 ¶¶ 129, 134, 137, 140, 142, 144, 146.

connection to the United States without the required qualitative evaluation of a defendant's

contact or connection with the forum state. *See Core-Vent Corp.*, 11 F.3d at 1485.

Plaintiffs rely on *Shields v. Fédération Internationale de Natation*, 419 F. Supp. 3d 1188,

1209 (N.D. Cal. 2019), where the district court found jurisdiction over the Fédération

Internationale de Natation ("FINA") for claims arising out of FINA's control over international

swimming competitions. Dkt. No. 151 at 28. However, the parties in *Shields* did not dispute that

the alleged injury occurred in the United States. Motion to Dismiss Plaintiffs' Complaint at 16,

*Shields*, 419 F. Supp. 3d 1188 (N.D. Cal. 2019) (No. C18-7393). Further, it was clear from

jurisdictional discovery that the defendant had knowingly interfered with USA Swimming's

plans to host a competition in the United States. *Shields*, 419 F. Supp. 3d at 1207. In contrast, the

alleged conspiracy here limited QMJHL Defendants' conduct entirely to Canada. *See* Dkt. No. 1

¶¶ 129–46.

Plaintiffs also cite *In re Packaged Seafood Prods.*, 338 F. Supp. 3d 1079, and *In re CRT*,

27 F. Supp. 3d 1002, to assert that "[c]ourts regularly find personal jurisdiction where foreign

defendants participate in agreements that inflate the prices paid by United States residents. Dkt.

No. 151 at 29. But again, in both of those cases, there was specific action by defendants directed

at the United States. *In re Packaged Seafood Products* involved defendants' purchase of a U.S.-

based American company and, *inter alia*, defendants' management and oversight of the company

that took place in the United States. 338 F. Supp. 3d at 1159–61. And in *In re CRT*, the defendant

specifically shared information with co-conspirators that included sales of customers in the

United States, coordinated pricing decisions in relation to United States market conditions, and

discussed prices in U.S. dollars. 27 F. Supp. 3d at 1012. In both of those cases, there were

actions directed specifically at the United States; here, Plaintiffs provide caselaw but argue no

facts that support actions by QMJHL Defendants that were directed specifically at the United

States in furtherance of the alleged agreement with the other CHL Leagues. And Plaintiffs'

Complaint alleges that the anticompetitive conduct "was specifically aimed at the *integrated*

North American market." Dkt. No. 1 ¶ 302 (emphasis added). In other words, the challenged

agreements were directed at Canada and the United States jointly, not at the United States alone.

*Ayla, LLC*, 11 F.4th at 980.

Therefore, the allegations in the Complaint regarding the challenged agreements do not

satisfy the express aiming prong and, accordingly, do not provide a basis for personal jurisdiction

over QMJHL Defendants.

ii)    Scouting and Recruiting

Scouting and recruiting may establish purposeful direction. In *Senne v. Kansas City*

*Royals Baseball Corp.*, 105 F. Supp. 3d 981 (N.D. Cal. 2015), plaintiffs were former and current

Minor League baseball players who asserted claims against the Office of the Commissioner of

Baseball doing business as Major League Baseball and its thirty member clubs under the Fair

Labor Standards Act ("FLSA") and state wage and hour laws. *Id.* at 992. Plaintiffs alleged that

they were paid illegally low wages during the championship season, no overtime wages, and no

wages for work performed outside the championship season. *Id.* The court found that "where a

defendant conducts extensive and ongoing scouting and recruiting in the forum and hires

residents of the forum on a regular and continuous basis," then that contact is not "random" or

"fortuitous." *Id.* at 1029. The court then pointed to the following facts obtained during

jurisdictional discovery in finding that the Atlanta Braves purposefully directed their activities at

California: (1) the Braves employed three scouts who were based in California; (2) during the

relevant time period, twenty of their employees travelled to California between three and ten

times per year to scout and recruit California players; (3) the Braves drafted California players

every year during the relevant time period; and (4) California players constituted 12% of the total

number of players drafted by the Atlanta Braves during the relevant time period. *Id.* at 1029–30. The court went through this analysis for each defendant team, *id.* at 1029–40, with California players constituting 9% of the total number of players drafted by a team representing the lowest percentage that also still qualified for purposeful direction, *id.* at 1034.

Here, other than simply stating that "[t]he Complaint details how the QMJHL Clubs scout and recruit players" (Dkt. No. 151 at 28), Plaintiffs do not explain how the scouting and recruiting by these Defendants is expressly aimed at the United States. The Complaint generally discusses how the scouting and recruiting by all Defendants was restricted to their exclusive territories (*see, e.g.*, Dkt. No. 1 ¶ 9), but those territories included both Canada and the United States (*id.* ¶¶ 8, 176). Further, none of the individual QMJHL Defendants are alleged to have any employees based in the United States. *See id.* ¶¶ 128–46. While Plaintiffs contend that several teams have "non-employee scout[s]" in the United States (*see id.* ¶¶ 134, 137), without more detail regarding the functions of these scouts and their connections to the United States, the Court cannot impute to Defendants any connections to the United States by these scouts. Finally, as to the majority[8] of the QMJHL Clubs, Plaintiffs make no allegations that they *ever* recruited any players from the United States. *See id.* ¶¶ 130–33, 135–36, 138–39, 141, 143, 145. Plaintiffs allege that seven of the 18 QMJHL Clubs recruited at least one player from the United States since 2020, but of those seven clubs, four[9] are alleged to have recruited only one player each from the United States during that time. *See id.* ¶¶ 129, 137, 142, 144. The remaining three Clubs

---

[8] Defendants Hockey Junior Baie-Comeau Inc., Le Club de Hockey Drummond Inc., Cape Breton Major Junior Hockey Club Limited, Les Olympiques de Gatineau Inc., Club de Hockey Les Remparts de Québec (2014) Inc., Le Club de Hockey Junior Armada Inc., Le Club de Hockey L'Océanic de Rimouski Inc., Les Huskies de Rouyn-Noranda Inc., Les Tigres de Victoriaville (1991) Inc., Club de Hockey Shawinigan Inc., and Les Saguenéens Junior Majeur de Chicoutimi.

[9] Defendants Le Titan Acadie Bathurst (2013) Inc. / The Acadie Bathurst Titan (2013) Inc., Moncton Wildcats Hockey Club Limited, Saint John Major Junior Hockey Club Limited, and Les Foreurs de Val-d'Or (2012) Inc.

1  are alleged to have recruited two, three, and four players from the United States since 2020,

2  respectively. *See id.* ¶¶ 140, 134, 146. This means that, as to the QMJHL Club with the *most*

3  players recruited from the United States since 2020, that Club recruited only one U.S.-based

4  player per year—far less than the 9% of the total players drafted found to be sufficient in *Senne*.

5        Therefore, the allegations in the Complaint regarding QMJHL Defendants' recruitment

6  activities in the United States do not satisfy the express aiming prong and, accordingly, do not

7  provide a basis for personal jurisdiction over QMJHL Defendants.

8                        iii)    Marketing

9        Plaintiffs argue that QMJHL Defendants "marketed themselves in the United States by

10  entering into licensing agreements with American companies, selling television and streaming

11  rights to United States residents, and selling merchandise and tickets to United States residents."

12  Dkt. No. 151 at 28 (citing Dkt. No. 1 ¶¶ 42, 83, 128–46, 266, 283). Other than asserting this fact,

13  Plaintiffs do not explain how QMJHL Defendants' marketing activities are expressly aimed at

14  the United States.

15        The Ninth Circuit has found personal jurisdiction over a foreign corporation where its

16  advertisements made an "intentional, explicit appeal to American consumers and no others."

17  *Ayla, LLC.*, 11 F.4th at 980. But here, Plaintiffs make no factual allegations supporting their

18  assertion that QMJHL Defendants' marketing targeted the United States specifically. Instead, the

19  marketing appears to be directed to Canada and the United States jointly. *See, e.g.*, Dkt. No. 1

20  ¶¶ 266.a. ("Major junior hockey games are televised in the United States and Canada"), 266.c.

21  ("the World Junior Ice Hockey Championships . . . is televised throughout North America).

22  While the *In re CRT* case cited by Plaintiffs involved marketing activities, in that case defendants

23  shared marketing information with co-conspirators to coordinate price decisions specifically in

24  relation to United States market conditions. 27 F. Supp. 3d at 1012. Here, the marketing and

sales at issue are for the games played by the various clubs and are geared towards North America (and not just the United States).

Further, the connection between Defendants' marketing and sales in the United States and Plaintiffs' antitrust claims has previously been questioned. Plaintiffs originally filed this case in the Southern District of New York and were told in the order dismissing the case:

> [W]ith respect to the CHL Defendants' marketing of merchandise, advertising, and streaming online . . . within the United States, including advertising by certain CHL Defendants on New York-targeted platforms, Plaintiffs have not articulated any "substantial relationship" or "articulable nexus" between those transactions and Plaintiffs' claims of violations of antitrust law.

*World Ass'n of Icehockey Players Unions N. Am. Div. v. Nat'l Hockey League*, No. C24-1066, 2024 WL 4893266, at *15 (S.D.N.Y. Nov. 26, 2024). The district court also provided a lengthy explanation of why those transactions are far too distant from Plaintiffs' antitrust claims for the purposes of specific jurisdiction. *Id.* at *15–16. Despite Plaintiffs having the issue previously identified for them and having had the benefit of jurisdictional discovery in the other case,[10] neither their Complaint nor their response brief addresses this issue.

Therefore, the allegations in the Complaint regarding QMJHL Defendants' marketing and sales activities in the United States do not satisfy the express aiming prong and, accordingly, do not provide a basis for personal jurisdiction over QMJHL Defendants.

Thus, Plaintiffs have not alleged that QMJHL Defendants' actions were expressly aimed at the United States for the purposes of asserting personal jurisdiction over QMJHL Defendants.

---

[10] Plaintiffs conducted jurisdictional discovery in the case before the Southern District of New York. 2024 WL 4893266, at *5.

(c)    Whether QMJHL Defendants' Actions Caused Harm in the United States

CHL Defendants argue that because QMJHL Defendants are located wholly in Canada, any harms from alleged restraints imposed on players by QMJHL Defendants were suffered in Canada and that similarly, to the extent any harm "befell a player who was recruited from the United States to play in the QMJHL or its member Clubs, that harm would also occur in Canada." Dkt. No. 139 at 22–23. Plaintiffs respond that the harmful effects of QJMHL Defendants and their co-conspirators were felt in the United States. Dkt. No. 151 at 28.

Both parties point to *In re Western States Wholesale Natural Gas Antitrust Litigation*, 715 F.3d 716 (9th Cir. 2013), in support of their positions. In that case, the Ninth Circuit held that purposeful direction had been established where plaintiffs alleged that defendants had engaged in acts "intended to have" an effect in the forum state. 715 F.3d 716, 743–44 (9th Cir. 2013). The court determined that allegations that defendant had "either directly or indirectly . . . engaged in the practice of wash sales, and manipulated market indices through the reporting of false trading information" were "intended to have, and did have, a direct, substantial, and reasonably foreseeable effect on commerce in Wisconsin"—these intentional acts were notably directed at the forum state itself. *Id.* But plaintiffs in that case went beyond simply alleging intentional acts that were directed at the forum state; they asserted a slew of facts that, taken as true, established that defendants' price manipulation was expressly aimed at the forum state. *Id.* at 744.

CHL Defendants contend that, unlike the allegations in *In re Western States*, Plaintiffs here have not alleged any intent by QMJHL Defendants to inflict harm in the United States. To the extent that Plaintiffs allege harm, CHL Defendants argue, that harm occurred in Canada. Dkt. No. 139 at 22–23. For example, "[a] U.S.-based recruit could not suffer harm from the QMJHL

1    or any of its member Clubs—in the form of restrained compensation, freedom of movement, or

2    any other injury—unless he left the United States and agreed to join one of the QMJHL Clubs."

3    *Id.*

4          Plaintiffs counter that "[i]t is enough that a 'jurisdictionally sufficient amount of harm' is

5    suffered in the forum, even if 'more harm might have been suffered in another [forum],'" relying

6    on the Ninth Circuit's opinion in *Yahoo! Inc. v. La Ligue Contre Le Racisme*. Dkt. No. 151 at 29

7    (second alteration in original) (quoting *Yahoo! Inc.*, 433 F.3d at 1207). But in so holding, the

8    *Yahoo!* court did not disavow *Calder*'s requirement that a defendant take affirmative actions

9    with intent to affect the forum state—it merely held that, if a defendant had *also* taken

10   affirmative actions with intent to affect another forum, it would not preclude a forum state from

11   asserting personal jurisdiction. 433 F.3d at 1207. Plaintiffs also rely on *In re Packaged Seafood*

12   and *In re CRT* (Dkt. No. 151 at 29), but in both of those cases, the respective courts found that

13   defendants had purposefully directed their activities at the forum state, so it followed that the

14   injury would be felt in the forum state. *See supra* Section III.A.1.b.(1)(b). But here, in contrast,

15   the Court finds that QMJHL Defendants did not purposefully direct their activities at the United

16   States. *See supra* Section III.A.1.b.(1). Plaintiffs' reliance on *Will Co. v. Lee*, 47 F.4th 917 (9th

17   Cir. 2022), fares no better, as the Ninth Circuit found there that the defendant, a foreign video-

18   hosting site, had expressly aimed its website content at the United States. *Id.* at 916 ("[A]ccess is

19   *only* lawful in the United States, and [the site] provides compliance procedures *onl*y for the

20   United States, which means it prepared for U.S. visitors to the exclusion of all others." (emphasis

21   in original)). But the Court has found that QMJHL Defendants did not expressly aim their

22   conduct at the United States. *See supra* Section III.A.1.b.(1)(b).

23         Plaintiffs also contend that QMJHL Defendants caused harm in the United States by

24   "refusing to compete for the services of Players residing outside of New England" and

"subjecting [Players] to involuntary drafts that restrained competition for their services." Dkt. No. 151 at 29. These allegations, Plaintiffs argue, are sufficient to demonstrate foreseeable harm in the United States—although it may not be the "brunt" of the harm alleged, it is a "jurisdictionally sufficient amount of harm." *Id.* But as previously discussed, *see supra* Section III.A.1.b.(1)(b)(ii)., there are no allegations that the majority of the QJMHL Clubs *ever* recruited any players from the United States. *See* Dkt. No. 1 ¶¶ 130–33, 135–36, 138–39, 141, 143, 145. Further, while seven of the 18 QMJHL Clubs recruited at least one player from the United States since 2020, four are only alleged to have recruited one U.S. player each since 2020, *see id.* ¶¶ 129, 137, 142, 144, and the remaining three Clubs are alleged to have recruited two, three, and four players from the United States since 2020, respectively, *see id.* ¶¶ 140, 134, 146. There is not much guidance on what constitutes a "jurisdictionally sufficient amount of harm," but the Supreme Court held in *Keeton v. Hustler Magazine*, 465 U.S. 770 (1984), that New Hampshire had personal jurisdiction over the publisher of a national magazine even though just over one percent of sales occurred in that state, because that one percent still amounted to "a substantial number of copies." *Id.* at 780–81. And the Ninth Circuit held in *Will Co.* that while "just 4.6% of [defendant's] views occurred in the United States during the relevant period, that amounted to over 1.3 million visits, an undeniably 'substantial' number." *Will Co.*, 47 F.4th at 927. Even for those QJMHL Clubs that recruited and signed players from the United States, the Court is skeptical that recruiting one player, at most, per year, can constitute a "jurisdictionally sufficient amount of harm." *See Boschetto v. Hansing*, 539 F.3d 1011, 1017 n.3 (9th Cir. 2008) ("In *Burger King* the [Supreme] Court noted that even a 'single act' by the defendant can support jurisdiction, but only if that act creates a 'substantial connection' with the forum." (citing *Burger King*, 471 U.S. at 476 n.18)).

1    For these reasons, the Court does not find that QJMHL Defendants caused sufficient

2    harm in the United States to trigger personal jurisdiction over them.

3                    **(2)**      **Purposeful Availment**

4    Plaintiffs contend that QMJHL Defendants purposefully availed themselves of the United

5    States by "selling broadcasting rights and merchandise into the United States, systematically

6    scouting and recruiting players, agreeing with their U.S.-based counterparts not to encroach on

7    their unlawfully allocated territories, negotiating payments from the NHL to 'develop' Players,

8    and agreeing with the NHL teams to be the sole employer for NHL-drafted Players who do not

9    make an NHL Club roster.[11] Dkt. No. 151 at 30.

10                    (a)      The Challenged Agreements

11    To the extent that Plaintiffs allege that the SPAs that players from the United States

12    entered into with QMJHL Clubs provide the basis for the first element, the Court analyzes this

13    reason under purposeful availment. "[T]he existence of a contract between a resident of the

14    forum state and a non-resident defendant is insufficient by itself to create personal jurisdiction

15    over the non-resident." *Van Steenwyk v. Interamerican Mgmt. Consulting Corp.*, 834 F. Supp.

16    336, 340 (E.D. Wash. 1993) (citing *Roth v. Garcia Marquez*, 942 F.2d 617, 621 (9th Cir.1991)).

17    As the Supreme Court has explained, this is because:

18              [A] contract is "ordinarily but an intermediate step serving to tie up
                prior business negotiations with future consequences which
19              themselves are the real object of the business transaction." It is
                these factors—prior negotiations and contemplated future
20              consequences, along with the terms of the contract and the parties'
                actual course of dealing—that must be evaluated in determining
21              whether the defendant purposefully established minimum contacts
                within the forum.
22

23    _____

24    [11] The Court considers these last two examples to be part and parcel of Plaintiffs' allegations regarding the
      challenged agreements. *See infra* Section III.A.1.b.(1)(b)(i).

*Burger King*, 471 U.S. at 479 (quoting *Hoopeston Canning Co. v. Cullen*, 318 U.S. 313, 316–17 (1943)); *see also Van Steenwyk*, 834 F. Supp. at 340. With respect to prior negotiations, courts do not focus narrowly on the negotiation of specific contract terms but, instead, consider which party initiated the negotiations and whether the defendant reached out to the plaintiff in the forum. *See Roth*, 942 F.2d at 622 (question of purposeful availment depends, in part, on which party initiated contact); *Van Steenwyk*, 834 F. Supp. at 342 (finding purposeful availment based, in part, on evidence that defendant negotiated contract with plaintiff in the forum). In addition, to support a finding of purposeful availment, the contract cannot be "a one-shot deal that was merely negotiated and signed by one party in the forum" but must instead be dependent upon further activities in the forum state. *Roth*, 942 F.2d at 622. Finally, if "the economic relationships created by the contract were to have found their fulfillment outside this state," minimum contacts would not be established for personal jurisdiction over the defendant in the state. *Van Steenwyk*, 834 F. Supp. at 342.

Here, while Plaintiffs' Complaint specifies that Plaintiff Gould's 2020 contract with the Tri-City Americans was prepared, presented, signed, and counter-signed in the United States, Dkt. No. 1 ¶ 72, the Complaint contains no such allegations for any of the individual QJMHL Defendants. Further, the performance pursuant to any contract with QMJHL Clubs would largely take place in Canada. Therefore, the allegations in the Complaint regarding contracts between players and the QMJHL Clubs do not satisfy the purposeful availment prong and, accordingly, do not provide a basis for personal jurisdiction over QMJHL Defendants.

(b)    Scouting and Recruiting

CHL Defendants argue that "[a] defendant does not establish minimum contacts with a forum when its only contacts involve scouting or recruiting a plaintiff to leave the forum and travel or work elsewhere." Dkt. No. 139 at 24. The Court agrees.

1      Although it is an unpublished decision, *Sarkis v. Lajcak*, 425 F. App'x 557, 559 (9th Cir.

2   2011), provides useful guidance for analyzing purposeful availment. In *Sarkis*, the Ninth Circuit

3   noted that the Supreme Court has instructed courts to "'use a highly realistic approach,' by

4   looking at the 'prior negotiations and contemplated future consequences along with the terms of

5   the contract and the parties' actual course of dealing" to analyze purposeful availment. *Id.* at 558.

6   In *Sarkis*, the defendant contacted the plaintiff in California to negotiate a contract, which

7   provided that the plaintiff would move to Bosnia to work for defendant, and plaintiff

8   subsequently moved to Bosnia. *Id.* at 558–59. The defendant did not target its solicitation of

9   applications to California but, rather, advertised internationally. *Id.* at 559. Under these

10   circumstances, the Ninth Circuit found no purposeful availment and, therefore, no personal

11   jurisdiction over the defendant in California, as "[t]he contemplated future consequences of the

12   contract were that [plaintiff] would move to Bosnia and work for [defendant]." *Id.* The Ninth

13   Circuit distinguished cases like this one—in which recruitment draws a plaintiff away from the

14   forum—from others "involv[ing] a contract for the state resident to work in the state," that would

15   establish a legitimate connection to the forum state and give rise to personal jurisdiction. *Id.*; *see*

16   *also Bailey v. DynCorp Int'l FZ-LLC*, No. C11-714, 2012 WL 112867, at *7 (D. Or. Jan. 11,

17   2012) (plaintiff recruited from Oregon to work in Afghanistan could not bring suit in Oregon).

18   Similarly, in the instant case, the scouting and recruitment of players in the United States was to

19   draw them away from the United States to play in Canada.

20      Therefore, the allegations in the Complaint regarding QMJHL Defendants' scouting

21   and recruiting activities in the United States do not satisfy the purposeful availment prong and,

22   accordingly, do not provide a basis for personal jurisdiction over QMJHL Defendants.

23

24

(c)    <u>Marketing</u>

Plaintiffs assert that "the QMJHL Clubs . . . purposefully availed themselves of the United States by, *inter alia*, selling broadcasting rights and merchandise in the United States." Dkt. No. 151 at 30. They then assert that Defendants' two cases are unpublished and off-point without clarifying which cases and to which issue(s) (marketing, recruiting or the challenged agreements) those cases apply. *Id.* Without more, this is insufficient for the Court to find purposeful availment by the QMJHL Defendants based on their marketing activities in the United States—particularly where the Complaint fails to detail any marketing that QMJHL Defendants undertook in the United States. *See also supra* Section III.A.1.b.(1)(b)(iii).

Therefore, the allegations in the Complaint regarding QMJHL Defendants' marketing and sales activities in the United States do not satisfy the purposeful availment prong and, accordingly, do not provide a basis for personal jurisdiction over QMJHL Defendants.

\*      \*      \*

For the reasons outlined above, the Court finds that Plaintiffs fail to establish that QMJHL Defendants' actions were purposefully directed at the United States. As such, the Court need not address the remaining prongs to determine that it cannot assert personal jurisdiction over QMJHL Defendants. Accordingly, CHL Defendants' motion as to QMJHL Defendants is GRANTED.

### 2.    Non-Corporation OHL Defendant Clubs

Plaintiffs argue for the exercise of personal jurisdiction over certain non-corporation OHL Defendant Clubs—the Erie Otters, Saginaw Spirit, Ottawa 67s, and Sarnia Sting—pursuant to the Clayton Act or, in the alternative, pursuant to Federal Rule of Civil Procedure 4(k)(2) or the Washington long-arm statute, RCW 4.28.185. Dkt. No. 151 at 33–34. CHL Defendants argue that jurisdiction pursuant to section 12 of the Clayton Act cannot attach to non-corporation OHL

Defendant Clubs because: (1) they are not corporations; (2) Rule 4(k)(2) cannot apply since OHL Defendants have "made no suggestion that they are immune from jurisdiction in all 50 states"; and (3) Plaintiffs have not alleged sufficient Washington-specific contacts for these Clubs such that specific jurisdiction pursuant to the Washington long-arm statute exists. Dkt. No. 152 at 13–14.

### a.    *Clayton Act*

Section 12 of the Clayton Act applies to "[a]ny suit, action, or proceeding under the antitrust laws against a *corporation* . . . ." 15 U.S.C. § 22 (emphasis added). Therefore, the plain terms of the Clayton Act appear to govern service only upon corporations. *GovernmentGPT Inc. v. Axon Enter. Inc.*, No. C24-1869, 2025 WL 743998, at *6 (D. Ariz. Mar. 7, 2025) (citing 15 U.S.C. § 22). Here, as with other cases, the Parties dispute whether Section 12 applies to other types of corporate entities.

Defendant JAW Hockey Enterprises LP (which operates the Erie Otters) and Defendant Ottawa 67's Limited Partnership (which operates the Ottawa 67's) are limited partnerships. Dkt. No. 1 ¶¶ 112, 119. Defendant Saginaw Hockey Club, L.L.C. (which operates the Saginaw Spirit) is a limited liability company. *Id.* ¶ 123. The only case Plaintiffs cite to support the proposition that Section 12 may apply to unincorporated business entities in the context of analyzing personal jurisdiction is the Ninth Circuit's decision in *D'Augusta*, which they cite in their section discussing Defendant NHL. Dkt. No. 151 at 34 (citing *D'Augusta*, 117 F.4th at 1100 n.1). Plaintiffs assert that the Ninth Circuit found that the district court in *D'Augusta* erred in finding that the Section 12 did not reach the limited-partnership defendant in that case. However, the point in the footnote was not that the defendant was a limited partnership, but that the district court erred in "holding that it lacked personal jurisdiction over [the defendant] *because it held no ties to California*." *Id.* (emphasis added). The Ninth Circuit was merely commenting that the

district court should have looked to the defendant's nationwide contacts and not limited its analysis to a single state. The footnote says nothing about the applicability of Section 12 because of the business structure of the defendant.[12]

Plaintiffs also argue that other courts "have applied Section 12 to limited partnerships, limited liability companies, and other 'corporate-like entities,'" relying on a recent Eastern District of Arkansas case. Dkt. No. 151 at 33 (citing *Arkansas v. Syngenta Crop Prot. AG*, No. C22-1287, 2025 WL 551660, at *6 (E.D. Ark. Feb. 19, 2025)). The Court agrees with CHL Defendants' contention that Plaintiffs' cited case is inapposite. Dkt. No. 152 at 13. While *Syngenta Crop Protection* did not ultimately evaluate whether it would be proper to apply Section 12 to a limited liability company ("LLC"), it did note that "[t]here are . . . courts that have applied section 12 to other corporate-like entities," referencing cases from the Southern District of New York and the District of Kansas. 2025 WL 551660, at *6 (citing *PharmacyChecker.com, LLC v. Nat'l Ass'n of Bds. of Pharmacy*, 530 F. Supp. 3d 301, 321 n.5 (S.D.N.Y. 2021); *Budicak, Inc. v. Lansing Trade Grp., LLC*, No. C19-2449, 2020 WL 758801, at *3 (D. Kan. Feb. 14, 2020)). But the *PharmacyChecker.com* court, relying on *Budicak*, "assumed without deciding" that Section 12 was applicable to an LLC defendant, 530 F. Supp. 3d at 321 n.5, and the *Budicak* court likewise did not evaluate whether Section 12 was applicable to an LLC defendant—instead, it evaluated personal jurisdiction pursuant to the Clayton Act (which includes the "corporation" limitation) *and* the Sherman Act (which does not contain any "corporation" limitation), 2020 WL 758801, at *2–3.

And at least one court in this Circuit recently rejected an argument that Section 12 of the Clayton Act could apply to an LLC or other non-corporation defendant. *GovernmentGPT Inc.*,

---

[12] Plaintiffs also cite Ninth Circuit cases discussing the definition of "corporation" in different contexts such as bankruptcy and determining venue; the Court does not find these cases persuasive. Dkt. No. 151 at 33.

2025 WL 743998, at *6–7. After evaluating caselaw from throughout the Ninth Circuit and nationwide, the *GovernmentGPT* court determined that there was "no question" that Section 12 did not apply to LLCs because they are "not subject to the jurisdictional hook that 15 U.S.C. § 22 provides." *Id.* at *7. The Court finds *GovernmentGPT* persuasive; accordingly, it will not apply Clayton Act jurisdiction to Defendants JAW Hockey Enterprises LP, Ottawa 67's Limited Partnership, and Saginaw Hockey Club, L.L.C.

But Defendant 211 SSHC Canada ULC (which operates the Sarnia Sting) is an unlimited liability corporation ("ULC") (Dkt. No. 1 ¶ 124), which is a type of taxable corporation under Canadian law. *See Wyndham Hotel Grp. Can., ULC v. Ostrander*, No. C21-16333, 2022 WL 16552817, at *2 (D.N.J. Oct. 31, 2022) ("A ULC is an entity incorporated in the usual manner, possessing the formal characteristics of an ordinary corporation."). Accordingly, application of Section 12 of the Clayton Act to Defendant 211 SSHC Canada ULC is appropriate.

### b.    *Rule 4(k)(2)*

Because Section 12 of the Clayton Act cannot serve as the basis for personal jurisdiction over Defendants JAW Hockey Enterprises LP, Ottawa 67's Limited Partnership, and Saginaw Hockey Club, L.L.C., the Court must determine if another long-arm statute applies. Federal Rule of Civil Procedure 4(k)(2) permits courts to exercise personal jurisdiction over a defendant where "(1) the action arises under federal law; (2) "the defendant is not subject to jurisdiction in any state's courts of general jurisdiction"; and (3) the court's exercise of jurisdiction comports with due process." *Ayla, LLC*, 11 F.4th at 978.

Plaintiffs contend that "the two Ottawa-based Clubs" are subject to jurisdiction pursuant to Federal Rule of Civil Procedure 4(k)(2). Dkt. No. 151 at 34. CHL Defendants argue that Rule 4(k)(2) cannot apply because "the OHL [C]lubs made no suggestion that they are immune from jurisdiction in all 50 states." Dkt. No. 152 at 13.

Based on Plaintiff's own allegations, Rule 4(k)(2) cannot apply to either Defendant Saginaw Hockey Club, L.L.C.—a Michigan limited liability company (Dkt. No. 1 ¶ 123) that is subject to jurisdiction in Michigan—or Defendant JAW Hockey Enterprises LP—a Delaware limited partnership (Dkt. No. 1 ¶ 112) that is subject to jurisdiction in Delaware. *See, e.g.*, *3123 SMB LLC v. Horn*, 880 F.3d 461, 462–63 (9th Cir. 2018) ("[A] corporation shall be deemed to be a citizen of every State . . . by which it has been incorporated . . . .").

CHL Defendants argue that "the OHL [C]lubs made no suggestion that they are immune from jurisdiction in all 50 states, so Rule 4(k)(2) does not apply." Dkt. No. 152 at 13. But while "[o]rdinarily, the plaintiff bears the burden of proving personal jurisdiction over the defendant . . . , proving the lack of personal jurisdiction in every state could be quite onerous, and it is the defendant, not the plaintiff, that likely possesses most of the information necessary to do so." *Holland Am. Line Inc. v. Wartsila N. Am., Inc.*, 485 F.3d 450, 461 (9th Cir. 2007). Accordingly, the Ninth Circuit has held:

> [A] defendant who wants to preclude use of Rule 4(k)(2) has only to name some other state in which the suit could proceed. Naming a more appropriate state would amount to a consent to personal jurisdiction there . . . . If, however, the defendant contends that he cannot be sued in the forum state and refuses to identify any other where suit is possible, then the federal court is entitled to use Rule 4(k)(2). This procedure makes it unnecessary to traipse through the 50 states, asking whether each could entertain the suit.

*Id.* (quoting *ISI Int'l, Inc. v. Borden Ladner Gervais LLP*, 256 F.3d 548, 552 (7th Cir. 2001)). Thus, it is defendants' burden to *affirmatively identify* a state in which they are subject to jurisdiction in order to avoid application of Rule 4(k)(2). Because CHL Defendants have not identified any state in which Defendant Ottawa 67's Limited Partnership is subject to jurisdiction, the Court is entitled to assert personal jurisdiction over Defendant Ottawa 67's

Limited Partnership pursuant to Rule 4(k)(2) based upon the information (or lack of information) currently before the Court.

### c.   *Minimum Contacts Analysis*

Defendant 211 SSHC Canada ULC (the Sarnia Sting) is subject to personal jurisdiction pursuant to the Clayton Act and Defendant Ottawa 67's Limited Partnership (the Ottawa 67's) is subject to personal jurisdiction pursuant to Rule 4(k)(2). *See supra* Sections III.A.2.a.–b. Defendants JAW Hockey Enterprises LP (Erie Otters) and Saginaw Hockey Club, L.L.C. (Saginaw Spirit) are not subject to personal jurisdiction pursuant to either the Clayton Act or Rule 4(k)(2); accordingly, the only remaining basis for personal jurisdiction is the Washington long-arm statute, which provides for the exercise of personal jurisdiction to the extent permitted by the due process clause. *See Chan*, 39 F.3d at 1405. Therefore, the Court must determine whether the assertion of jurisdiction over each of these defendants comports with due process— in other words, whether each Defendant has minimum contacts with the relevant forum such that an assertion of jurisdiction does not "offend traditional notions of fair play and substantial justice." *Schwarzenegger*, 374 F.3d at 801.

### (1)   <u>Defendant 211 SSHC Canada ULC</u>

Defendant 211 SSHC Canada ULC is subject to jurisdiction pursuant to Section 12 of the Clayton Act, *see supra* Section III.A.2.a.; thus, the United States is the relevant forum for purposes of the minimum contacts analysis. *D'Augusta*, 117 F.4th at 1100 n.1.

Plaintiffs allege that the Sarnia Sting, operated by Defendant 211 SSHC Canada ULC, has signed eight U.S. players since 2020. Dkt. No. 1 ¶ 124. Further, although the Sarnia Sting's home arena is located in Ontario, Canada, as a member of the OHL, the Sarnia Sting regularly travels to the United States in order to practice and compete in games held in the United States and licenses and sells merchandise and products, including television events, related to those

games. *Id.* ¶¶ 107, 280–81. Critically, CHL Defendants do not argue that non-corporation OHL Defendant Clubs lack the minimum contacts necessary to support an assertion of personal jurisdiction with the United States; they only argue that Plaintiffs have failed to allege Washington-specific contacts for these entities. Dkt. No. 139 at 21–22. But since the relevant forum is the United States and not Washington, then, like the corporate OHL Defendant Clubs and WHL Defendant Clubs, whose jurisdiction CHL Defendants do not challenge, the non-corporation OHL Defendant Clubs, including the Sarnia Sting, have sufficient contacts with the United States to support an assertion of personal jurisdiction over Defendant 211 SSHC Canada ULC.

Therefore, the Court finds that it has personal jurisdiction over Defendant 211 SSHC Canada ULC.

### (2)    Defendant JAW Hockey Enterprises LP

Because Defendant JAW Hockey Enterprises LP is not subject to jurisdiction pursuant to either Section 12 of the Clayton Act or Rule 4(k)(2), the Court must determine whether it is subject to jurisdiction pursuant to the Washington long-arm statute; thus, Washington is the relevant forum for purposes of the minimum contacts analysis.

CHL Defendants argue that "Plaintiffs have not alleged any (let alone sufficient) Washington-specific contacts for [Defendant JAW Hockey Enterprises LP, which operates the Erie Otters] that could support jurisdiction under the Washington long-arm statute." Dkt. No. 139 at 22 (cleaned up). The Court agrees. Plaintiffs argue that "the Erie Otters . . . have purposefully directed their conduct towards Washington by agreeing not to source players from that state and the claims arise out of that agreement." Dkt. No. 151 at 34. But Plaintiffs have made no allegations suggesting that the Erie Otters purposefully directed any conduct toward Washington, specifically, as compared to the other 24 states from which the Erie Otters agreed not to recruit

players; thus, Plaintiffs have failed to show that Defendant JAW Hockey Enterprises LP "expressly aimed" any intentional act at Washington. *See Schwarzenegger*, 374 F.3d at 806. Having failed on this element, the Court need not reach the other elements of the minimum contacts analysis.

Therefore, the Court finds that it does not have personal jurisdiction over Defendant JAW Hockey Enterprises LP.

### (3)   Defendant Ottawa 67's Limited Partnership

Defendant Ottawa 67's Limited Partnership is subject to jurisdiction pursuant to Rule 4(k)(2), *see supra* Section III.A.2.b.; thus, the United States is the relevant forum for purposes of the minimum contacts analysis.

Plaintiffs allege that the Ottawa 67's, operated by Defendant Ottawa 67's Limited Partnership, signed two U.S. players since 2020. Dkt. No. 1 ¶ 119. Further, although the home arena of the Ottawa 67's is located in Ottawa, Canada, as a member of the OHL, the Ottawa 67's regularly travels to the United States in order to practice and compete in games held in the United States and licenses and sells merchandise and products, including television events, related to those games. *Id.* ¶¶ 107, 280–81. Critically, CHL Defendants do not argue that non-corporation OHL Defendant Clubs lack the minimum contacts necessary to support an assertion of personal jurisdiction with the United States; they only argue that Plaintiffs have failed to allege Washington-specific contacts for these entities. Dkt. No. 139 at 21–22. But since the relevant forum is the United States and not Washington, then like the corporate OHL Defendant Clubs and WHL Defendant Clubs, whose jurisdiction CHL Defendants do not challenge, the non-corporation OHL Defendant Clubs, including the Ottawa 67's, have sufficient contacts with the United States to support an assertion of personal jurisdiction over Defendant Ottawa 67's Limited Partnership.

1    Therefore, the Court finds that it has personal jurisdiction over Defendant Ottawa 67's

2    Limited Partnership.

3                    **(4)    <u>Defendant Saginaw Hockey Club, L.L.C.</u>**

4    Because Defendant Saginaw Hockey Club, L.L.C. is not subject to jurisdiction pursuant

5    to either Section 12 of the Clayton Act or Rule 4(k)(2), the Court must determine whether it is

6    subject to jurisdiction pursuant to the Washington long-arm statute; thus, Washington is the

7    relevant forum for purposes of the minimum contacts analysis.

8    CHL Defendants argue that "Plaintiffs have not alleged any (let alone sufficient)

9    Washington-specific contacts for [Defendant Saginaw Hockey Club, L.L.C., which operates the

10   Saginaw Spirit] that could support jurisdiction under the Washington long-arm statute." Dkt. No.

11   139 at 22 (cleaned up). The Court agrees. Plaintiffs argue that "the . . . Saginaw Spirit have

12   purposefully directed their conduct towards Washington by agreeing not to source players from

13   that state and the claims arise out of that agreement." Dkt. No. 151 at 34. But Plaintiffs have

14   made no allegations suggesting that the Saginaw Spirit purposefully directed any conduct toward

15   Washington, specifically, as compared to the other 24 states from which the Saginaw Spirit

16   agreed not to recruit players; thus, Plaintiffs have failed to show that Defendant Saginaw Hockey

17   Club, L.L.C. "expressly aimed" any intentional act at Washington. *See Schwarzenegger*, 374

18   F.3d at 806. Having failed on this element, the Court need not reach the other elements of the

19   minimum contacts analysis.

20   Therefore, the Court finds that it does not have personal jurisdiction over Defendant

21   Saginaw Hockey Club, L.L.C.

22                              *        *        *

23   For the reasons outlined above, the Court can assert personal jurisdiction over Defendants

24   211 SSHC Canada ULC and Ottawa 67's Limited Partnership but cannot assert personal

jurisdiction over Defendants JAW Hockey Enterprises LP and Saginaw Hockey Club, L.L.C. Accordingly, CHL Defendants' motion is DENIED as to Defendants 211 SSHC Canada ULC and Ottawa 67's Limited Partnership, and GRANTED as to Defendants JAW Hockey Enterprises LP and Saginaw Hockey Club, L.L.C.

### 3.    Defendant NHL

Plaintiffs argue for the assertion of personal jurisdiction over Defendant NHL pursuant to Section 12 of the Clayton Act or, in the alternative, pursuant to the Washington long-arm statute. Dkt. No. 151 at 34. Defendant NHL argues that Section 12 of the Clayton Act does not apply to unincorporated associations, and that Plaintiffs have failed to meet their burden to show that Defendant NHL purposefully directed conduct at Washington or that Plaintiffs' claims arise from Defendant NHL's contacts with Washington. Dkt. No. 153 at 6–7.

### a.    *Clayton Act*

Plaintiffs admit in their complaint that the NHL is "an unincorporated joint venture association." Dkt. No. 1 ¶ 82. As such and for the reasons stated above, *see supra* Section III.A.2.a., Section 12 of the Clayton Act does not apply to Defendant NHL because it is not a corporation (Dkt. No. 1 ¶ 82). Accordingly, the Court turns to determining whether jurisdiction may be asserted pursuant to the Washington long-arm statute.

### b.    *Washington Long-Arm Statute*

Defendant NHL argues that Plaintiffs' single, conclusory allegation that "Defendants . . . engaged in an illegal anticompetitive scheme that was directed at, and had the intended effect of causing injury to, persons residing in, located in, and/or doing business in the United States, including in Washington State and this District" is insufficient to show that the NHL "expressly aimed" any conduct at Washington. Dkt. No. 141 at 20 (quoting Dkt. No. 1 ¶ 152). Defendant NHL further argues that Plaintiffs predicate their claim on the NHL-CHL agreement when no

actions with regard to that agreement took place in Washington. *Id.* at 21. Finally, Defendant NHL asserts that even if Plaintiffs had met the first two requirements for minimum contacts, the limited contacts the NHL has with Washington would make exercising jurisdiction over it unreasonable. *Id.* at 23. In response, Plaintiffs provide several reasons why they believe the Defendant NHL's actions are directed at Washington. Dkt. No. 151 at 35–36. Plaintiffs assert that the same arguments they make with regard to the purposeful availment/directed conduct element support their contention that their claims arise out of or relate to the Defendant NHL's contacts with Washington. *Id.* at 36. Therefore, the Court will discuss these two elements together.

Plaintiffs contend that Defendant NHL expressly directed its conduct at Washington because "Plaintiffs have alleged in detail the NHL's involvement in a transnational conspiracy that includes several Clubs, and an NHL Club, that are located in Washington." Dkt. No. 151 at 35; *see also* Dkt. No. 1 ¶¶ 32–40, 82, 268–79, 281, 291, 293, 319–21. But Defendant NHL's participation in the alleged conspiracy alone is not sufficient to establish purposeful direction, as Washington courts "have rejected the conspiracy theory of long-arm jurisdiction." *Fifteen Twenty-One Second Ave. Condo. Ass'n. v. Viracon, LLC*, No. C23-1999, 2024 WL 4277847, at *3 (W.D. Wash. Sept. 24, 2024) (quoting *Silver Valley Partners, LLC v. De Motte*, 400 F. Supp. 2d 1262, 1268 (W.D. Wash. 2005)); *see also Hewitt v. Hewitt*, 78 Wn. App. 447, 453–54 & n.2, 896 P.2d 1312 (1995) (noting that while Washington courts had not ruled on the "conspiracy/imputation theory of long-arm jurisdiction," "other courts generally disapprove of its use" and rejecting as "unpersuasive" cases from courts that have accepted the theory). Further, in an unpublished opinion, the Ninth Circuit has expressed that "[t]here is a great deal of doubt surrounding the legitimacy of this conspiracy theory of personal jurisdiction," noted that "use of the theory has been criticized by commentators," and further pointed out that an

analogous conspiracy theory had been rejected. *Chirila v. Conforte*, 47 F. App'x 838, 842 (9th Cir. 2002) (citing *Piedmont Label Co. v. Sun Garden Packing Co.*, 598 F.2d 491, 492 (9th Cir. 1979) (rejecting a similar theory that venue could be founded solely on allegations that a co-defendant of a conspiracy—of which defendant was a member—performed acts in the forum district)). The Court notes that Plaintiffs do not cite a single case in support of their proposition. *See* Dkt. No. 151 at 35. Therefore, Plaintiffs must allege that Defendant NHL *itself* has taken intentional actions expressly aimed at the forum state. *See Fifteen Twenty-One Second Ave. Condo. Ass'n*, 2024 WL 4277847, at *3 (citing *Calder*, 465 U.S. at 789).

Plaintiffs assert three additional ways in which they allege Defendant NHL has taken intentional actions expressly aimed at Washington. First, Plaintiffs contend that Plaintiff Gould played for a WHL Club in Washington and suffered injuries there. Dkt. No. 151 at 35; *see also* Dkt. No. 1 ¶¶ 72–74. Second, Plaintiffs assert that Defendant NHL directed its conduct at Washington by "requiring that NHL [C]lubs return Players who do not make their rosters to their former Clubs, ensuring that these Players will again be subject to the same anticompetitive restraints," thus purposefully directing conduct towards Washington. Dkt. No. 151 at 35; *see also* Dkt. No. 1 ¶¶ 270–71, 287. Third, Plaintiffs allege that Defendant NHL caused its minor league affiliates in the AHL and ECHL to refuse to compete for the services of Major Junior players in Washington. Dkt. No. 151 at 36; *see also* Dkt. No. 1 ¶¶ 36–38, 293. The Court will address each in turn.

First, Plaintiff Gould's history with a Washington WHL Club and his injuries suffered in Washington are insufficient to confer jurisdiction over Defendant NHL. While "a defendant's contacts with the forum State may be intertwined with his transactions or interactions with the plaintiff or other parties[,] a defendant's relationship with a plaintiff or third party, standing alone, is an insufficient basis for jurisdiction." *Walden v. Fiore*, 571 U.S. 277, 286 (2014). The

minimum contacts analysis "looks to [a] defendant's contacts with the forum State itself, not the defendant's contacts with persons who reside there." *Id.* at 285. And the Supreme Court has cautioned that a plaintiff's forum connections should not be "improperly attribute[d]" to a defendant. *Id.* at 289.

Second, Plaintiffs argue that Defendant NHL "actively participates in the conspiracy by requiring that NHL Clubs return Players who do not make their rosters to their former Clubs." Dkt. No. 151 at 35. As an initial matter, Defendant NHL submitted an affidavit averring that: (1) the NHL-CHL agreement was negotiated primarily in New York and Canada (Dkt. No. 142 ¶ 10); (2) no one from the NHL traveled to or communicated with anyone in Washington as part of the negotiation or execution of the agreement (*id.* ¶¶ 10–11); (3) the NHL carried out its obligations under the agreement from New York and Canada (*id.* ¶ 12); and (4) the NHL draft has never been held in Washington (*id.* ¶ 4). Plaintiffs fail to respond to any of these facts. But "in the face of a contradictory affidavit, [a] 'plaintiff cannot simply rest on the bare allegations of its complaint.'" *Yamashita v. LG Chem, Ltd.*, 62 F.4th 496, 502 (9th Cir. 2023).

Further, even accepting that the NHL-CHL agreement *can* affect players in Washington,[13] Plaintiffs admit that Defendant NHL applies these same restraints to all players drafted into the NHL from any Major Junior Club in any location in the United States—not just players in Washington. Dkt. No. 1 ¶ 271; *see also id.* ¶ 270 (noting that Defendant NHL drafts "many 18- and 19-year-old Major Junior Players"). The Court finds this situation similar to that

---

[13] Plaintiffs assert in their opposition brief that in the 2024 NHL draft, the Seattle Kraken (an NHL team based in Seattle, Washington) assigned their top draft pick to his former WHL Club, citing to a September 25, 2024, article from the Spokane Chiefs. Dkt. No. 151 at 24 n.1. While this information was available to Plaintiffs at the time they filed their Complaint on December 23, 2024, they did not include this information in the Complaint, nor do they state whether the player named in the article is a WAIPU member. Accordingly, because "district courts may not consider material outside the pleadings when assessing the sufficiency of a complaint" unless such information is subject to consideration under the incorporation-by-reference doctrine or judicial notice, and because Plaintiffs have made no such argument as to the 2024 NHL draft, the Court will not consider this information. *Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 998 (9th Cir. 2018).

in *Mehr v. Féderation Internationale de Football Association*, 115 F. Supp. 3d 1035 (N.D. Cal. 2015). In that case, the court determined:

> [T]he allegation that FIFA requires its members, such as U.S. Soccer, to 'follow FIFA's rules and the Laws of the Game' and also requires the members of its members (*i.e.,* U.S. Soccer's members) to follow those rules and laws, even if true, could be said of almost any location in the United States. Even when combined with the fact that there are many youth soccer players in Northern California, this allegation is not sufficient to show that FIFA has availed itself of the privilege of conducting activities within California, such that it should have reasonably anticipated being haled into court in this state.

*Id.* at 1051. The Court agrees with the rationale of the *Mehr* court. "[T]he foreseeability that is critical to due process analysis . . . is that the defendant's conduct and connection with the forum state is such that [it] should reasonably anticipate being haled into court there." *Id.* (quoting *World-Wide Volkswagen*, 444 U.S. at 297). As the same restraints apply to all players drafted into the NHL, they create no connection to any particular forum. *In re Packaged Seafoods Products Antitrust Litigation*, MD15-2670, 2020 WL 2747115, at *5 (S.D. Cal. May 26, 2020) (rejecting the plaintiff's theory of specific jurisdiction because the "effects from the nation-wide price-fixing conspiracy alleged . . . create no connection to any particular forum," and, therefore, the defendant's conduct was not "tethered to [the forum] in any meaningful way"); *see also Aldrich v. Nat'l Collegiate Athletic Ass'n*, 484 F. Supp. 3d 779, 795 (N.D. Cal. 2020) ("The NCAA legislates in Indiana, where it is headquartered. Thus, the harm caused by the NCAA's failure to enact particular legislation arises out of Indiana. A contrary finding would improperly subject the NCAA to jurisdiction anywhere because the NCAA failed to implement legislation in all 50 states.").

Third, as to the AHL and ECHL's refusal to compete for the services of players, this allegation similarly applies across the board—not only to Washington—rendering Plaintiffs'

attempt to rely on this fact insufficient to establish purposeful direction. And again, the Court

notes that Plaintiffs did not cite a single case in either section of their response brief addressing

the first two elements for establishing minimum contacts supporting their arguments. *See* Dkt.

No. 151 at 35–36.

Therefore, the Court cannot assert personal jurisdiction over Defendant NHL based on its

alleged participation in the conspiracy, Plaintiff Gould's history playing for and suffering injury

from a Washington WHL Club, or effects from the NHL-CHL agreement. As Plaintiffs fail to

establish that Defendant NHL purposefully availed itself of the law of Washington and directed

its conduct at Washington, the Court need not reach the last element regarding the

reasonableness of exercising jurisdiction over Defendant NHL.[14] *Pebble Beach Co. v. Caddy*,

453 F.3d 1151, 1155 (9th Cir. 2006) ("If any of the three requirements is not satisfied,

jurisdiction in the forum would deprive the defendant of due process of law.").

\*    \*    \*

For the reasons outlined above, the Court cannot assert personal jurisdiction over

Defendant NHL. Accordingly, Defendant NHL's motion to dismiss is GRANTED.[15]

**B.    Whether Plaintiff's Claims Are Barred by the FTAIA**

CHL Defendants argue that "the FTAIA bars 85 percent of Plaintiffs' claims, *i.e.*, all

claims for injuries allegedly suffered by players on the 51 (out of 60) CHL Clubs located in

Canada." Dkt. No. 139 at 13. Plaintiffs argue that the FTAIA does not apply to claims involving

---

[14] While Defendant NHL argues that Plaintiffs cannot rely on it contact with Washington through its member club, the Seattle Kraken, to establish purposeful direction (Dkt. No. 153 at 9), Plaintiffs only use this argument to assert that it would be reasonable to exercise jurisdiction over Defendant NHL (Dkt. No. 151 at 37), an element this Court need not reach.

[15] Because Defendant NHL must be dismissed, the Court declines to address its arguments regarding Individual Plaintiffs' standing to assert claims against Defendant NHL and the non-statutory labor exemption as it relates to Individual Plaintiffs' claims against Defendant NHL.

markets that include the United States and that, even if the FTAIA does apply, they meet the domestic effects exception. *See* Dkt. No. 141 at 40, 44.

### 1.    Whether the Motion Regarding the FTAIA Is Premature

As an initial matter, Plaintiffs argue that CHL Defendants' motion is premature with regard to the FTAIA, as "questions about the applicable scope of the Sherman Act (including whether the FTAIA creates a carve-out on the facts of this case) are merits issues that cannot be resolved under Rule 12(b)(6)." Dkt. No. 151 at 38. But as CHL Defendants point out, Plaintiffs concede that the FTAIA may be evaluated at the pleadings stage where "a defect is plainly apparent on the face of the complaint." *See* Dkt. No. 152 at 7 (citing Dkt. No. 151 at 38). And Defendants argue that Plaintiffs state in their Complaint that they "seek[] recovery for foreign injuries, specifically for foreign damages suffered by 'Players in Clubs that operate in Canada whose compensation (including for assignment of [name, image, and likeness] rights) has been artificially depressed,'" making the foreign nature of the claims "plainly apparent on the face of the[] Complaint." *Id.* (quoting Dkt. No. 1 ¶ 302). The Complaint also alleges that 51 of the 60 Clubs are based in and operate out of Canada. *See* Dkt. No. 1 ¶¶ 84–146. Accordingly, it is appropriate for the Court to consider the Parties' arguments with respect to the FTAIA at the motion to dismiss stage.

### 2.    Applicability of the FTAIA

CHL Defendants seek dismissal pursuant to the FTAIA of the claims for injuries allegedly suffered by players on the 51 CHL Clubs located in Canada. Dkt. No. 139 at 13. There are two groups of players within those 51 CHL Clubs: (1) players from Canada who played for and were employed by the Clubs based in Canada, and (2) players from the United States who played for and were employed by the Clubs based in Canada. Plaintiffs argue that the FTAIA

1  does not apply to claims for injuries suffered by players for Clubs based in Canada because they

2  arise pursuant to a market that includes the United States. Dkt. No. 151 at 40.

3       "[T]he FTAIA's general rule applies where the anticompetitive conduct at issue is

4  foreign." *Empagran I*, 542 U.S. at 163. Congress's intent behind the FTAIA "was to assure

5  American companies that they would not be liable under the Sherman Act for conduct that

6  typically would be considered anticompetitive so long as that conduct adversely affected foreign

7  markets only." *In re Capacitors Antitrust Litig.*, No. C14-3264, 2016 WL 5724960, at *1 (N.D.

8  Cal. Sept. 30, 2016) (citing *Empagran I*, 542 U.S. at 161). In many of the cases addressing the

9  scope of the FTAIA's application, the conduct at issue was much more clearly wholly foreign

10  than the conduct in this case—for example, a price-fixing conspiracy by foreign and domestic

11  manufacturers of vitamins with harm inflicted, pursuant to that conspiracy, by a foreign

12  distributor on a foreign consumer, *Empagran I*, 542 U.S. at 159; or a foreign price-fixing

13  conspiracy in the market for capacitors with harm inflicted, pursuant to that conspiracy, to

14  capacitors billed and shipped to foreign entities, *In re Capacitors*, 2016 WL 5724960, at *5. But

15  here, Plaintiffs allege a conspiracy to restrain trade for the services of foreign and domestic

16  hockey players, whom Defendants scouted, recruited, and employed both ways across the United

17  States/Canada border (although predominantly within or into Canada). *See, e.g.*, Dkt. No. 1

18  ¶¶ 286–87.

19       CHL Defendants correctly argue that courts "routinely carve[] out and dismiss[] foreign

20  injury claims brought as part of a broader set of claims." Dkt. No. 139 at 15 (citing *In re Static*

21  *Random Memory (SRAM) Antitrust Litig.*, No. C07-1819, 2010 WL 5477313, at *4 (N.D. Cal

22  Dec. 31, 2010)). A review of relevant caselaw suggests that where Sherman Act claims concern a

23  market including the United States, courts separate out and apply the FTAIA to the portion of

24  those claims arising from foreign injury.

1      The court in *In re SRAM* held that "Plaintiffs' damages claims implicating foreign

2   commerce must be analyzed independently to determine their justiciability and, if necessary, a

3   portion of the claims may be dismissed from the lawsuit." 2010 WL 5477313, at *4. The court

4   also noted that "[c]ourts have dismissed claims for damages to the extent based on purchases

5   made in foreign commerce, pursuant to the FTAIA, in numerous cases." *Id.* (listing cases). For

6   example,

7              In *In re Rubber Chemicals* [*Antitrust Litigation*, 504 F. Supp. 2d
               777 (N.D. Cal. 2007)], the court rejected the plaintiffs' arguments
8              that their single claim [for injuries suffered in foreign and domestic
               commerce arising from a conspiracy to fix prices for rubber
9              chemicals] could not be split, or analyzed for its separate domestic
               and foreign components, and explained that "the type of injury
10             involved determines the justiciability of the alleged claims."

11   *Id.* (quoting 504 F. Supp. 2d at 784). Similarly, in *United States v. LSL Biotechnologies*,

12   No. C00-529, 2002 WL 31115336 (D. Ariz. Mar. 28, 2002), *amended* (May 23, 2002), *aff'd*, 379

13   F.3d 672 (9th Cir. 2004), the court considered Sherman Act claims arising from a non-compete

14   clause related to a partnership between a foreign and domestic corporation to develop "seeds

15   designed to grow fresh-market tomatoes in North America during the winter months," noting that

16   "North America" referred to Mexico and some Southern U.S. states—like the alleged market

17   here, a market extending beyond a single country. *Id.* at *3–4. The *LSL Biotechnologies* court,

18   like the *In re Rubber Chemicals* and the *In re SRAM* courts, divided the government's claims,

19   applying the FTAIA only to the government's allegations regarding seeds developed to be sold

20   and grown in Mexico. *Id.*; *see also In re Rubber Chemicals*, 504 F. Supp. 3d at 784; *In re SRAM*,

21   2010 WL 5477313, at *4. Finally, in *In re Capacitors*, the court separately determined the

22   applicability of the FTAIA to categories of transactions. *See* 2016 WL 5724960, at *3–6. In other

23   words, where the wholly foreign conduct can be isolated from the other claims in a case, courts

24   have pulled out those wholly foreign claims and applied the FTAIA to them. Thus, it is

1  appropriate to apply the FTAIA independently to all of Plaintiffs' claims arising from injury

2  occurring in the Canada even though the same injury is alleged to have occurred, pursuant to the

3  same challenged conduct, in the United States.

4  　　　　And claims in this case for injuries suffered by players for Clubs based in Canada—

5  which arise from, among other injuries, the alleged undercompensation of players in Canada

6  pursuant to anticompetitive agreements enacted among Canadian entities (*see* Dkt. No. 1 ¶¶ 83–

7  106, 108–27, 129–46, 166)—are clearly within the scope of the FTAIA's general exclusionary

8  rule. *See, e.g.*, *Empagran I*, 542 U.S. at 159 (holding that "a purchaser in the United States could

9  bring a Sherman Act claim under the FTAIA based on domestic injury, but a purchaser in

10  Ecuador could not bring a Sherman Act claim based on foreign harm"), 163 ("[T]he FTAIA's

11  general rule applies where the anticompetitive conduct at issue is foreign.").

12  　　　　Plaintiffs make the additional argument that the FTAIA cannot apply to their claims

13  arising from injury occurring in Canada because Canadian-based players performed within the

14  United States pursuant to their contracts by traveling in the United States, practicing in the

15  United States, and playing hockey games in the United States. Dkt. No. 151 at 42–43; *see also*,

16  *e.g.*, Dkt. No. 1 ¶ 281. CHL Defendants' response to Plaintiffs' argument on this point is

17  persuasive. CHL Defendants contend that, were the Court to adopt Plaintiffs' position that the

18  performance of some hockey services in the United States could remove those contracts from the

19  scope of the FTAIA, "a long-term Canadian employment contract would no longer be "foreign

20  commerce" under the FTAIA—and a Canadian employee could suddenly sue her Canadian

21  employer under the Sherman Act—if that Canadian employee went on a single business trip to

22  the United States." Dkt. No. 152 at 10. The Court agrees that such a result would be contrary to

23  the intent of the FTAIA and would create "a serious risk of interference with a foreign nation's

24  ability independently to regulate its own commercial affairs." *Empagran I*, 542 U.S. at 165.

Further, in evaluating whether "allegations involve commercial activities taking place abroad," the Court must consider the entirety of the transaction. Dkt. No. 151 at 42. For Canadian players who play for Canada-based Clubs, the vast majority of the transaction occurs in Canada and is the result of allegedly anticompetitive agreements enacted among Canadian entities. *See* Dkt. No. 1 ¶¶ 83–106, 108–27, 129–46, 156–58. In other words, this group of players operates wholly separately from domestic U.S. commerce (other than by playing games in the United States, which is not germane to this analysis for the reasons stated above)—making the conduct clearly wholly foreign. *See Motorola Mobility LLC v. AU Optronics Corp.*, 775 F.3d 816, 181 (7th Cir. 2015). Even for players from the United States who play for Canada-based Clubs, Plaintiffs allege that the majority of performance under the contracts occurs in Canada. *See* Dkt. No. 1 ¶¶ 184 (alleging the Clubs made players captive), 228 (alleging the Clubs underpaid the players), 247 (detailing performance under employment contracts); *see also id.* ¶¶ 85–106, 108–27, 129–46 (alleging that majority of Clubs are located in Canada); Dkt. No. 1-1 at 24 (noting that players live in the city or towns in which their Club is located). Finally, the harm to the players from the United States who played for Canada-based Clubs occurred after they relocated to Canada for their foreign Clubs. *See Motorola*, 775 F.3d at 817–18.

Therefore, the Court finds that the FTAIA applies to Plaintiffs' claims arising from foreign injuries—i.e., claims related to players drafted from either Canada or the United States to Canadian CHL teams.

### 3. Domestic Effects Exception

Because the FTAIA applies to Plaintiffs' claims arising from injury suffered in Canada, the next step is to determine whether, as Plaintiffs argue, the domestic effects exception (also referred to as the "domestic injury exception") applies. Plaintiffs primarily rely on their argument that Defendants' alleged conduct is not "wholly foreign" to support their contention that the

1   domestic effects exception should apply. *See* Dkt. No. 151 at 44–45. *But see supra* Section

2   III.B.2.

3        "*Empagran I* is the leading case on the domestic injury exception," which carves out

4   from the FTAIA (and thus applies the Sherman Act to) conduct which has a direct, substantial,

5   and reasonably foreseeable effect on domestic commerce giving rise to the claim. *In re TFT-*

6   *LCD (Flat Panel) Antitrust Litig.*, 785 F. Supp. 2d 835, 840 (N.D. Cal. 2011) (citing *Empagran*

7   *I*, 542 U.S. 155). "In *Empagran I*, the plaintiffs filed a class action on behalf of purchasers of

8   vitamins and alleged that foreign and domestic vitamin manufacturers and distributors had

9   conspired to fix the price of vitamin products in the United States and abroad." *Id.* at 840–41.

10  "At issue were claims brought by foreign vitamin distributors who bought vitamins for delivery

11  outside the United States." *Id.* at 841 (citing *Empagran I*, 542 U.S. at 159–60). The *Empagran I*

12  Court emphasized that the decision was "based upon the following: The price-fixing conduct

13  significantly and adversely affects both customers outside the United States and customers

14  within the United States, but the adverse foreign effect is independent of any adverse domestic

15  effect." *Empagran I*, 542 U.S. at 164. "The [*Empagran I*] Court held that where 'the adverse

16  foreign effect is independent of any adverse domestic effect,' the FTAIA domestic effect

17  exception did not apply," but noted that it "'assumed that the anticompetitive conduct . . .

18  independently caused foreign injury; that is, the conduct's domestic effects did not help to bring

19  about that foreign injury.'" *In re Flat Panel*, 785 F. Supp. 2d at 841 (quoting *Empagran I*, 542

20  U.S. at 164).

21       After the *Empagran I* decision, the case was remanded to the D.C. Circuit to determine

22  whether allegations that price-fixing in the United States facilitated defendants' international

23  price-fixing agreement were sufficient to bring the international price-fixing within the scope of

24  the domestic effects exception. 542 U.S. at 175. On remand, the court determined that "'but-for'

causation between the domestic effects and the foreign injury claim is not sufficient to bring anti-competitive conduct within the FTAIA exception. The statutory language—'gives rise to'—indicates a direct causal relationship, that is, proximate causation, and is not satisfied by the mere but-for 'nexus.'" *Empagran S.A. v. F. Hoffmann-LaRoche, Ltd.* (*Empagran II*), 417 F.3d 1267, 1271 (D.C. Cir. 2005). The Ninth Circuit has also adopted a proximate-cause standard: "a proximate cause standard is consistent with principles of comity—'the respect sovereign nations afford each other by limiting the reach of their laws.'" *In re Dynamic Random Access Memory (DRAM) Antitrust Litig.*, 546 F.3d 981, 987 (9th Cir. 2008) (quoting *Empagran II*, 417 F.3d at 1271). Additionally, in this Circuit, plaintiffs must show that the conduct has a "direct" effect for purposes of the domestic effects exception to the FTAIA—meaning that "it follows as an immediate consequence of the defendant[s'] activity." *Hui Hsiung*, 778 F.3d at 758 (citing *LSL Biotechnologies*, 379 F.3d at 680–81).

Plaintiffs contend that "the territorial allocations and restrictions on player movement directly caused a restriction in competition among U.S.-based Clubs for the Players' labor [(the domestic effect)] and Plaintiffs' claims all arise from, among other things, that restriction." Dkt. No. 151 at 45. But "it must be the ***domestic effects*** of the [d]efendants' anticompetitive conduct, rather than the ***anticompetitive conduct*** itself, which gives rise to [p]laintiff's foreign injuries." *In re Rubber Chemicals*, 504 F. Supp. 3d at 786 (boldface and emphasis in original).

Similar theories to Plaintiffs' have been rejected by courts in this Circuit as failing to satisfy the proximate-cause standard. For example, in *In re DRAM*, the Ninth Circuit determined that "defendants' conspiracy may have fixed prices in the United States and abroad, and maintaining higher U.S. prices might have been necessary to sustain the higher prices globally, but [plaintiff] has not shown that the higher U.S. prices proximately caused its foreign injury of having to pay higher prices abroad." 546 F.3d at 988. The court noted that this causation theory

1  directly paralleled the "'but-for' or indirect causation theories rejected in [other cases],"

2  including the theory in *Empagran II* that "because the product (vitamins) was fungible and

3  globally marketed, the defendants were able to sustain super-competitive prices abroad only by

4  maintaining super-competitive prices in the United States as well." *Id.* at 989 (cleaned up)

5  (quoting *Empagran II*, 417 F.3d at 1270); *see also In re Capacitors*, 2016 WL 5724960, at *6

6  (determining that "global pricing" theory "based on the idea that 'the domestic effects of

7  defendants' conduct gave rise to plaintiffs' claims where defendants made sales to a U.S.

8  corporate family member and to a foreign corporate family member as part of a global pricing

9  system" was insufficient to establish proximate cause); *In re Optical Disk Drive Antitrust Litig.*,

10  No. C10-2143, 2017 WL 11513316, at *6 (N.D. Cal. Dec. 18, 2017) (rejecting global pricing

11  theory as failing to establish proximate cause, even where U.S.-based teams set global pricing).

12          But for players from the United States who play for and are employed by Canada-based

13  Clubs, the reason that they play in Canada is because they were scouted and recruited in the

14  United States to play on teams and in locations that they did not choose—and the fact that

15  players cannot choose where to play is part of the injury alleged by Plaintiffs. *See, e.g.*, Dkt.

16  No. 1 ¶¶ 188, 196. As Plaintiffs argue (Dkt. No. 151 at 44–45),[16] the recruitment of these players

17  in the United States pursuant to anticompetitive agreements and geographical restrictions is a

18  domestic effect of Defendants' conduct, and those players' underpayment in Canada (i.e., their

19  foreign injury) is a direct, substantial, and reasonably foreseeable result of that domestic effect.

20  *See* Dkt. No. 1 ¶¶ 8 (noting that each league's protected territory includes a combination of

21  Canadian provinces and U.S. states), 9 ("*[A]s a result[] of this market allocation agreement,*

22

23  ―――――――――――――
[16] Plaintiffs contend that "the territorial allocations and restrictions on player movement directly caused a restriction
in competition *among U.S.-based clubs* for the Players' labor and Plaintiffs' claims all arise from, among other
things, that restriction." Dkt. No. 151 at 45 (emphasis added). However, Plaintiffs allege in their Complaint that the

24  restriction in competition for U.S.-based players' labor was not limited to U.S.-based clubs. *See* Dkt. No. 1 ¶¶ 8–9.

1    Major Junior Clubs have restricted their scouting, recruiting, and signing of Players to those

2    Players who reside within their exclusive territories . . . ." (emphasis added)), 280–81. It is the

3    recruitment (or restrictions on recruitment) in the United States of players that proximately

4    caused those players' foreign injury, because without such recruitment, those players would not

5    have signed SPAs with Canadian teams; their being sent to Canada as well as their

6    underpayment thus followed as an immediate consequence of Defendants' activity. *See id.* To be

7    sure, this recruitment and resulting injury, as Defendants argue and as Plaintiffs concede, occurs

8    simultaneously to the recruitment (and resulting injury) of players from Canada, but this fact

9    does not defeat application of the domestic effects exception. *See, e.g.*, *Sun Microsystems Inc. v.*

10    *Hynix Semiconductor Inc.*, 532 F. Supp. 2d 1101, 1110, 1113 (N.D. Cal. 2007) (finding that

11    domestic effect was established where plaintiffs alleged that defendants' conduct led to higher

12    prices for DRAM in the United States, and where plaintiffs also alleged that defendants

13    "manipulated the price of DRAM charged around the globe"). Therefore, the domestic effects

14    exception applies to foreign injury suffered by players who were recruited in the United States.

15      Other cases where courts have found that the domestic effects exception does not apply

16    are distinguishable from this specific set of facts. For example, in *In re DRAM*, the plaintiff was

17    a British corporation that had "purchased DRAM outside of the United States," 546 F.3d at 988,

18    and in *Empagran I*, plaintiffs were foreign vitamin purchasers who had bought vitamins from

19    foreign distributors, 542 U.S. at 159–60. While these facts are clearly distinguishable from

20    Plaintiffs' allegations regarding injury suffered in Canada by players recruited in the United

21    States, they are comparable to Plaintiffs' allegations regarding injury suffered in Canada by

22    players recruited in Canada—these players are foreign employees of foreign employers whose

23    injury was suffered independently of any domestic effect of those same foreign employers'

24    anticompetitive conduct in the United States. The theory that foreign injury to this group of

players was caused by a trans-national price-fixing conspiracy with the purpose and effect of lowering compensation in the United States is insufficient to trigger the domestic effects exception under the FTAIA. *See In re Rubber Chemicals*, 504 F. Supp. 3d at 787.[17] Therefore, the domestic effects exception cannot apply to foreign injury by players not recruited in the United States.

*    *    *

For the reasons outlined above, the Court finds that the FTAIA applies to Plaintiffs' claims arising from foreign injuries, but that the domestic effects exception applies to Plaintiffs' claims arising from players who suffered foreign injuries but who were recruited from the United States.[18] Accordingly, CHL Defendants' motion as to dismissal pursuant to the FTAIA is GRANTED IN PART and DENIED IN PART.

**C.    Whether the Court Should Decline to Address Plaintiffs' Claims Under the Doctrine of International Comity**

CHL Defendants argue that the Court should decline to address Plaintiffs' remaining claims (that is, claims arising from injury suffered by players in the United States and players recruited from the United States to teams based in Canada)—which they represent as overlapping with claims asserted in ongoing Canadian litigation—under principles of international comity. Dkt. No. 139 at 19–20. Plaintiffs contend that comity principles do not support preclusion of the Court's adjudication of their claims. Dkt. No. 165 at 2.

---

[17] Given this theory of recovery, the court in *In re Rubber Chemicals* found it would be futile to allow plaintiffs to amend their complaint. *Id.*

[18] CHL Defendants raise the question of whether Plaintiff DiLaura played on a U.S.-based CHL team during the purported class period. Dkt. No. 139 at 13. While the Complaint clearly alleges that Plaintiff Gould played for the WHL during 2021 and 2022, after the start of the class period, it does not similarly allege that Plaintiff DiLaura played for the WHL during the class period.

1      **1.    Predicate Matters**

2          a.    ***True Conflict of Law***

3          Plaintiffs argue that "[c]omity concerns only exist where there is a 'true conflict of law'

4  because the two countries' legal demands are 'irreconcilable.'" Dkt. No. 151 at 46 (quoting *In re*

5  *Vitamin C Antitrust Litig.*, 8 F.4th 136, 145 (2d Cir. 2021)). The Second Circuit's determination

6  that a "true conflict of law" was a necessary predicate to the application of international comity

7  in *In re Vitamin C* relied on the Supreme Court's decision in *Hartford Fire Insurance Co. v.*

8  *California*, 509 U.S. 764 (1993), which addressed the question of "whether a U.S. district court

9  could exercise jurisdiction over antitrust claims filed against a group of London reinsurers."

10  *Mujica*, 771 F.3d at 599 (citing *Hartford Fire*, 509 U.S. at 769); *see In re Vitamin C*, 8 F.4th at

11  144–45. But the Ninth Circuit determined that *Hartford Fire* "left unclear whether it was saying

12  that the only relevant comity factor *in that case* was conflict with foreign law . . . or whether the

13  Court was more broadly rejecting balancing of comity interests in *any* case where there is no true

14  conflict." *Mujica*, 771 F.3d at 600 (quoting Harold Hongju Koh, *Transnational Litigation in*

15  *United States Courts* 80 (2008) (emphasis in original)). The *Mujica* court held further that

16  "*Hartford Fire* does *not* require proof of a 'true conflict' as a prerequisite for invoking the

17  doctrine of comity, at least in a case involving adjudicatory comity." *Id.* (emphasis in original).

18  Accordingly, under Ninth Circuit precedent, "a true conflict is not always required for the

19  application of adjudicatory comity." *Id.* at 603. Thus, that "Defendants' conduct may be

20  challenged as civil violations under both the Sherman Act and the Canadian Competition Act" is

21  not fatal to an application of adjudicatory comity.

22          b.    ***Parallel Canadian Proceedings***

23          Plaintiffs also argue that because "[t]here are no cases currently being litigated in Canada

24  that seek relief for the antitrust injury Players suffer as a result of the competitive restraints that

bar their freedom of movement," the Court cannot (or should not) decline to exercise jurisdiction pursuant to adjudicative comity principles here. Dkt. No. 165 at 4.

As discussed above, *see supra* Section I.D., there are several related proceedings that are either pending or that have previously been dismissed in Canada. Two pending cases concern personal injury: *Carcillo v. CHL*, No. 20-CV-642705 (Super. Ct. Ont.) (concerning physical and sexual abuse); and *McEwan v. CHL*, No. S190264, (Sup. Ct. B.C.) (concerning concussions). One pending case concerns violations of Canada's wage-and-hour laws: *Berg v. CHL*, CV-14-514423CP (Super. Ct. Ont.). Finally, one case challenging the same restraints on competition to sign players was previously dismissed: *Mohr v. NHL*, [2021] FC 488 (Fed. Ct. Can.).

It thus appears that no litigation seeking relief for antitrust injury is currently pending in Canadian courts; the one case that *did* seek relief for the same injury for which Plaintiffs seek to recover here was previously dismissed. *Mohr v. NHL*, [2021] FC 488 (Fed. Ct. Can.). Plaintiffs contend that under *Mujica*, the Court's inquiry into an application of principles of international comity should end here. *See* Dkt. No. 165 at 4. But in *Mujica*, the existence of Colombian litigation was not a prerequisite to the application of international comity. Rather, it was discussed within the context of the adequacy of the foreign forum—just one of the factors bearing on adjudicatory comity. *See* 771 F.3d at 613. And as Defendants point out, courts have previously dismissed cases on international comity grounds where no ongoing, parallel proceedings in a foreign forum existed. *See, e.g.*, *Elliott v. PubMatic, Inc.*, No. C21-1497, 2021 WL 3616768 (N.D. Cal. Aug. 16, 2021); *Alternate Health USA Inc. v. Edalat*, No. C17-1887, 2022 WL 767573 (C.D. Cal. Mar. 14, 2022). Thus, it does not appear that the lack of parallel litigation in a foreign forum precludes application of comity principles to this case—though it will certainly be relevant to the discussion of the adequacy of the foreign forum.

Accordingly, the Court will turn to a discussion of the relevant factors.

### 2.    Strength of Government Interests

Because "[t]he proper analysis of foreign interests essentially mirrors the consideration of U.S. interests," the Court will address the strength of government interests together. *See Mujica*, 771 F.3d at 607.

### a.    *Location of the Conduct*

"[B]ecause 'comity is most tied to the question of territoriality,' the court first considers 'where the conduct in question took place.'" *Lawson v. Klondex Mines Ltd.*, 450 F. Supp. 3d 1057, 1073 (D. Nev. 2020) (quoting *Mujica*, 771 F.3d at 604). Defendants contend that the "vast bulk" of the alleged conduct occurred in Canada, among Canadian entities (Dkt. No. 164 at 3), while Plaintiffs argue that Defendants' conduct took place, "in material part," in the United States (Dkt. No. 165 at 5).

The majority of Plaintiffs' challenged conduct occurred in Canada: Plaintiffs allege that the market allocation at issue was facilitated by Defendant CHL between Canadian Defendants WHL, OHL, and QMJHL and each of their respective Clubs (Dkt. No. 1 ¶ 178), the majority of which are located in Canada—only nine out of the 60 CHL Clubs are based in the United States (Dkt. No. 1 ¶¶ 83, 281). This means that the relevant negotiations and agreements between Defendant CHL and the CHL Member Leagues likely occurred in Canada; the rules and regulations promulgated by Defendant CHL and the CHL Member Leagues originated in Canada; and the actions by Defendant CHL and the CHL Member Leagues largely occurred in Canada. "Not surprisingly, U.S. courts have afforded far less weight, for comity purposes, to U.S. or state interests when the activity at issue occurred abroad." *Mujica*, 771 F.3d at 605.

While the injuries remaining before the Court include injuries sustained by players on teams based in the United States, even those are counterbalanced by injuries occurring in Canada to those players who were recruited in the United States to Clubs based in Canada. *See supra*

Sections III.B.2–3; *see also* Dkt. No. 1 ¶¶ 184 (alleging the Clubs made players captive), 228 (alleging the Clubs underpaid the players), 247 (detailing performance under employment contracts); *see also id.* ¶¶ 85–106, 108–27, 129–46 (alleging that majority of Clubs are located in Canada); Dkt. No. 1-1 at 24 (noting that players live in the city or towns in which their Club is located).

The vast majority of the conduct at issue—including both the location of Defendants' conduct and the location of Plaintiffs' injuries—is located in Canada. Therefore, this factor weighs in favor of abstention.

###### b.    *Nationality of the Parties*

Second, "the court takes 'account of whether any of the parties are United States citizens or nationals, and also whether they are citizens of the relevant state.'" *Lawson*, 450 F. Supp. 3d at 1074 (quoting *Mujica*, 771 F.3d at 605). "While 'the presence of U.S. nationals . . . does not establish jurisdiction in this country on its own, it can, as we have noted, contribute to a finding that there is a "nexus" between the United States and the parties and claims in a case.'" *Id.* (omission in original) (quoting *Mujica*, 771 F.3d at 605). "[T]he weaker the nexus between the challenged conduct and . . . U.S. parties, the weaker the justification for adjudicating the matter in U.S. courts and applying U.S. federal or state law." *Id.* (alteration in original) (quoting *Mujica*, 771 F.3d at 605–06). Defendants argue that "Canadian parties predominate in this case" (Dkt. No. 164 at 3), while Plaintiffs argue that "thousands of putative class members are U.S. citizens or nationals" (Dkt. No. 165 at 5).

The majority of the Parties are undoubtedly Canadian: Plaintiff WAIPU North America is based in Canada, Plaintiff Gould is a Canadian citizen, and the remaining Defendants are primarily Canadian. *See supra* Section I.B. While Plaintiff DiLaura is a United States citizen, Plaintiff WAIPU USA Corp. is a United States corporation, and several of the individual

1   Defendant Clubs are also based in the United States, the United States-based parties are in the

2   minority. *Id.* And while Plaintiffs argue in their supplemental brief that "in the recent OHL draft,

3   81 of the 303 drafted Players resided in the United States" (Dkt. No. 165 at 5),[19] the complaint

4   alleges that between December 23, 2020, and December 23, 2024, CHL Clubs recruited fewer

5   than 100 Major Junior hockey players in total from the United States to play on Canadian

6   teams.[20]

7          *Lawson* is instructive here. In *Lawson*, a securities action, defendants were Canadian

8   corporations. 450 F. Supp. 3d at 1074. Plaintiff did not argue his own citizenship but argued that

9   this factor weighed in favor of the court retaining jurisdiction because "thousands of

10   [defendants'] stockholders were U.S. nationals." *Id.* Here, similarly, Plaintiffs ask the Court to

11   find that this factor weighs in favor of retaining jurisdiction because "thousands of putative class

12   members are U.S. citizens or nationals." Dkt. No. 165 at 5. But even taking this assertion as

13   true,[21] "U.S. nationals are not necessarily more prevalent in this litigation than any other

14   national." *Lawson*, 450 F. Supp. 3d at 1074. Therefore, this factor is neutral.

---

18   [19] *See supra* n.13.

19   [20] Calgary Flames (2 players) (Dkt. No. 1 ¶ 86); Edmonton Oil Kings (3 players) (*id.* ¶ 87); Kelowna Rockets (2 players) (*id.* ¶ 90); Medicine Hat Tigers (3 players) (*id.* ¶ 93); Prince George Cougars (3 players) (*id.* ¶ 97); Red Deer Rebels (3 players) (*id.* ¶ 98); Regina Pats (5 players) (*id.* ¶ 99); Saskatoon Blades (1 player) (*id.* ¶ 100); Swift Current Broncos (1 player) (*id.* ¶ 103); Vancouver Giants (4 players) (*id.* ¶ 105); Victoria Royals (2 players) (*id.* ¶ 106); Windsor Spitfires (6 players) (*id.* ¶ 108); London Knights (9 players) (*id.* ¶ 109); Barrie Colts (1 player) (*id.* ¶ 110); Guelph Storm (1 player) (*id.* ¶ 113); Kingston Frontenacs (4 players) (*id.* ¶ 114); Mississauga Steelheads (1 player) (*id.* ¶ 115); Niagara IceDogs (7 players) (*id.* ¶ 116); Oshawa Generals (2 players) (*id.* ¶ 118); Ottawa 76's (2 players) (*id.* ¶ 119); Sarnia Sting (8 players) (*id.* ¶ 124); Soo Greyhounds (2 players) (*id.* ¶ 125); Kitchener Rangers (4 players) (*id.* ¶ 126); Sudbury Wolves (1 player) (*id.* ¶ 127); Acadie-Bathurst Titan (1 player) (*id.* ¶ 129); Halifax Mooseheads (3 players) (*id.* ¶ 134); Moncton Wildcats (1 player) (*id.* ¶ 137); Charlottetown Islanders (2 players) (*id.* ¶ 140); Saint John Sea Dogs (1 player) (*id.* ¶ 142); Val-d'Or Foreurs (1 player) (*id.* ¶ 144); Sherbrooke Phoenix (4 players) (*id.* ¶ 146).

24   [21] *But see supra* n.13.

1      c.    *Character of the Conduct*

2      The third factor is the nature of the conduct in question. "We should ask whether the

3    action is civil or criminal; whether it sounds in tort, contract, or property; and whether the

4    conduct is a regulatory violation or is a violation of international norms against torture, war

5    crimes, or slavery." *Mujica*, 771 F.3d at 606. In other antitrust cases, courts have considered "the

6    relative significance of effects on the United States as compared with those elsewhere, the extent

7    to which there is explicit purpose to harm or affect American commerce, . . . and the relative

8    importance to the violations charged of conduct within the United States as compared with

9    conduct abroad." *Timberlane Lumber Co. v. Bank of Am., N.T. & S.A.*, 549 F.2d 597, 614 (9th

10    Cir. 1976).

11      The primary purpose of the Sherman Act is "the promotion of consumer welfare."

12    *PLS.Com, LLC v. Nat'l Ass'n of Realtors*, 32 F.4th 824, 832 (9th Cir. 2022). It is "abundantly

13    clear that the United States has a strong interest in seeing its laws and regulations followed."

14    *Lawson*, 450 F. Supp. 3d at 1074 (citing *Laker Airways Ltd. v. Sabena, Belgian World Airlines*,

15    731 F.2d 909, 924 (D.C. Cir. 1984) ("[T]he United States has a substantial interest in regulating

16    the conduct of business within the United States.")). It will certainly affect the United States if

17    corporations are able to restrain competition for the services of Major Junior hockey players who

18    are United States citizens.

19      However, it cannot be disputed that Canada also has a legitimate interest here. Canada

20    has an interest in regulating conduct—such as anticompetitive behavior, which Canada regulates

21    under the Canadian Competition Act ("CCA") and through its Competition Bureau (*see* Dkt. No.

22    168 at 4)—that occurs within its borders. *See Lawson*, 450 F. Supp. 3d at 1077. In this case, the

23    alleged conduct charged by Plaintiffs occurred predominantly in Canada, between Canadian

24    entities. *See* Dkt. No. 1 ¶¶ 83–106, 108–27, 129–46, 166. And of the claims that remain before

the Court (i.e., those claims arising from injuries sustained by players on teams based in the United States or by players on teams based in Canada, but who were recruited from the United States), Plaintiffs have not alleged that "there is explicit purpose to harm or affect American commerce."

Given that the majority of the conduct at issue occurred in Canada, asserting jurisdiction for a small group and allowing the small group to potentially upend the conduct of business that mostly occurs in another country would be like the tail wagging the dog. For these reasons, this factor weighs in favor of abstention.

### d.    *Foreign Policy Interests*

Fourth, "we must take cognizance of . . . foreign policy interests . . . . As we do when applying the political question, act of state, and foreign affairs doctrines, we must respect the Constitution's commitment of the foreign affairs authority to the political branches." *Mujica*, 771 F.3d at 606. "Courts have found that U.S. interests weigh against hearing cases where doing so would be harmful to U.S. foreign policy." *Id.* Defendants argue that this Court should defer to Canada's "stronger public and foreign policy interests in regulating the CHL, the highest-level junior hockey league in the Canadian developmental hockey model," particularly as hockey is the national winter sport of Canada. Dkt. No. 164 at 5. Plaintiffs contend that because the Canadian government "has not expressed any interest in this case since it was originally filed in the Southern District of New York in February 2024," their claims "do not raise the issue of 'whether adjudication of this case by a United States court would offend amicable working relations with Canada.'" Dkt. No. 165 at 7 (quoting *Mujica*, 771 F.3d at 601 (cleaned up)).

Here, the Canadian court considered similar allegations challenging Defendants' conduct and determined that they did not give rise to a claim under the CCA. *See generally* Dkt. No. 136-19. Plaintiffs therefore ask this Court to supplant Canadian antitrust law with the Sherman Act

pursuant to Defendants' limited contacts with the United States. "No one denies that America's antitrust laws, when applied to foreign conduct, can interfere with a foreign nation's ability independently to regulate its own commercial affairs." *Empagran I*, 542 U.S. at 165. However, in this case the Court sees two reasons weighing in favor of Canada's hearing the portion of this case arising from injury suffered by players in Canada, regardless of where they were recruited from. First, it cannot be disputed that Canada has a legitimate interest in regulating conduct that occurs within its borders, such as the conduct at issue in this case. *See Lawson*, 450 F. Supp. 3d at 1057. And second, although the Canadian government has not affirmatively expressed interest in this litigation, neither has the U.S. government. Here, the fact that parallel litigation was dismissed because it did not state a claim under the CCA does not demonstrate that Canadian courts are unwilling or unable to hear this dispute, or that there is *no* remedy for Plaintiffs in Canada—it merely demonstrates that the particular claims raised by the *Mohr* plaintiffs were not cognizable.

Therefore, this factor weighs in favor of abstention.

### e.    *Public Policy Interests*

The Court believes the United States has a public policy interest in the treatment of Major Junior hockey players recruited from and playing in the United States. But under this factor, the inquiry is whether extending comity to foreign proceedings would be contrary to the policies of the United States. *Lawson*, 450 F. Supp. 3d at 1076 (citing *Pravin Banker Assocs., Ltd. v. Banco Popular Del Peru*, 109 F.3d 850, 855 (2d Cir. 1997)). As in *Lawson*, the Court here "is satisfied that extending comity to [Canadian courts] would not be contrary to the public policy of the United States." 450 F. Supp. 3d at 1076. "Even when foreign practices may differ from American ones, we will respect those differences so long as the variance does not violate strongly-held state or federal public policy." *Id.* Here, deferring to Canadian antitrust law and the

jurisdiction of Canadian courts in the case of harm suffered by players in Canada does not violate U.S. policy.

Therefore, this factor weighs in favor of abstention.

### 3.      Adequacy of the Foreign Forum

The Court must also determine whether the foreign forum is adequate. In considering the adequacy of the Canadian forum, the Court looks to "(1) whether the judgment was rendered via fraud; (2) whether the judgment was rendered by a competent court utilizing proceedings consistent with civilized jurisprudence; and (3) whether the foreign judgment is prejudicial [and] . . . repugnant to fundamental principles of what is decent and just." *Mujica*, 771 F.3d at 608 (omission in original) (quoting *Belize Telecom, Ltd. v. Gov't of Belize*, 528 F.3d 1298, 1306 (11th Cir. 2008)).

Nothing in the record here indicates that any of the related Canadian litigation has been rendered by or subject to fraud. Second, "there is no question that the Canadian court is a competent court that utilize[s] proceedings consistent with civilized jurisprudence." *Lawson*, 450 F. Supp. 3d at 1078; *see also E&L Consulting, Ltd. v. Doman Indus. Ltd.*, 360 F. Supp. 2d 465, 471 (E.D.N.Y. 2005) (describing CCA as "equivalent" to the Sherman Act); *Paraschos v. YBM Magnex Int'l, Inc.*, 130 F. Supp. 2d 642, 647 (E.D. Pa. 2000) (concluding that "any relief afforded to plaintiffs under Canadian law by the Canadian courts would be adequate, albeit it may differ from any specific relief afforded by this Court" because Canadian law "clearly provides causes of action for securities fraud"). Finally, the prior *Mohr* judgment does not appear to have been prejudicial, and the Court does not find it to be repugnant to fundamental principles of decency and justice.

In *Mohr*, a former WHL player sued the CHL and its member leagues, the NHL, and other related defendants under the CCA, alleging that defendants conspired to impose

"unreasonable terms and conditions"—including depressed wages and the loss of NIL rights—upon players. *See generally* Dkt. No. 136-19. The *Mohr* court determined first that Mohr did not provide "sufficient material facts and particulars" to support his claim as required under the Canadian rules. *Id.* ¶ 28; *see also id.* ¶¶ 29–30. The court went on to determine that Mohr's claim brought under Section 45 of the CCA also failed because defendants were not "competitors . . . with respect to a product" (*id.* ¶ 37), and because the alleged conspiracy did not concern the "production or supply" of the relevant product (as compared to the acquisition of services) (*id.* ¶¶ 46, 48), as required under subsection 45(1) of the CCA. Mohr's claim under Section 48 of the CCA also failed, the court determined, because his alleged "intra-league" agreement did not relate *exclusively* to matters described in subsection 48(1) (i.e., opportunities to play or compete in professional sport and opportunities to negotiate with and play for the team or Club of the players' choice), as the alleged agreements also concerned trading of players to other teams, player benefits, and obligations of players. *See id.* ¶¶ 64, 69–72. Plaintiffs argue that *Mohr* demonstrates that no judicial forum exists in Canada for Plaintiffs to pursue their claims or obtain adequate relief. Dkt. No. 168 at 4.

Plaintiffs further argue that even with post-*Mohr* amendments to the CCA, there is no adequate remedy available to Plaintiffs under Canadian law, because "although the CCA now criminalizes employer conspiracies to 'fix, maintain, decrease or control salaries, wages or terms and conditions of employment' or to make no-poach agreements," it fails "to reach Plaintiffs' core claims of territorial allocation or the operation of Player drafts based on those allocations" or "provide any remedy for past harms to the overwhelming majority of the putative class." Dkt. No. 165 at 7. But the lack of remedy against Defendants in Canada stems from the decisions of the Canadian legislature not to codify particular private rights of action, rather than from the inadequacy of the Canadian legal system. *See Mujica*, 771 F.3d at 614. Like in *Mujica*, where the

Ninth Circuit affirmed abstention even where the Colombian single-recovery rule denied plaintiffs the remedy they sought, the fact that Canada does not offer the remedy sought by Plaintiffs does not render the Canadian legal system inadequate. *See id.*

Therefore, this factor weighs in favor of abstention.

*     *     *

The allegations in the complaint give the Court pause, and the Court believes the United States has an interest in the treatment of Major Junior hockey players recruited from and playing in the United States. However, after considering and weighing the factors as directed by the Ninth Circuit in *Mujica*, the Court finds that the balance tips towards abstention with respect to the remaining claims under the doctrine of international comity.

## IV. CONCLUSION

Accordingly, Defendant NHL's motion is GRANTED, and CHL Defendants' motion is GRANTED. Plaintiffs had the opportunity to amend their complaint when they filed this new case after having their New York Case dismissed, *World Ass'n of Icehockey Players Unions N. Am. Div. v. Nat'l Hockey League*, 2024 WL 4893266, and have not requested an opportunity to amend again here. Therefore, the Court ORDERS as follows:

(1)    Defendant NHL is DISMISSED for lack of personal jurisdiction under Rule 12(b)(2).

(2)    QMJHL Defendants are DISMISSED for lack of personal jurisdiction under Rule 12(b)(2).

(3)    Defendants JAW Hockey Enterprises LP and Saginaw Hockey Club, L.L.C. are DISMISSED for lack of personal jurisdiction under Rule 12(b)(2).

(4)    Plaintiffs' claims arising from injury suffered in Canada, by Players recruited from outside the United States, are DISMISSED under the FTAIA.

(5)    Plaintiffs' remaining claims arising from injury suffered by players in the United States and from injury suffered in Canada by Players recruited from within the United States are DISMISSED under the doctrine of international comity.

(6)    As Plaintiffs had an opportunity to amend their complaint after the dismissal of the New York Case and have not requested leave to amend, the Court DISMISSES the case WITH PREJUDICE.

Dated this 23rd day of May 2025.

Tana Lin
United States District Judge